**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Case No. 25-11563** |
| | § | |
| **WC PARADISE COVE MARINA, LP** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |
| | § | |

### AC VIP PC MARINA DEBT, LLC'S EXPEDITED MOTION FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)

AC VIP PC Marina Debt, LLC ("AC VIP" or "Noteholder"), a secured creditor of the debtor (the "Debtor") in the above-captioned bankruptcy case (the "Bankruptcy Case") and a party in interest in this chapter 11 proceeding, files this motion for relief from the automatic stay pursuant to 11 U.S.C. § 362(d) (the "Motion").

### JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), and (O).

2.      Venue for this case and the Motion are proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The Court may grant the relief requested in this motion pursuant to 11 U.S.C. §§ 105 and 362(d).

## PRELIMINARY STATEMENT

4.    This is the Debtor's second bankruptcy case in two years.[1] In the first case, the Debtor claimed that it just needed time to finalize a sale or a refinancing. The Court denied the Noteholder's request for relief from stay and the Debtor confirmed a chapter 11 plan. That Plan (as defined below) gave the Debtor another 18 months to accomplish a sale or refinancing. That did not occur, the Debtor has now defaulted on the Plan, and despite numerous extensions and forbearance agreements, the Debtor has never been able to complete a sale or refinancing.  As of October 7, 2025, the amount due and owing under the Note was not less than $5,389,596.24, which continues to accrue default interest at a rate of 18% per annum, and fees and costs.

5.    This bankruptcy case bears all the hallmarks of a bad faith filing, and the Court should lift the automatic stay to allow AC VIP to finally foreclose on the Debtor's marina.  The Debtor, which is owned and controlled by Natin Paul, owns a marina and related improvements on Lake Travis, Texas.  AC VIP is the holder of a promissory note made by the Debtor and secured by the Debtor's real property, improvements, and personal property (collectively, the "Property"). In what seems like déjà vu, the Debtor filed for bankruptcy after a duly noticed foreclosure auction had commenced on the steps at the Travis County Courthouse but before the sale could be completed.  The Debtor has had 18 months since the confirmation of the Debtor's prior Plan (and 24 months after filing the first bankruptcy cases) to sell its marina or refinance AC VIP's loan. The Debtor has had every opportunity to do this in the nearly four years since the loan initially matured in **October 2021**.  This time around, the Debtor defaulted on AC VIP's loan by failing to pay AC VIP on or before May 10, 2025, the loan maturity date.  AC VIP agreed to forbearances

---

[1] The Debtor's first bankruptcy case was *In re WC Paradise Cove Marina, LP*, Case No. 23-10731(CGB) (Bankr. W.D. Tex.) (the "Prior Bankruptcy Case"), which was filed on September 4, 2023.

in May, June, July, August, and September to allow the Debtor time to allegedly refinance its debt. The Debtor failed to do so, and the Debtor has not provided AC VIP with any evidence of a supposedly imminent refinancing.[2]  The Debtor is attempting to hold AC VIP hostage after numerous opportunities to take the responsible action and sell or refinance the Property.

6.       By this Motion, AC VIP seeks expedited relief from the automatic stay for cause pursuant to 11 U.S.C. § 362(d)(1), to exercise its rights against the Property.  Cause is a flexible concept and is satisfied by these facts.  The Debtor has had ample time before and after Plan confirmation to sell the Property or obtain alternative financing, is failing to adequately maintain the Property, and filed this case for the sole purpose of stopping a duly noticed foreclosure sale. Default interest and legal fees continue to accrue, and what equity cushion existed continues to diminish.  The Debtor has a single asset encumbered by AC VIP's lien, the Debtor has few, if any, employees, few, if any, unsecured creditors, and as of August 31, 2025, the Debtor had $2,460.32 in its bank account—with other funds having been consistently transferred to other insider entities.

7.       To make matters worse, the Debtor's persistent failure to properly maintain the Property has jeopardized AC VIP's collateral.  Because water levels on Lake Travis fluctuate significantly, the marina must be routinely moved in and out to remain secure and protected.  The Debtor failed to perform these necessary adjustments.  Consequently, when water levels rose during the storms on or about July 4–5, 2025, the marina was not moved inward in accordance with the rising lake level, causing it to become disconnected from land while remaining partially anchored in the middle of the lake.  This prolonged detachment left the marina vulnerable and further demonstrated the Debtor's ongoing neglect.  The failure to adequately maintain and secure

---

[2] Postpetition, on October 11, 2025, VIP Marinas, an affiliate of AC VIP, received a generic inquiry from Alessandro Ciaccio, soliciting potential refinancing for the Debtor.  In reality, there was likely never an imminent refinancing, contrary to the representations made by the Debtor to AC VIP.

17879709

the marina not only threatens its structural integrity but also places at risk its operating permit with the Lower Colorado River Authority ("LCRA").  These are precisely the types of risks AC VIP demonstrated in the prior bankruptcy case.

8.      The Debtor delayed in reconnecting and securing the marina following the July 2025 floods, which allegedly delayed a refinancing.  As of September 2025, the Debtor had still not reconnected and secured the marina, and it was only until AC VIP required the Debtor to retain a reputable repair service that the Debtor did so.

9.      Additionally, between May 1, 2025 and August 31, 2025, the Debtor also made approximately $200,000.00 in transfers to WC South Congress Square LLC, an affiliate of the Debtor while the Debtor was not paying AC VIP default interest and failing to maintain the Property.

10.     Expedited relief is justified because AC VIP believes that its collateral is at risk of further diminution in value, and AC VIP's equity cushion has already diminished.  The Debtor has had more than adequate time to pay AC VIP in full.  Accordingly, AC VIP seeks authority to exercise its rights and protect its collateral by foreclosing as soon as possible.

## BACKGROUND

### A.      The Prepetition Loan and Assignment to AC VIP

11.     On April 23, 2015, the Debtor, as borrower, signed a promissory note in favor of Northwest Federal Credit Union (the "Prior Lender") in the amount of $3,200,000.00 (the "Note," attached hereto as **Exhibit A-1** to the *Declaration of Austin Cameron*, the "Cameron Declaration"). The Cameron Declaration is attached to this Motion as **Exhibit A**. On the same date, the Debtor entered into the Loan and Security Agreement with the Prior Lender (the "Loan Agreement," attached as **Exhibit A-2** to the Cameron Declaration). Also on the same date, the Debtor executed

17879709

a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (the "Deed of Trust," attached as **Exhibit A-3** to the Cameron Declaration) granting the Prior Lender a security interest and lien in the Property. The Deed of Trust was filed contemporaneously in the official public records of Travis County, Texas. The Prior Lender filed a UCC Financing Statement as a fixture filing under Clerk's File No. 2015074141 in the Official Public Records of Travis County, Texas on or about May 13, 2015, as continued by the UCC Financing Statement Amendment, filed under Clerk's File No. 2019186897 in the Official Public Records of Travis County, Texas on or about November 26, 2019 (collectively, the "UCC Financing Statements"). The obligations under the Note, Loan Agreement, Deed of Trust, UCC Financing Statements are guaranteed by Natin Paul and Crestone Property Group, LLC ("Crestone" and together with Natin Paul, the "Guarantors").

12. Thereafter, on February 25, 2022, Austin Cameron and Jenny Cameron (collectively, "Cameron") purchased the Loan Agreement, the Note and all other "Loan Documents" (as defined in the Loan Agreement), and all indebtedness arising under the Loan Agreement, and all liens and security interests securing such indebtedness, including the Deed of Trust, from the Prior Lender, and in connection therewith, the Prior Lender assigned the Deed of Trust to Cameron pursuant to the Assignment of Deed of Trust (the "Cameron Assignment," attached as **Exhibit A-4** to the Cameron Declaration).[3]

13. On March 16, 2022, Cameron further assigned the Loan Agreement, the Note and all other "Loan Documents" (as defined in the Loan Agreement), and all indebtedness arising under the Loan Agreement, and all liens and security interests securing such indebtedness, including the Deed of Trust, to AC VIP, and in connection therewith, Cameron assigned the Deed

---

[3] The UCC Financing Statements were assigned to AC VIP by the UCC Financing Statement Amendment, filed with the County Clerk, Travis County, Texas (Filing No. 2022083111) on or about May 6, 2022, as modified by the Plan. On or about May 30, 2025, AC VIP filed a UCC Financing Statement with the Texas Secretary of State (Filing No. 25-0026363805) on or about May 30, 2025.

17879709

of Trust to AC VIP pursuant to a further Assignment of Deed of Trust (the "AC VIP Assignment," and together with the Loan Agreement, the Note, the Deed of Trust, and Cameron Assignment, the "Loan Documents," attached as **Exhibit A-5** to the Cameron Declaration).

**B.      Prior Prepetition Maturity, Default, and Substitute Trustee's Sale**

14.      The Note's maturity date was October 23, 2021, and remains due and payable.[4]

15.      On December 30, 2021, William H. Casterline, Jr. PLLC, counsel to the Prior Lender, sent a Notice of Default to the Debtor and related parties (the "Initial Demand"), stating that the Note matured on October 23, 2021 and demanding payment in full.  Following its purchase of the Loan Agreement, the Note and the other Loan Documents, on May 16, 2022, AC VIP sent a Notice of Assignment of Loan to the Debtor and related parties advising them of the assignment of the Loan Agreement, the Note and the other Loan Documents by the Prior Lender to AC VIP (the "Notice of Assignment" attached as **Exhibit A-6**).

16.      Thereafter, after many communications by AC VIP with the Debtor attempting to resolve the Debtor's failure to repay the Note, on August 4, 2023, AC VIP sent a formal Demand for Payment to the Debtor and related parties (the "AC VIP Demand"), demanding payment and providing notice that the Note had matured by its terms pursuant to the Loan Documents.  As set forth in the AC VIP Demand, pursuant to the terms of the Loan Agreement, as a result of the Debtor's failure to repay the Note on the maturity date, interest was accruing (and continues to accrue) at a default interest rate of 18% per annum. Moreover, the AC VIP Demand noted that, as of August 1, 2023, the aggregate amounts owed to AC VIP was not less than $4,069,199.49.

---

[4] The Note originally was set to mature on April 23, 2021. Pursuant to the Agreement for Modification, Amortization, or Extension of a Note, dated June 22, 2021, the maturity date was extended to October 23, 2021.

17879709

17.     The AC VIP Demand requested payment in full of $4,069,199.49 (including all lawful and unpaid interest) on or before 5:00 p.m. (prevailing Central Time) on August 11, 2023. In addition, the AC VIP Demand specified that if this amount was not received by AC VIP by this time, it intended to commence nonjudicial proceedings to foreclose the liens and security interests existing under the Deed of Trust and the Loan Agreement.  The Debtor failed to pay the past due amounts owed to AC VIP.

18.     On August 14, 2023, AC VIP provided the Debtor with Notice of Substitute Trustee's Sale, which was set to commence at 10:00 a.m. at the county courthouse in Austin, Travis County, Texas.

## C.     The Prior Bankruptcy Case

19.     Late on September 4, 2023, the day before the scheduled foreclosure sale, the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The case was entitled *In re WC Paradise Cove Marina, LP*, Case No. 23-10731(CGB) (Bankr. W.D. Tex.) (the "Prior Bankruptcy Case").  As of September 4, 2023, the amount due under the Note was in excess of $4,125,000.

20.     The same issues have continued to plague the Property that existed in the Prior Bankruptcy Case.  The Property is in disrepair and has been neglected by the Debtor.  In the Prior Bankruptcy Case, the Debtor also allowed insurance on the Property to lapse.  The Court allowed the Debtor to get adequate insurance in place.

21.     During the course of the Prior Bankruptcy Case, the Debtor and AC VIP negotiated a consensual plan of reorganization [Docket No. 126] ("Plan"), which was confirmed by the Bankruptcy Court on April 2, 2024 [Docket No. 133].  The Plan provided that the Debtor would make monthly interest payments of 12% regular interest until the new maturity date on May 10,

17879709

2025.  *See* Plan at 16.  The Plan specified that the Debtor would either sell or refinance the Property in order to pay AC VIP in full on or before the Maturity Date (as defined in the Plan).

**D.      Post-Bankruptcy Maturity, Default, and Substitute Trustee's Sale**

22.      The Debtor failed to make payment in full of the outstanding amount of the Note on the maturity date set forth in the Plan, and the Note has continued to accrue default interest, fees, and costs.  The Debtor represented to AC VIP that it was refinancing its debt.  The Debtor has had years to refinance the Note but has failed to do so, even when this Court gave the Debtor an *extra year* to sell or refinance the Note under the Plan. The Debtor's defaults under the Note, the Plan, and the other Loan Documents are continuing and are outside the applicable cure period.

23.      On May 12, 2025, AC VIP sent a (the "<u>Notice of Default</u>" attached as **<u>Exhibit A-7</u>** to the Cameron Declaration) demanding payment and providing notice that the Note had matured by its terms pursuant to the Loan Documents.

24.      On May 12, 2025, AC VIP posted its Notice of Substitute Trustee's Sale with the County Clerk of Travis County Texas evidencing AC VIP's intent to conduct a foreclosure sale of the Property on June 3, 2025.  On May 13, 2025, AC VIP delivered notice of the foreclosure sale attaching the Notice of Substitute Trustee's Sale to the Debtor and Guarantors.

25.      On June 2, 2025, AC VIP, the Debtor, and the Guarantors entered into a Limited Forbearance Agreement dated June 2, 2025 (the "<u>First LFA</u>") under which AC VIP agreed, amongst other things, to forbear from foreclosing on the Property (but not posting for foreclosure) until 2:00 p.m. (Dallas, Texas time) on June 30, 2025.

26.      On June 10, 2025, AC VIP posted its Notice of Substitute Trustee's Sale with the County Clerk of Travis County Texas evidencing AC VIP's intent to conduct a foreclosure sale of

17879709

the Property on July 1, 2025.  On June 10, 2025, AC VIP delivered notice of the foreclosure sale attaching the Notice of Substitute Trustee's Sale to the Debtor and Guarantors.

27.     On June 30, 2025, AC VIP, the Debtor, and the Guarantors entered into a Limited Forbearance Agreement dated June 30, 2025 (the "Second LFA") under which AC VIP agreed, amongst other things, to forbear from foreclosing on the Property (but not posting for foreclosure) until 2:00 p.m. (Dallas, Texas time) on August 1, 2025.

28.     On July 10, 2025, AC VIP posted its Notice of Substitute Trustee's Sale with the County Clerk of Travis County Texas evidencing AC VIP's intent to conduct a foreclosure sale of the Property on August 5, 2025.  On July 11, 2025, AC VIP delivered notice of the foreclosure sale attaching the Notice of Substitute Trustee's Sale to the Debtor and Guarantors.

29.     On August 1, 2025, AC VIP, the Debtor, and the Guarantors entered into a Limited Forbearance Agreement dated August 1, 2025 (the "Third LFA") under which AC VIP agreed, amongst other things, to forbear from foreclosing on the Property (but not posting for foreclosure) until 2:00 p.m. (Dallas, Texas time) on August 29, 2025.  As of the date of the Third LFA, the Debtor had not made material progress to reconnect and secure the marina, which was floating in the middle of Lake Travis.  The Debtor represented, warranted, and covenanted that,

> the repairs to the Property occurring or in progress as of the date of this Agreement have been to date and will until completion be performed in a good and workmanlike manner, in strict accordance with applicable laws, rules, regulations and ordinances, in substantial conformance with any and all approved and/or permitted plans and specifications, and in a lien free manner. All marina anchoring will be at least 10,000-pound anchoring per anchor and using 5/8" galvanized steel cable, unless professionally advised otherwise in which case Borrower will notify Lender.

Third LFA, § 2.3.

30.     On August 8, 2025, AC VIP posted its Notice of Substitute Trustee's Sale with the County Clerk of Travis County Texas evidencing AC VIP's intent to conduct a foreclosure sale of

17879709

the Property on September 2, 2025. On August 11, 2025, AC VIP delivered notice of the foreclosure sale attaching the Notice of Substitute Trustee's Sale to the Debtor and Guarantors.

31. On September 1, 2025, AC VIP, the Debtor, and the Guarantors entered into a Limited Forbearance Agreement (the "Fourth LFA" attached to the Cameron Declaration as **Exhibit A-8** and together with the First LFA, Second LFA, and Third LFA, the "Limited Forbearance Agreements") dated September 1, 2025 under which AC VIP agreed, amongst other things, to forbear from foreclosing on the Property (but not posting for foreclosure) until 2:00 p.m. (Dallas, Texas time) on October 2, 2025. The Fourth LFA included the requirement that the Debtor fund a deposit for marina repairs with a contractor approved by AC VIP to reconnect and secure the marina because the Debtor had failed to do so following the July 4-5, 2025 floods in Central Texas.

32. On September 12, 2025, AC VIP posted its Notice of Substitute Trustee's Sale with the County Clerk of Travis County Texas evidencing AC VIP's intent to conduct a foreclosure sale of the Property on October 7, 2025. On September 12, 2025, AC VIP delivered notice (attached to the Cameron Declaration as **Exhibit A-9**) of the foreclosure sale attaching the Notice of Substitute Trustee's Sale to the Debtor and Guarantors.

33. As of October 3, 2025, AC VIP had not received any information from the Debtor supporting a likelihood of refinancing of the indebtedness under the Note, despite the Debtor's repeated assurances that refinancing was imminent. On May 7, 2025, the Debtor conveyed to AC VIP that it had a refinancing closing date of May 31. They then told AC VIP that the supposed title company required an updated survey, extending the closing date into July. Then the July 4-5 floods hit, and the Debtor claimed that the supposed lender required the marina to be reconnected to land in advance of providing refinancing. The marina was reconnected in September, and on

10

17879709

October 3, the Debtor told AC VIP it would send documents in support of refinancing. It never did. AC VIP notified the Debtor that it would not enter into another forbearance agreement and that it intended to proceed with the scheduled foreclosure on October 7, 2025.

34.     In each of the Limited Forbearance Agreements, the Debtor and the Guarantors acknowledged and agreed that Debtor was in payment default under the Note, Loan Agreement, and Deed of Trust and waived notice of foreclosure on any collateral and all other notices. *See* Fourth LFA, § 1.2. In each of the Limited Forbearance Agreements, the Debtor and the Guarantors "hereby acknowledge, ratify, reaffirm and agree that each of the Loan Documents and the first priority, perfected liens and security interests created thereby in favor of [AC VIP] in the Collateral, are and shall remain in full force and effect and binding on [the Debtor] and each other Obligor and are enforceable in accordance with their respective terms and applicable law." *Id.*, § 2.6. The Debtor and Guarantors further acknowledged the amount of the indebtedness, subject to change for any legal fees, costs and expenses incurred by AC VIP with respect to the Limited Forbearance Agreement, the Loan Documents, or the exercise of AC VIP's rights and remedies after the date of the Limited Forbearance Agreement. *Id.*, § 2.2(c). They also agreed that all amounts owed under the Note, the obligations under the Loan Documents (as defined in the Limited Forbearance Agreement) and the Plan would accrue interest at a rate of 18% per annum. *Id.*, § 2.2(h).

35.     As of October 7, 2025, the amount due and owing under the Note was not less than $5,389,596.24, which continues to accrue default interest at a rate of 18% per annum, and fees and costs. The equity cushion that existed in the Prior Bankruptcy Case has been eroded, and the Debtor filed this bankruptcy case solely to stave off foreclosure to continue to hold AC VIP and its collateral hostage.

17879709

36.     Insurance on the Property will be up for renewal in November 2025, and given the amount of cash the Debtor had on hand as of August 31, 2025, the Debtor will have insufficient cash to make the necessary insurance payment.

37.     On October 11, 2025, VIP Marinas, an affiliate of AC VIP, received an email from Alessandro Ciaccio, the CEO of Global Private Investors, inquiring whether VIP Marinas provided marina financing, providing information for the refinancing of AC VIP's loan to the Debtor.  The email and attached brochure are attached hereto as **Exhibit B**.  The email states, "We are seeking $7 million and need a minimum of $5.3 million as that is the amount of the outstanding debt.  This indicates that the Debtor did not have refinancing when it represented to AC VIP on or about October 3, 2025 that it did and that it would send documents in support of refinancing.  After years to sell, refinance, or allow AC VIP to foreclose on the Property, the Debtor is still attempting to string AC VIP along when there is no real possibility of a sale or refinancing.  The Court should lift the automatic stay to allow AC VIP to foreclose on the Property.

## RELIEF REQUESTED

38.     Pursuant to 11 U.S.C. § 362(d)(1), the automatic stay as to the Property should be lifted for cause.  The Debtor is trying to take another bite at the proverbial apple, but it is clear their intent is simply to delay and frustrate AC VIP's efforts to recover what it is rightfully owed since May 2023.  After extending every courtesy to the Debtor to refinance or sell the Property as it had promised to do before May 10, 2025, the Debtor has reneged on its commitment both to this Court and to AC VIP.

39.     "Cause" is not defined in Section 362(d)(1), but courts have interpreted it as inherently broad and flexible.  *See, e.g., In re Tex. State Optical, Inc.*, 188 B.R. 552, 556 (Bankr. E.D. Tex. 1995) ("[C]ause is an intentionally broad and flexible concept that permits the

Bankruptcy Court, as a court of equity, to respond to inherently fact-sensitive situations.").[5] Section 362(d)(1) provides flexibility to a creditor seeking relief from the automatic stay because "it has no requirement that the debtor not have equity in the property." *In re Valdez*, 324 B.R. 296, 301 (Bankr. S.D. Tex. 2005). Thus, filing a bankruptcy petition solely to forestall creditors can be an independent form of relief under section 362(d)(1). *Id.* at 302. It is axiomatic that a "good faith" standard is required as part of any bankruptcy case. *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986). A lack of good faith is a basis for the bankruptcy court to lift the automatic stay under 11 U.S.C. § 362(d)(1).

40.     Cause exists to lift the automatic stay because the Debtor filed this case in bad faith for the sole purpose of stalling the foreclosure proceeding that was scheduled the day after the petition date. A party opposing relief from the automatic stay has the burden of proof on all issues other than the issue of the debtor's equity in property. 11 U.S.C. § 362(g). Accordingly, the Debtor bears the burden of proof of showing that its bankruptcy filing was made in good faith. *See In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2005); *In re Sherwood Enters., Inc.*, 112 B.R. 165, 170-71 (Bankr. S.D. Tex. 1989). The Debtor has had every opportunity to refinance the indebtedness under the Note but has failed to do so in the *18 months* since the Plan was confirmed. In reality, the Debtor has no real intent or ability to pay off AC VIP.

41.     There is no particular test to determine whether a bankruptcy case has been filed in bad faith, and the determination of whether a case was filed in bad faith "depends largely upon the

---

[5] In determining whether cause exists under 362(d)(1), courts generally look to a number of factors, including (i) interference with the bankruptcy case, (ii) good or bad faith of the debtor, (iii) injury to the movant if the stay is not lifted, (iv) any injury to the debtors or other creditors if the stay is modified; and (v) the proportionality of the harms from modifying or continuing the stay. *See In re Mosher*, 578 B.R. 765, 772 (Bankruptcy S.D. Tex. 2017). No single factor is outcome determinative; each must be weighed within the context of all relevant circumstances and not all factors are relevant in every case. *Id.* In considering these factors, a reviewing court may use its discretion to assess only those which are most relevant. *Id.* at 773.

bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities." *Little Creek*, 779 F.2d at 1072. The Fifth Circuit created a list of non-exclusive factors to provide bankruptcy courts guidance in analyzing the debtor's bad faith motivation: (1) the debtor has one asset, such as a tract of undeveloped or developed real property; (2) the secured creditors' lien encumbers this tract; (3) the debtor has no employees other than principals; (4) the debtor has little or no cash flow; (5) the debtor has no available sources of income to sustain a plan of reorganization or to make adequate protection payments; (6) the debtor has only a few, if any, unsecured creditors whose claims are relatively small; and (7) the property has been posted for foreclosure. *Id*. at 1073.

42. Significantly, this is not a case where a secured lender seeks to foreclose after a single missed payment or a non-monetary default. The Debtor has completely ignored its obligations under the Note and the Plan, which the Debtor agreed to during its Prior Bankruptcy Case. Before the Prior Bankruptcy Case, the Debtor had not made a payment since the Note had matured in 2021. The Debtor failed to pay AC VIP in full on the Maturity Date (as defined in the Plan). The Debtor committed that the amount owed to AC VIP would be "paid from cash proceeds from the Refinancing or Sale of all or a portion of the Property on or before the Maturity Date." Plan at 16. The Debtor was provided an additional five months to pay AC VIP in full, all while default interest continued to accrue, but the Debtor failed to do so.

43. AC VIP requested support for a refinancing that Debtor represented is in process, but AC VIP never received any documentation in support of a refinancing. The Debtor has supposedly been refinancing since May 2025. It is also AC VIP's understanding that the Debtor has never attempted to market and sell the Property despite ample time to do so. The email

attached hereto as Exhibit 2 indicates that the Debtor is still searching for financing, despite representations to the contrary. *See* Exhibit 2.

44.     Almost all of the *Little Creek* factors are applicable here. Namely, the Debtor has (1) one asset—the Property; (2) the Property is subject to AC VIP's lien, (3) the Debtor has few, if any, unsecured creditors; (4) the Property was posted for foreclosure; (5) the Debtor has very few employees; and (6) the Debtor does not have available sources of funds to make adequate protection payments.

45.     **Multiple Filings**.  The Debtor's multiple bankruptcy filings are indicative of bad faith, especially because both cases were filed on the eve of foreclosure with a clear intent to frustrate the rights of AC VIP. The Debtors also failed to perform under the Plan in the Prior Bankruptcy Case.  "When debtors have exhibited a lack of effort in their bankruptcy proceedings and have instead engaged in serial filings to thwart the efforts of secured creditors exercising their rights under state law, courts have found that these serial filings are evidence of bad faith and abuse of the bankruptcy process."  *In re McKenzie*, Case No. 19-10130, 2019 Bankr. LEXIS 907, at *7 (Bankr. S.D.N.Y. Mar. 25, 2019); *In re Cusano*, 431 B.R. 726, 735 (B.A.P. 6th Cir. 2010) ("While multiple filings are not, in and of themselves, improper or indicative of bad faith, a history of multiple filings and dismissals may be construed as bad faith.") (citing *In re Glenn*, 288 B.R. 516, 520 (Bankr. E.D. Tenn. 2002)).  Filings on the eve of foreclosure are probative of bad faith.  *See Glenn*, 288 B.R. at 520 (citing *In re Falotico*, 231 B.R. 35, 40 (Bankr. D.N.J. 1999)).

46.     "Where a debtor requests Chapter 11 relief for a second time, the good faith inquiry must focus on whether the second petition was filed to contradict the initial bankruptcy proceeding."  *In re Elmwood Dev. Co.*, 964 F.2d 508, 511 (5th Cir. 1992).  Likewise, a second bankruptcy filing filed with the intent of modifying a previously confirmed and substantially

contemplated plan in violation of 11 U.S.C. § 1127(b) is filed in bad faith and should be dismissed. *See In re SC SJ Holdings LLC*, 2025 Bankr. LEXIS 174, at *13 (Bankr. D. Del. Jan. 30, 2025) (citing *In re Northampton Corp.*, 39 B.R. 955, 956 (Bankr. E.D. Pa. 1984)).  In *Northampton*, the Court observed that "filing of a chapter 11 petition, with an eye toward curing defaults arising under a previously confirmed chapter 11 plan, is so akin to modifying the previous plan … that the filing of a new Chapter 11 petition is deemed an attempted modification under [section 1127(b)]." *Northampton*, 39 B.R. at 957.  Chapter 11 proceedings filed with that purpose in mind are dismissed or converted for cause. *Id.*  The Debtor's sole purpose in filing this bankruptcy case is to modify the terms of AC VIP's loan to the Debtor, which continued under the terms of the Plan and Confirmation Order.  The Debtor should not be allowed to act in contravention of section 1127(b) by pursuing a second bankruptcy case for the purpose of modifying the terms of the Plan in the Prior Bankruptcy Case.

47.     **The Property is the Debtor's only significant asset.** The Debtor's only significant asset is the Property, which consists of a marina on Lake Travis that is in poor condition.  The Debtor filed this case as a single asset real estate case.  *See* Docket No. 1.

48.     **The Property is subject to AC VIP's lien**.  As the Debtor has agreed and acknowledged, and as Exhibit A-8 demonstrates, the Property is encumbered by AC VIP's first priority, perfected liens and security interests, which secure not less than $5,398,821.24 owed to AC VIP under the Note and the Plan as of the Petition Date.

49.     **The Debtor has few, if any, unsecured creditors**.  The list of creditors the Debtor filed on October 7, 2025 lists 13 entities, including AC VIP, under the "Unsecured Creditors/Interested Parties" category but does not specify the amount of their claims. [Docket No.

17879709

3].  On information and belief, none of these creditors has large claims, and some of them may have no claim at all, against the Debtor's estate.

50.     **The Property was posted for foreclosure**.  AC VIP posted for foreclosure on May 12, 2025, June 10, 2025, July 10, 2025, August 8, 2025, and September 12, 2025.  The Debtor's last-minute filing—while the foreclosure auction was under way on October 7—demonstrates the Debtor's gamesmanship. Filing bankruptcy for the sole purpose of postponing foreclosure is an example of bad faith conduct.  *See Glenn*, 288 B.R. at 520 (citing *In re Falotico*, 231 B.R. 35, 40 (Bankr. D.N.J. 1999)); *In re McGittigan*, Civil Action No. 95-1612, 1996 U.S. Dist. LEXIS 5592 (E.D. La. April 17, 1996) (finding a bad faith filing where debtors filed first bankruptcy to block sheriff's sale, defaulted on the same note after closure of the first case, and filed again to forestall second sheriff's sale).

51.     **The Debtor has very few employees**.  On information and belief, the Debtor has very few employees at the marina.

52.     **The Debtor does not have available sources of funds to sustain a plan of reorganization or make adequate protection payments**.  The ending balance of the Debtor's bank account for August 2025 was $2,460.32. *See* **Exhibit C**.  As of May 31, 2025, the month in which the Debtor made its last interest-only payment to AC VIP, it had an ending balance of $14,190.69.  Instead of paying AC VIP, the Debtor has transferred nearly $200,000 in funds between May 2025 and August 2025 to WC South Congress Square, LLC, a Delaware limited liability company believed to be affiliated with the Debtor.[6]

---

[6] The Transfers in the last four months to WC South Congress Square were:
    May 20, 2025 - $9,000.00
    June 18, 2025 - $20,000.00
    July 3, 2025 - $65,000.00
    August 5, 2025 - $100,000

17879709

53.     Based on the amount of cash the Debtor has on hand, it is unlikely that the Debtor will be able to make adequate protection payments, fund a plan, or pay its insurance renewal payment that is due in or about November 2025, creating the same risks that existed in the Prior Bankruptcy Case.  AC VIP's collateral is repeatedly jeopardized by the Debtor, and the Debtor is allowed to continue limping along with impunity.  Additionally, the Property still requires repairs and ongoing maintenance, which are being neglected.

54.     Finally, as a result of the damage to the Property and the ongoing accrual of default interest, any equity cushion that existed has been eroded.  The Travis Central Appraisal District, Travis County, Texas appraised the value of the Property as $2,457,831.00.  *See* **Exhibit D** attached hereto.

55.     Accordingly, cause exists to lift the stay under Section 362(d)(1) to allow AC VIP to complete its foreclosure sale.

WHEREFORE, AC VIP respectfully requests that the Court enter an order substantially in the form attached hereto as **Exhibit E** modifying and lifting the automatic stay in order to permit AC VIP to foreclose on the Property; and (ii) granting such other and further relief as may be just and proper.

17879709

Dated: October 14, 2025.

Respectfully submitted,

**PORTER HEDGES LLP**

*/s/ Eric M. English*
Eric M. English (TX 24062714)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Fax: (713) 226-6248
eenglish@porterhedges.com

*Counsel for AC VIP PC*
*Marina Debt, LLC*

17879709

**<u>CERTIFICATE OF CONFERENCE</u>**

I certify that on October 13, 2025, I conferred with counsel for the Debtor via email regarding the Motion. Debtors' counsel has indicated that they oppose the Motion and expedited consideration.

*/s/ Michael B. Dearman*
Michael B. Dearman

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a true and correct copy of the foregoing document will be mailed by United States first-class mail, postage prepaid on October 14, 2025, to Debtors' counsel at the address listed below and to the parties on the attached matrix and by electronic mail through the Court's ECF system to all parties who have registered an appearance in this a case.

Ron Satija
rsatija@haywardfirm.com
7600 Burnet Road, Ste. 530
Austin, Texas 78757

*/s/ Eric M. English*
Eric M. English

17879709

## SERVICE LIST

**Debtor**
WC Paradise Cove, LP
814 Lavaca Street
Austin, TX 78701

**Secured Parties**

AC VIP PC Marina Debt,

LLC,
c/o Porter Hedges LLP
Eric M. English
1000 Main Street, 36th
Floor
Houston, TX 77002

**Unsecured
Creditors/Interested
Parties**
City of Austin
PO Box 2267
Austin, TX 78783

Zakree Parks Chapman
610 Rolling Brook Lance
Cedar Park, TX 78613

Good Guard Security
21622 Plummer St
Los Angeles, CA 91311

Travis County WCID #17
3812 Eck Lane
Austin, TX 78734

Lower Colorado River
Authority (LCRA)
P.O. Box 301142
Dallas, TX 75303

Spectrum Business
1912 Western Justice
Leander, TX 78641

Spillar Lakefront Services
LLC
PO Box 60074
City of Industry, CA 91716

Texas Disposal Systems
PO Box 660816
Dallas, TX 75266

Prime Dock Supplies
5115 Hudson Ben Road
Austin, TX 78734

Reliable Boat Sales
PO Box 5466
Lago Vista, TX 76845

AC VIP Marina Debt
1119 Marina Point Drive
Strawn, TX 76475

Marina Association of
Texas
P.O. Box 490
La Vernia, TX 78121

Webself Storage
(EMOVE)
2727 N. Central Ave.
Phoenix, AZ 85004