## Exhibit A-1

**Cameron Declaration**

14165918

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Case No. 25-11563** |
| | § | |
| **WC PARADISE COVE MARINA, LP** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |
| | § | |

## DECLARATION OF AUSTIN CAMERON

I, Austin Cameron, declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the following is true and correct:

1.     My name is Austin Cameron. I am over the age of 18, and I am of sound mind and capable of making this declaration. I have personal knowledge of the facts stated herein, and every statement contained herein is true and correct.

2.     I am Manager of AC VIP PC Marina Debt, LLC ("AC VIP"),[1] a Texas limited liability company. In this capacity, I am generally familiar with AC VIP's operations, businesses, financial affairs, and books and records, including regarding the regarding the Note and other Loan Documents. I am also one of the custodians of the books, records, and files of AC VIP. I have personally worked on AC VIP's books, records, and files, and, as to the following facts, I know them to be true and correct to the best of my knowledge and have gained knowledge of them from AC VIP's books, records, and files.

3.     On April 23, 2015, the Debtor, as borrower, signed a promissory note in favor of Northwest Federal Credit Union (the "Prior Lender") in the amount of $3,200,000.00 (the "Note," attached hereto as **Exhibit A-1**). On the same date, the Debtor entered into the Loan and Security

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

14165918

Agreement with the Prior Lender (the "Loan Agreement," attached hereto as **Exhibit A-2**). On April 23, 2015, the Debtor executed a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (the "Deed of Trust," attached hereto as **Exhibit A-3**) granting the Prior Lender a security interest in the Property, and that the Deed of Trust was filed timely in the official public records of Travis County, Texas.

4.    On February 25, 2022, the Prior Lender assigned the Deed of Trust pursuant to the Assignment of Deed of Trust to Jenny Cameron and myself (the "Cameron Assignment", attached hereto as **Exhibit A-4**).

5.    On March 16, 2022, Cameron assigned the Deed of Trust pursuant to a further Assignment of Deed of Trust to AC VIP (the "AC VIP Assignment," and together with the Loan Agreement, Deed of Trust, and Cameron Assignment, the "Loan Documents"), which is attached hereto as **Exhibit A-5**.

6.    I have reviewed the Loan Documents.

7.    The Note's original maturity date was October 23, 2021.[2]

8.    On December 30, 2021, William H. Casterline, Jr. PLLC, counsel to the Prior Lender, sent a Notice of Default to the Debtor and related parties (the "Initial Demand"), stating that the Note matured on October 23, 2021 and demanding payment in full. Following its purchase of the Loan Agreement, the Note and the other Loan Documents, on May 16, 2022, AC VIP sent a Notice of Assignment of Loan to the Debtor and related parties advising them of the assignment of the Loan Agreement, the Note and the other Loan Documents by the Prior Lender to AC VIP (the "Notice of Assignment"). Thereafter, after many communications by AC VIP with the Debtor attempting to resolve the Debtor's failure to repay the Note, on August 4, 2023, AC VIP sent a

---

[2] The Note originally was set to mature on April 23, 2021. Pursuant to the Agreement for Modification, Amortization, or Extension of a Note, dated June 22, 2021, the maturity date was extended to October 23, 2021.

Demand for Payment to the Debtor and related parties (the "AC VIP Demand"), demanding payment and providing notice that the Note had matured by its terms pursuant to the Loan Documents. As set forth in the AC VIP Demand, pursuant to the terms of the Loan Agreement, as a result of the Debtor's default, interest was accruing (and continues to accrue) at a default interest rate of 18% per annum. Moreover, the AC VIP Demand noted that as of August 1, 2023, the aggregate amounts owed to AC VIP was not less than $4,069,199.49.

9.      The AC VIP Demand requested payment in full of $4,069,199.49 (including all lawful and unpaid interest) on or before 5:00 p.m. (prevailing Central Time) on August 11, 2023. In addition, the AC VIP Demand specified that if this amount was not received by AC VIP by this time, it intended to commence nonjudicial proceedings to foreclose the liens and security interests existing under the Deed of Trust and the Loan Agreement.

10.     As of 5:00 p.m. (prevailing Central Time) on August 11, 2023, the Debtor did not pay any of the past due amounts owed to AC VIP.

11.     Accordingly, on August 14, 2023, AC VIP provided the Debtor with Notice of Substitute Trustee's Sale, which was set to commence at 10:00 a.m. at the county courthouse in Austin, Travis County, Texas.

12.     Late on September 4, 2023, the day before the scheduled foreclosure sale, the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, which initiated *In re WC Paradise Cove Marina, LP*, Case No. 23-10731(CGB) (Bankr. W.D. Tex.) (the "Prior Bankruptcy Case").

13.     During the course of the Prior Bankruptcy Case, the Debtor and AC VIP negotiated a consensual plan of reorganization [Case No. 23-10731, Docket No. 126] ("Plan"), which was confirmed by the Bankruptcy Court on April 2, 2024 [Case No. 23-10731, Docket No. 133].  The

Plan provided that the Debtor would make monthly interest payments of 12% regular interest until the new maturity date on May 10, 2025. *See* Plan at 16. The Plan specified that the Debtor would either sell or refinance the Property in order to pay AC VIP in full on or before the Maturity Date (as defined in the Plan).

14.     The Debtor failed to make payment in full of the outstanding amount of the Note on the Maturity Date, and the Note has continued to accrue default interest, fees, and costs.

15.     On May 12, 2025, AC VIP sent a (the "Notice of Default" attached as **Exhibit A-6** to the Cameron Declaration) demanding payment and providing notice that the Note had matured by its terms pursuant to the Loan Documents.

16.     On May 12, 2025, AC VIP posted its Notice of Substitute Trustee's Sale with the County Clerk of Travis County Texas evidencing AC VIP's intent to conduct a foreclosure sale of the Property on June 3, 2025. On May 13, 2025, AC VIP delivered notice of the foreclosure sale attaching the Notice of Substitute Trustee's Sale to the Debtor and Guarantors.

17.     On June 2, 2025, AC VIP, the Debtor, and the Guarantors entered into a Limited Forbearance Agreement dated June 2, 2025 (the "First LFA") under which AC VIP agreed, amongst other things, to forbear from foreclosing on the Property (but not posting for foreclosure) until 2:00 p.m. (Dallas, Texas time) on June 30, 2025.

18.     On June 10, 2025, AC VIP posted its Notice of Substitute Trustee's Sale with the County Clerk of Travis County Texas evidencing AC VIP's intent to conduct a foreclosure sale of the Property on July 1, 2025. On June 10, 2025, AC VIP delivered notice of the foreclosure sale attaching the Notice of Substitute Trustee's Sale to the Debtor and Guarantors.

19.     On June 30, 2025, AC VIP, the Debtor, and the Guarantors entered into a Limited Forbearance Agreement dated June 30, 2025 (the "Second LFA") under which AC VIP agreed,

amongst other things, to forbear from foreclosing on the Property (but not posting for foreclosure) until 2:00 p.m. (Dallas, Texas time) on August 1, 2025.

20.     On July 10, 2025, AC VIP posted its Notice of Substitute Trustee's Sale with the County Clerk of Travis County Texas evidencing AC VIP's intent to conduct a foreclosure sale of the Property on August 5, 2025.  On July 11, 2025, AC VIP delivered notice of the foreclosure sale attaching the Notice of Substitute Trustee's Sale to the Debtor and Guarantors.

21.     On August 1, 2025, AC VIP, the Debtor, and the Guarantors entered into a Limited Forbearance Agreement dated August 1, 2025 (the "Third LFA") under which AC VIP agreed, amongst other things, to forbear from foreclosing on the Property (but not posting for foreclosure) until 2:00 p.m. (Dallas, Texas time) on August 29, 2025.  As of the date of the Third LFA, the Debtor had not made material progress on repairing the marina, which was floating in the middle of Lake Travis.

22.     On August 8, 2025, AC VIP posted its Notice of Substitute Trustee's Sale with the County Clerk of Travis County Texas evidencing AC VIP's intent to conduct a foreclosure sale of the Property on September 2, 2025.  On August 11, 2025, AC VIP delivered notice of the foreclosure sale attaching the Notice of Substitute Trustee's Sale to the Debtor and Guarantors.

23.     On September 1, 2025, AC VIP, the Debtor, and the Guarantors entered into a Limited Forbearance Agreement (the "Fourth LFA" attached hereto as **Exhibit A-7** and together with the First LFA, Second LFA, and Third LFA, the "Limited Forbearance Agreements") dated September 1, 2025 under which AC VIP agreed, amongst other things, to forbear from foreclosing on the Property (but not posting for foreclosure) until 2:00 p.m. (Dallas, Texas time) on October 2, 2025.  The Fourth LFA included the requirement that the Debtor fund a deposit for marina

repairs to a repair company approved by AC VIP because the Debtor had failed to make necessary repairs to the marina caused by the July 4-5, 2025 floods in Central Texas.

24.     On September 12, 2025, AC VIP posted its Notice of Substitute Trustee's Sale  with the County Clerk of Travis County Texas evidencing AC VIP's intent to conduct a foreclosure sale of the Property on October 7, 2025.  On September 12, 2025, AC VIP delivered notice of the foreclosure sale attaching the Notice of Substitute Trustee's Sale to the Debtor and Guarantors (the "Notice of Substitute Trustee's Sale" attached hereto as **Exhibit A-8**).

25.     As of the Petition Date, the amount due under the Note was not less than $5,398,821.24.

| | |
|---|---|
| Final Order Loan Balance | $4,860,638.40 |
| Interest @ 12% 5/1-5/10/25 | $16,202.13 |
| Agreed Default Fee w/ Lender Concession 5/11/25 | $97,157.08 |
| Legal Fees and expenses as of 10/7/25 | $61,499.01 |
| New Principal Balance 5/11/25 | $4,876,840.53 |
| Interest @18% 5/11-10/7/2025 | $363,324.62 |
| **Balance as of 10/7/2025** | **$5,398,821.24** |

26.     The Debtor has not made payments on the Note since May 6, 2025 other than separately agreed to forbearance fees.  In addition, the Debtor has failed to adequately maintain its Property, and the marina has continued in disrepair.  Because the marina was not adequately maintained, the storms occurring in Central Texas, on or about July 4-5, 2025 caused the marina to become disconnected from land where it remained in the middle of the lake for several months before being reconnected. The Debtor's persistent failure to perform the substantial maintenance necessary to preserve and secure the marina has jeopardized the integrity of the Property and leaves it susceptible to further damage.

27.     Exhibits A-1 through A-8 are (a) documents incorporated and kept in the course of AC VIP's business, and AC VIP relies upon the accuracy of the documents' contents in the course

of its business, (b) were made at or near the time of the occurrence of the matters rendered by persons with personal knowledge of the information in the business record or from information transmitted by persons with personal knowledge, kept in the ordinary course of AC VIP's regularly conducted business activities, and it is AC VIP's regular practice to make such records.

28.     I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.

29.     Executed on this 14th day of October 2025, at Palm City, Florida.


_/s/ Austin Cameron_____
Austin Cameron
Manager
AC VIP PC Marina Debt, LLC

## Exhibit A-1

**Note**

# PROMISSORY NOTE

Scottsdale, Arizona
April 23, 2015

$3,200,000.00 (U.S.)

FOR VALUE RECEIVED, on or before the Maturity Date (hereinafter defined), the undersigned, WC PARADISE COVE MARINA, LP, a Texas limited partnership ("Maker"), as a principal and not as an accommodation party, promises to pay to the order of NORTHWEST FEDERAL CREDIT UNION (hereinafter called "Lender" or, with its successors and assigns, "Holder"), at its principal office at 200 Spring Street, Herndon, Virginia 20170-5209, or at such other place as Holder hereof from time to time may designate in writing, the principal sum of THREE MILLION TWO HUNDRED THOUSAND AND NO/100 DOLLARS ($3,200,000.00) (U.S.), with interest on the unpaid principal balance of this Note from time to time outstanding computed at a floating rate of interest per annum equal to two and one-quarter percent (2.25%) above the "Prime Rate" in effect as of the date of this Note, and which rate shall be automatically adjusted on the third (3rd) anniversary date of this Note and every three (3) years thereafter. The "Prime Rate" is defined as the rate established from time to time by the Wall Street Journal as the WSJ Prime Rate. The WSJ Prime Rate is not necessarily the lowest interest rate offered or charged by the Bank at any given time.

The interest rate applicable under this Note from time to time is sometimes referred to herein as the "Interest Rate." The Holder shall determine the interest for each day by multiplying a daily interest factor by the unpaid principal balance outstanding for such day (computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the actual number of days the principal balance is outstanding). Interest shall be calculated and accrue on each advance of the principal of this Note from and including the day on which such advance is made.

This Note is executed by Maker in accordance with the terms of that certain Loan and Security Agreement of even date herewith between Maker and Lender (the "Loan Agreement"). All capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Loan Agreement, the applicable provisions of which are incorporated herein.

Payments of accrued interest and the principal balance of this Note shall be made as and when hereinafter set forth:

(a)     Commencing on June 1, 2015, and continuing on the first day of each calendar month thereafter until the third (3rd) anniversary of the date of this Note, Maker shall make payments of principal and interest in equal monthly installments of $19,651 (which payment amount is based on the amortization of the principal balance of this Note at the Interest Rate as of the date of this Note amortized over an amortization period of 300 months). Commencing on the third (3rd) anniversary of the date of this Note and every three (3) years thereafter, the amount of such equal monthly installments shall be adjusted so that interest is calculated at the Interest Rate as of such anniversary date.

(b)     Notwithstanding anything contained herein to the contrary, all accrued and unpaid interest and the entire amount of the outstanding principal balance, together with all other fees and charges payable under the terms of this Note, shall be due and payable in full on the sixth (6th) anniversary of the date of this Note (the "Maturity Date").

10193.1.873890

Maker may prepay this Note, in whole or in part, at any time during the term of this Note.

Holder may apply any and all amounts received by it for application to the loan evidenced hereby in such order and manner as Holder in its discretion may determine. Any payment may be applied at the option of Holder to the repayment of any sums advanced by Holder for payment of taxes, assessments, insurance premiums, or for keeping, maintaining and/or protecting the Property subject to the Deed of Trust described in the Loan Agreement (the "Deed of Trust"); or Holder may require said sums so advanced to be repaid together with interest thereon at a per-annum rate equal to the greater of: (i) five percent (5%) above the Interest Rate, or (ii) eighteen percent (18.00%) (the "Default Rate"), in addition to the required monthly installments.

If any of the aforesaid monthly installments or any sums required to be paid under the terms of the Deed of Trust or the Loan Agreement are not paid when the same are due and payable, Holder hereof, at its option, and in addition to any other remedies available to it, may charge Maker a "late charge" of five percent (5%) of each unpaid monthly installment and/or sum, to reimburse Holder hereof for the extra expense involved in handling delinquent payments, in otherwise servicing the loan evidenced by this Note and in the loss to the Holder of the use of the money due but not yet paid. The undersigned understands and agrees that if for any reason it fails to pay any amount due under this Note on or before the date when due, the Holder shall be entitled to damages for the detriment caused thereby, but that it is extremely difficult and impractical to ascertain the extent of such damages. Therefore, the undersigned agrees that the late charge described in this paragraph is a reasonable estimate of such damages and shall be payable not as a penalty but as liquidated damages.

The terms, covenants, conditions, stipulations and agreements contained in the Deed of Trust and in the Loan Agreement are hereby made a part of this Note to the same extent as though said Deed of Trust and Loan Agreement were fully set forth herein.

Maker hereby expressly agrees that time is of the essence hereof, and if Maker fails to pay any installment of principal and/or interest within ten (10) calendar days after the same is due and payable hereunder, or fails to pay the entire indebtedness hereof when due, or if an Event of Default occurs under the Deed of Trust or the Loan Agreement, or if a default occurs and remains uncured after the expiration of any applicable cure period under any other note, guaranty, mortgage, deed of trust or other obligation of Maker to Lender, the unpaid principal balance hereof (including any amounts advanced by Holder in accordance with the Deed of Trust and/or the Loan Agreement and not repaid), with all accumulated interest thereon, shall, at the option of Holder hereof, become immediately due and payable without notice or demand, such notice and demand being hereby expressly waived, and shall thereafter until this Note is paid in full bear interest at the Default Rate. The undersigned recognizes that such failure to make the interest payments when due, the failure to pay the entire indebtedness when due, or the occurrence of such an Event of Default or default, will result in the Holder incurring additional ongoing expenses in servicing the loan evidenced by this Note and in loss to the Holder of the use of the money due. Further, the undersigned understands and agrees that if for any reason it fails to pay any installment of interest when due, or fails to pay the entire indebtedness hereof when due, or if an Event of Default occurs under any of the Deed of Trust or the Loan Agreement, or if a default occurs and remains uncured after the expiration of any applicable cure period under any other note, guaranty, mortgage, deed of trust or other obligation of Maker to Lender, the Holder shall be entitled to damages for the detriment caused thereby, but that it is extremely difficult and impractical to ascertain the extent of such damages. Therefore, the undersigned agrees that the Default Rate is a reasonable estimate of such ongoing damages and shall be payable not as a penalty but as liquidated damages.

Maker shall pay on demand any and all costs, fees and expenses (including reasonable attorney fees) incurred by Holder in connection with the exercise or enforcement of any of its rights, powers or remedies pursuant hereto or to the Deed of Trust or Loan Agreement, or to otherwise obtain judicial relief in connection with the transactions which are the subject of this Note, the Deed of Trust or the Loan Agreement, whether or not litigation has been commenced (including in all trial, bankruptcy and appellate proceedings), and all such amounts shall bear interest at the Default Rate and be secured by the Deed of Trust.

Maker and all other signatories hereto (all of which, including Maker, are severally each hereinafter called an "Obligor") each: (a) agree that the liability under this Note of all parties hereto is joint and several; (b) severally waive any homestead or exemption laws and right thereunder affecting the full collection of this Note; (c) severally waive any and all formalities in connection with this Note to the maximum extent allowed by law, including (but not limited to) demand, diligence, presentment for payment, protest and demand, and notice of extension, dishonor, protest, demand and nonpayment of this Note; and (d) consent that Holder may extend the time of payment or otherwise modify the terms of payment of any part or the whole of the debt evidenced by this Note, at the request of any other person liable hereon, and such consent shall not alter nor diminish the liability of any person hereon.

The loan evidenced hereby is for commercial or business purposes, and is not intended and will not be used for personal, family, household, educational, consumer or agricultural purposes.

This Note is governed by the laws of the State of Arizona, and Maker hereby consents to personal jurisdiction in any state or federal court in the State of Arizona and to venue in any state or federal court in Maricopa County, Arizona, in connection with any claim, allegation, cause of action or legal proceeding relating in any way to this Note.

Notwithstanding any provision in this Note, the Deed of Trust or any other Loan Document, the total liability for payments of interest and payments in the nature of interest, including all charges, fees, exactions, or other sums which may at any time be deemed to be interest, shall not exceed the limit imposed by the usury laws of the State of Arizona or the applicable laws of the United States of America, whichever shall be higher (the "Maximum Rate"). In the event the total liability for payments of interest and payments in the nature of interest, including, without limitation, all charges, fees, exactions or other sums which may at any time be deemed to be interest, which for any month or other interest payment period exceeds the Maximum Rate, all sums in excess of those lawfully collectible as interest for the period in question (and without further agreement or notice by, among or to the Holder or Maker) shall be applied to the reduction of the principal balance, with the same force and effect as though Maker had specifically designated such excess sums to be so applied to the reduction of the principal balance and Holder had agreed to accept such sums as a premium-free prepayment of principal; provided, however, that Holder may, at any time and from time to time, elect, by notice in writing to Maker, to waive, reduce or limit the collection of any sums in excess of those lawfully collectible as interest rather than accept such sums as a prepayment of the principal balance. Maker does not intend or expect to pay nor does Lender intend or expect to charge, accept or collect any interest under this Note or under the Loan Documents greater than the Maximum Rate. Maker agrees to an effective rate of interest that is the rate stated herein plus any additional rate of interest resulting from any other charges in the nature of interest paid or to be paid by or on behalf of Maker, or any benefit received or to be received by Holder, in connection with this Note. Maker specifically consents to the compounding of interest.

If any term, clause or provision of this Note shall be determined by any court to be illegal, invalid or unenforceable, the illegality, invalidity or unenforceability of such term, clause or provision

shall not affect the legality, validity or enforceability of the remainder thereof or of any other term, clause or provision hereof, and this Note shall be construed and enforced as if such illegal, invalid or unenforceable term, clause or provision had not been contained herein, and all covenants, obligations and agreements shall be enforceable to the full extent permitted by law.

The obligations of Maker under this Note shall be absolute and unconditional, and·shall remain in full force and effect until the entire principal, interest, penalties, premiums and late charges, if any, on this Note and all additional payments, if any, due pursuant to the Loan Agreement, the Deed of Trust and/or any other Loan Document shall have been paid and, until such payment has been made, shall not be discharged, affected, modified or impaired upon the happening from time to time of any event, including, without limitation, any of the following, whether or not with notice to or the consent of Maker:  (a) the waiver, compromise, indulgence, settlement, release, termination, modification or amendment (including, without limitation, any extension or postponement of the time for payment, performance, renewal or refinancing) of the obligations, covenants or agreements of Maker under this Note, the Loan Agreement, the Deed of Trust or any other Loan Document; (b) the failure to give notice to Maker of the occurrence of a default under the terms and provisions of this Note or any other Loan Document; (c) the release, substitution or exchange by Holder of any security held by it for the payment of any amount due pursuant to this Note or any other Loan Document (whether with or without consideration) or the acceptance by Holder of any additional security for such payments or the availability or claimed availability of any other security, collateral or source of repayment; (d) the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all of the assets of, the marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, or reorganization of, or the consummation of an arrangement, composition with creditors, readjustment of debts, or other similar proceedings affecting, the Maker or any other person or entity who, or any of whose property, shall at the time in question be obligated in respect of the debt evidenced by this Note or any part thereof; (e) any failure, omission, delay or neglect by Holder in enforcing, asserting or exercising any right, power or remedy under this Note, any other Loan Document, or at law or in equity; (f) the release of any person primarily or secondarily liable for all or any part of the debt evidenced by this Note; (g) any nonperfection or other impairment of any security; (h) any assignment or transfer by Holder of all or any interest in this Note; (i) the invalidity or unenforceability of any term or provision in this Note or any other Loan Document; (j) any merger or consolidation involving Maker, any sale, assignment, transfer, conveyance or issuance of any stock, partnership or other equity interest by Maker, or any sale, transfer or conveyance by Maker or any other person of all or any part of such person's interest in Maker or any affiliate of Maker; or (k) to the extent permitted by law, any event or action that would, in the absence of this clause, result in the release or discharge of Maker from the performance or observance of any obligation, covenant or agreement contained in this Note.  In addition, Maker and each other Obligor waives and agrees not to assert: (i) any right to require Holder to proceed against Maker or any other Obligor, to proceed against or exhaust any security for this Note, to pursue any other remedy available to Holder, or to pursue any remedy in any particular order or manner; (ii) the benefits of any legal or equitable doctrine or principle of marshalling; (iii) notice of the existence, creation or incurring of new or additional indebtedness of Maker to Holder; (iv) the benefits of any statutory provision limiting the liability of a surety; (v) any defense arising by reason of any disability or other defense of Maker or by reason of the cessation from any cause whatsoever (other than payment in full) of the liability of Maker for payment of this Note; and (vi) the benefits of any statutory provision limiting the right of Holder to recover a deficiency judgment, or to otherwise proceed against any person or entity obligated for payment of this Note, after any foreclosure or trustee's sale of any security for this Note.  Without limiting the foregoing, it is the intention of the parties to this Note that any modification, limitation, or discharge of the obligations of Maker arising out of or by virtue of any bankruptcy, reorganization or similar proceeding for relief of

debtors under Federal or state law shall not affect, modify, limit or discharge the liability of any other Obligor in any manner whatsoever, and this Note shall remain and continue in full force and effect and shall be enforceable against such Obligor to the same extent and with the same force and effect as if any such proceedings had not been instituted; and each Obligor shall be jointly and severally liable to Holder for the full amount payable hereunder, irrespective of any modification, limitation, or discharge of the liability of any Obligor that may result from any such proceeding. The obligations of Maker to Holder pursuant hereto include and apply to any payment or payments received by Holder on account of the liabilities evidenced hereby, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be paid to a trustee, receiver, or any other person or entity under any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or similar law, common law or equitable doctrine. If any action or proceeding seeking such repayment is pending or, in Lender's sole judgment, threatened, this Note and any security interest therefor shall remain in full force and effect, notwithstanding that Maker may not then be obligated to Holder. The obligations of Maker to Holder under this Note, and any security therefor, shall remain in full force and effect (or be reinstated) until Holder has received payment in full of all amounts payable to it pursuant to this Note, the Deed of Trust, the Loan Agreement and any other Loan Document, and the expiration of any applicable preference or similar period pursuant to any bankruptcy, insolvency, reorganization, moratorium or similar law, or at law or equity, without any claim having been made before the expiration of such period asserting an interest in all or any part of any payment(s) received by Holder.

Maker expressly agrees that Holder shall not be required first to institute any suit or to exhaust its remedies against Maker or any other person or party to become liable hereunder or against any collateral or security for the loan evidenced hereby, in order to enforce this Note; and expressly agrees that, notwithstanding the occurrence of any of the foregoing, Maker shall be and remain, directly and primarily liable for all sums due under this Note and under the Loan Documents. Upon disposition by Holder of any interests granted by the Deed of Trust or any other collateral or security for the loan evidenced hereby, Maker shall be and shall remain liable for any deficiency.

All rights and claims of Maker against any other Obligor or the property of any other Obligor now or hereafter existing (collectively, the "Borrower Claims") shall be subordinate and subject in right of payment to the prior payment in full of the obligations of Maker to Holder. Until such obligations have been paid in full, and Maker has performed all of its obligations pursuant to this Note and any other Loan Documents, Maker shall not receive or collect, directly or indirectly, from any other Obligor or any other party any payment upon any Borrower Claim, nor seek to realize upon any collateral securing any such Borrower Claim. Notwithstanding the foregoing, if Maker shall receive any such payment, Maker shall hold such payment in trust for Holder and shall have absolutely no rights in or to such payment except to deliver it promptly to Holder, and Maker hereby covenants to do so. Maker will not assert any right to which it may be or become entitled, whether by subrogation, contribution or otherwise, against any other Obligor or against the property of any other Obligor by reason of the performance by such Obligor of its obligations under this Note, except after performance and payment in full of this Note and all other Loan Documents.

No set-off, counterclaim, reduction or diminution of any obligation, or any defense of any kind or nature, which Maker has or may have against any Obligor shall affect, modify or impair its obligations hereunder.

No extension, postponement, forbearance, delay or failure on the part of Holder in the exercise of any power, right or remedy hereunder, under the Deed of Trust, the Loan Agreement or any other instrument executed in connection herewith, or at law or in equity, shall operate as a waiver thereof, nor

shall a single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power, right or remedy. All rights, powers and remedies of Holder shall be cumulative and may be exercised simultaneously or from time to time in such order and manner as Holder in its sole discretion may elect.

This Note is secured, among other things, by the Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing executed and delivered by Maker to and for the use and benefit of Lender.

MAKER WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, ANY ASPECT OF THE TRANSACTION IN CONNECTION WITH WHICH THIS DOCUMENT IS BEING GIVEN OR ANY DOCUMENT EXECUTED OR DELIVERED IN CONNECTION WITH SUCH TRANSACTION. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY MAKER, AND MAKER ACKNOWLEDGES THAT NO ONE HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. MAKER FURTHER ACKNOWLEDGES HAVING BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL, SELECTED BY MAKER'S OWN FREE WILL, IN CONNECTION WITH THE TRANSACTION WITH RESPECT TO WHICH THIS DOCUMENT IS BEING GIVEN AND IN THE MAKING OF THIS WAIVER, AND THAT MAKER HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH SUCH COUNSEL. MAKER FURTHER ACKNOWLEDGES THAT IT HAS READ, AND UNDERSTANDS, THE MEANING AND RAMIFICATIONS OF THIS WAIVER PROVISION.

### SIGNATURE PAGE FOLLOWS

**SIGNATURE PAGE TO PROMISSORY NOTE**

*"MAKER"*

WC PARADISE COVE MARINA, LP, a Texas limited
partnership

By:  WC PARADISE COVE GP, LLC, a Texas limited
liability company, its General Partner

By:  WORLD CLASS CAPITAL GROUP, LLC, a
Texas limited liability company, its Manager

By _____

Printed Name ____ Natin Paul _____

Title _____ Manager _____

## Exhibit A-2

**Loan Agreement**

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (this "Agreement"), dated the 23rd day of April, 2015 (the "Effective Date"), is entered into by and between WC PARADISE COVE MARINA, LP, a Texas limited partnership ("Borrower"), and NORTHWEST FEDERAL CREDIT UNION ("Lender").

RECITALS:

A.     Lender has approved Borrower's application for financing in the amount and on the terms stated in this Agreement, to be secured by the Collateral and other security described herein, including, without limitation, a first lien on the real property described in Exhibit A attached hereto.

B.     The parties wish to define their rights and obligations with respect to such financing, and the parties are now entering into this Agreement and the other loan documents described herein.

AGREEMENT:

NOW, THEREFORE, in consideration of the foregoing, the mutual conditions and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows

1.     DEFINITIONS.

1.1.     Defined Terms. In addition to any other defined terms set forth in this Agreement, the following terms have the definitions set forth below for purposes of this Agreement:

"Account Debtor" shall mean any Person who is or who may become obligated to Borrower under, with respect to, or on account of an Account Receivable or other Collateral.

"Accounts Receivable" shall mean any and all accounts (as such term is defined in the UCC) of Borrower and each and every right of Borrower to (i) the payment of money or (ii) the receipt or disbursement of products, goods, services or other valuable consideration, whether such right now exists or hereafter arises, whether such right arises out of a sale, lease or other disposition of Inventory, or out of a rendering of services, or out of a policy of insurance issued or to be issued, or from a secondary obligation or arising out of the use of a credit or charge card or information contained on or for use with such card, incurred or to be incurred, or any other transaction or event, whether such right is created, generated or earned by Borrower or by some other Person who subsequently transfers its interest to Borrower, whether such right is or is not already earned by performance, and howsoever such right may be evidenced, together with all other rights and interests (including all liens and security interests) which Borrower may at any time have by law or agreement against any Account Debtor or other Person obligated to make any such payment or against any property of such Account Debtor or other Person. Accounts Receivable shall include, without limitation, all revenues, receipts, income, receivables and accounts relating to or arising from rentals, food and beverage facilities, vending machines, the provision or sale of other goods and services, and any other items of revenue, receipts or other income. Without limitation of the foregoing, all amounts due under the Leases shall also be included within the definition of Accounts Receivable.

"Applicable Usury Law" shall mean the usury laws of the State of Arizona.

"Base Interest Rate" shall mean the interest rate set forth as the "Base Interest Rate" in Section 2.3 below.

"Affiliate" shall mean any Person controlling, controlled by or under common control with Borrower. For purposes of this definition, "control" shall mean the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of any Person, whether through ownership of common or preferred stock or other equity interests, by contract or otherwise. Without limiting the generality of the foregoing, each of the following shall be an Affiliate: any shareholder, member, partner, manager, director, officer or other agent of Borrower, any

shareholder or subsidiary of Borrower, and any other Person with whom or which Borrower has common shareholders, members, partners, managers, directors or officers, or any trust or family member of any of the foregoing.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any holiday on which banks in Phoenix, Arizona, are required to close.

"**Collateral**" shall mean the Real Property and all assets of Borrower, however, arising wherever located and whether now owned or existing or hereafter existing or acquired including but not limited to the following:

    1. All fixtures and personal property now or hereafter owned by Borrower and attached to or contained in and used or useful in connection with the Real Property more fully described herein or the improvements thereon, and all renewals or replacements thereof or articles in substitution therefor, whether or not the same be attached to such improvements, and any and all proceeds of any of the foregoing.

    2. All leases, daily use fees, subleases, rents, issues, income, amounts due and payable to Borrower under any lease or sublease of the Real Property (whether now due and owing or due and owing in the future, including, but not limited to, rent, additional rent, percentage rent, taxes, insurance and reimbursable costs and expenses, whether due in one payment or amortized over a period of time), condemnation proceeds and profits relating to the Real Property and all proceeds thereof.

    3. All of Borrower's assets, howsoever arising, wherever located and whether now owned or existing or hereafter existing or acquired, including, but not limited to, the following:

        (i) all Equipment;

        (ii) all Accounts Receivable;

        (iii) all Inventory (as defined in the UCC);

        (iv) any and all monies, reserves, deposits, deposit accounts, securities, cash, cash equivalents, balances, credits, and interest and dividends on any of the above, of or in the name of Borrower, now or hereafter with the Lender, and any and all other property of any kind and description of or in the name of Borrower, now or hereafter, for any reason or purpose whatsoever, in the possession or control of, or in transit to, the Lender or any agent or bailee for the Lender;

        (v) all chattel paper, whether tangible or electronic chattel paper, contract rights, letter of credit rights, and instruments including, without limitation, all supporting obligations of any of the foregoing;

        (vi) all General Intangibles;

        (vii) all investment property;

        (viii) all furniture and fixtures;

        (ix) all documents of title and receipts, whether negotiable or non-negotiable, including all goods covered by such documents;

        (x) all books, records and computer records in any way relating to the above property;

        (xi) any and all substitutions, renewals, improvements, replacements, additions and proceeds of (i) through (x) above, including, without limitation, proceeds of insurance policies.

"**Deed of Trust**" shall mean a deed of trust (if available under applicable state law) or mortgage securing the Note and all of the Obligations under the Loan Documents, and constituting: (a) a first and prior lien on the fee title to the Real

Property, together with all buildings and improvements now or hereafter located on the Real Property and all fixtures and attachments of and to the buildings now on the Real Property, if any, and those to be erected on the Real Property and all rights and interests appurtenant thereto, (b) a first priority assignment of all Borrower's interest in and to the Leases including without limitation all rents, issues or profits therefrom, (c) a security agreement establishing a valid first priority security interest in and to the Personal Property, and (d) a fixture filing, as the same may be amended, restated or replaced from time to time.

"**Default Interest Rate**" shall mean the interest rate set forth as the "Default Interest Rate" in Section 2.3 below.

"**Entity Formation Documents**" shall mean the charter, articles, by-laws, operating agreement, partnership agreement or any other written documents evidencing the formation, organization, governance or continuing existence of an entity, as amended, modified, restated or supplemented as of the Effective Date, together with the documents providing for the qualification and authorization of the entity to do business in all other states in which such qualification and authorization are necessary in order for the entity to conduct its business and own its property.

"**Environmental Certificate**" shall mean an Unsecured Environmental Indemnity Agreement executed by Borrower and such other Obligors as required by Lender dated on or about the date hereof, as it may be from time to time renewed, amended, restated or replaced.

"**Equipment**" means all of Borrower's present and hereafter acquired machinery, motors, furniture, equipment, furnishings, fixtures, trade fixtures, motor vehicles, tools, parts, goods and other tangible personal property (other than inventory) of every kind and description used in Borrower's operations or owned by Borrower and any interest in any of the foregoing, and all attachments, accessories, accessions, replacements, substitutions, additions or improvements to any of the foregoing, wherever located.

"**Event of Default**" shall mean any of the events set forth in Section 7.1 of this Agreement.

"**General Intangibles**" shall mean all general intangibles (as such term is defined in the UCC) owned by Borrower, including, but not limited to payment intangibles, goodwill, software, trademarks, trade names, licenses, patents, patent applications, copyrights, inventions, franchises, books and records of Borrower, designs, trade secrets, registrations, prepaid expenses, all rights to and payments of refunds, overpayments, rebates and return of monies, including, but not limited to, sales tax refunds, tax refunds, tax refund claims and rights to and payment of refunds, overpayments or overfundings under any pension, retirement or profit sharing plans and any guarantee, security interests or other security held by or granted to Borrower to secure payment by an Account Debtor of any of the Accounts Receivable.

"**Guaranties**" shall mean the guaranties with respect to the Loan, as the same may from time to time be modified, amended, restated or replaced.

"**Guarantors**" shall mean all of the guarantors with respect to the Loan, including, without limitation, Natin Paul and Crestone Property Group, LLC, a Texas limited liability company.

"**Leases**" shall mean all of the leases of the Real Property or any portion thereof together with any and all other existing or future leases or other agreements for the use and/or occupancy of the Real Property or any portion thereof by Borrower as landlord, as the same may from time to time be modified, amended, restated or replaced.

"**Loan**" shall mean the loan described in Section 2.1 below.

"**Loan Closing**" shall mean the date of the initial funding of the Loan.

"**Loan Documents**" shall mean, collectively, each and every agreement, document and instrument now or hereafter executed in connection with this Agreement or evidencing, securing or otherwise ancillary to the Loan, as the same may from time to time be modified, amended, restated or replaced.

"**Loan Year**" shall mean the period of time from the Effective Date through the same day of the twelfth month thereafter, and each succeeding twelve month period through the Maturity Date.

"**Maturity Date**" shall mean April 23, 2021.

"**Maximum Interest Rate**" shall mean the lesser of (a) eighteen percent (18.00%) per annum; and (b) the maximum contract rate permitted by the Applicable Usury Law.

"**Note**" shall mean the promissory note from Borrower to Lender evidencing the Loan, as the same may from time to time be modified, amended, restated or replaced.

"**Obligations**" means, collectively, all payments Borrower or any Affiliate of Borrower is required to make under the Loan Documents together with all agreements, duties, covenants, indemnifications, warranties and other obligations which Borrower or any Affiliate of Borrower is now or hereafter required to Perform under the Loan Documents.

"**Obligors**" shall mean Borrower, each Guarantor, and each other party (other than Lender) to any Loan Document.

"**Performance**" or "**Perform**" means the full, timely and faithful performance.

"**Person**" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, government, or any agency or political division thereof, or any other entity.

"**Personal Property**" shall mean all of the following types of collateral now owned or hereafter acquired by a Borrower and as defined in the UCC: accounts, contract rights, general intangibles, chattel paper, documents, instruments, inventory, goods, equipment, investment property, deposit accounts, letter of credit rights, commercial tort claims, health care receivables, and all books and records relating to the foregoing, together with all proceeds of the conversion, whether voluntary or involuntary, of all or part of the foregoing into cash or liquidated claims, including, without limitation by reason of specification, all proceeds of insurance and all awards, payments or compensation, and all interest thereon, which may be made in respect of all or any part of the foregoing.

"**Property**" shall mean the Personal Property and the Real Property.

"**Real Property**" shall mean the real property commonly known as 17141 Rocky Ridge Road, Austin, Travis County, Texas 78734 legally described on Exhibit A attached hereto, together with all improvements and additions thereto, and all mineral rights, easements and other rights appurtenant thereto, as such real property and real property rights related thereto are more fully described in the Deed of Trust.

"**Title Commitment**" shall mean the title insurance commitment issued by the Title Company with respect to the Loan and the Real Property.

"**Title Company**" shall mean a nationally recognized title insurance company acceptable to Lender.

"**UCC**" shall mean the Uniform Commercial Code as adopted and in effect in the State of Arizona (or any other applicable state) as in effect from time to time.

1.2.  Other Terms.  All accounting terms used in this Agreement, unless otherwise indicated, shall have the meanings given to such terms in accordance with generally accepted accounting principles, consistently applied.

2.  LOAN, INTEREST RATE, FEES AND OTHER CHARGES.

2.1.   Loan.   The "Loan" shall mean a loan from Lender to Borrower (the "Loan") in the amount of Three Million Two Hundred Thousand and No/100 Dollars ($3,200,000.00) (the "Loan Amount"). The Loan shall be evidenced by a Secured Promissory Note dated as of the date hereof in the amount of the Loan Amount (as amended from time to time, the "Note"). The proceeds of the Loan shall be disbursed for the purposes set forth in Section 2.2 below upon the full satisfaction of all conditions precedent set forth in this Agreement, subject to and in accordance with all terms and conditions of the Loan Documents.

2.2.   Use of Loan Proceeds.   The proceeds of the Loan shall be used only (i) to fully repay and refinance certain existing indebtedness outstanding in favor of Independent Bank, (ii) to partially repay certain existing indebtedness in favor of WC Paradise Cove GP, LLC, a Texas limited liability company, and (iii) to pay loan fees, closing costs and expenses, to the extent approved by Lender.

2.3.   Interest Rate.

(a)   Base Interest Rate.   The "Base Interest Rate" shall be a floating rate of interest per annum equal to two and one-quarter percent (2.25%) above the Reference Rate in effect from time to time. The Base Interest Rate shall be adjusted on the third anniversary date of this Agreement and every three (3) years thereafter, to an amount equal to two and one-quarter percent (2.25%) above the Reference Rate then in effect. In no event shall the Base Interest Rate exceed the Maximum Interest Rate. Interest charges and all other fees and charges herein shall be computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.

(b)   Default Interest Rate.   The "Default Interest Rate" shall be a floating rate of interest per annum, as the same may change from time to time, equal to the greater of: (i) five percent (5%) above the Base Interest Rate, or (ii) eighteen percent (18%) per annum. In no event shall the Default Interest Rate exceed the Maximum Interest Rate.

(c)   Reference Rate.   The "Reference Rate" shall mean the rate of interest published in *The Wall Street Journal* (Western Edition) under the designation "Money Rates" and described as Prime Rate. If the rate so published is shown as a range of rates, Lender will use the highest rate in such range. If such rate is no longer published or available, Lender will choose a substitute rate based upon an index utilizing reasonably comparable information as determined by Lender.

2.4.   Payments.

(a)   Monthly Interest Payments.   Commencing on the first day of the first month following the closing of the Loan and continuing on the first day of each succeeding month for the full term of the Loan, Borrower shall pay or cause to be paid to Lender monthly principal and interest payments based upon a 300 month authorization schedule at the Base Interest Rate.

(b)   Balloon Payment on Maturity Date.   On or before the Maturity Date unless otherwise accelerated in accordance with the terms of the Note), one (1) final "balloon" payment of all unpaid principal, accrued and unpaid interest and any other amounts due hereunder or under the other Loan Documents shall be due and payable on or before 3:00 p.m. MST on such date.

2.5.   Term of Loan.

(a)   Maturity Date.   The maturity date for the Loan (the "Maturity Date") shall be the date that is seventy-two (72) months after the Effective Date of the Loan Agreement.

(b)   Due Date.   The due date for payment in full of the Loan shall be the earlier to occur of: (i) the Maturity Date of the Loan; (ii) the date on which Lender accelerates payment of the balance due under the Loan

after the occurrence of an Event of Default; or (iii) the date of satisfaction of the Loan through prepayment by Borrower pursuant to the terms of the Note or this Loan Agreement.

2.6.  Loan Fees.  Borrower will pay to Lender a loan fee of $64,000 (2% of the Loan Amount) (the "**Loan Fee**"), which loan fees shall be deemed fully earned by Lender as of the Effective Date and shall be paid to Lender by Borrower on the Effective Date.

2.7.  Application of Payments.  The amount of all payments or amounts received by Lender with respect to the Loan shall be applied to the extent applicable under this Agreement: (i) first, to any past due payments of interest hereunder and to accrued interest through the date of such payment, including any default interest; (ii) then, to late fees, overdue risk assessments, examination fees and expenses, collection fees and expenses and any other fees and expenses due to Lender hereunder; and (iii) last, the remaining balance, if any, to the unpaid principal balance of the Loan; provided, however, while an Event of Default exists, each payment with respect to the Loans shall be applied to such amounts owed to Lender by Borrower as Lender may determine. In calculating interest and applying payments as set forth above: (a) interest shall be calculated and collected through the date payment is actually received by Lender; (b) interest on the outstanding balance shall be charged during any grace period permitted hereunder; and (c) to the extent that Borrower makes a payment or Lender receives any payment or proceeds of the Collateral for Borrower's benefit that is subsequently invalidated, set aside or required to be repaid to any other person or entity, then, to such extent, the Obligations intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Lender and Lender may adjust the balance(s) of the Loans as Lender deems appropriate under the circumstances.

2.8.  Prepayment.  Borrower may prepay the outstanding principal balance of the Loan, in whole or in part, at any time without premium or penalty.  In connection with any prepayment of the Loan, Borrower shall pay, in addition to the principal amount that is being prepaid, all accrued but unpaid interest on such amount, all fees or other charges then outstanding under the Loan Documents, and all fees and costs incurred by Lender in the preparation of any documentation required in connection with such prepayment.

2.9.  Late Charge.  If a payment is one (1) day or more late, Borrower will be charged a late fee equal to five percent (5%) of the past due payment.

2.10.  Excess Interest.

2.10.1.  The contracted for rate of interest of the Loans contemplated hereby, without limitation, shall consist of the following:  (i) the applicable Base Interest Rate, as calculated and applied to the principal balance of the Obligations in accordance with the provisions of this Agreement; (ii) interest after an Event of Default, calculated and applied to the amount of the Obligations in accordance with the provisions hereof; and (iii) all Additional Sums (as herein defined), if any.  Borrower agrees to pay an effective contracted for rate of interest which is the sum of the above-referenced elements.  The Loan Fee, attorneys' fees, expert witness fees, letter of credit fees, and all other charges, goods, things in action or any other sums or things of value paid or payable by Borrower, whether pursuant to this Agreement or any other documents or instruments in any way pertaining to this lending transaction, or otherwise with respect to this lending transaction, that under any applicable law may be deemed to be interest with respect to this lending transaction, for the purpose of any applicable law that may limit the maximum amount of interest to be charged with respect to this lending transaction (collectively, the "**Additional Sums**"), shall be payable by Borrower as, and shall be deemed to be, additional interest and for such purposes only, the agreed upon and "contracted for rate of interest" of this lending transaction shall be deemed to be increased by the rate of interest resulting from the inclusion of the Additional Sums.

2.10.2.  It is the intent of the parties to comply with the Applicable Usury Law and, if applicable, the laws of the state where the Real Property is located.  Accordingly, it is agreed that notwithstanding any provisions to the contrary in this Agreement, or in any of the documents securing payment hereof or otherwise relating hereto, in no event shall this Agreement or such documents require the payment or permit the collection of interest in excess of the Maximum Interest Rate.  In the event (a) any such excess of interest otherwise would be contracted for, charged or received from Borrower or otherwise in connection with the Loan evidenced hereby, or (b) the maturity of the Obligations is accelerated in whole or in part, or (c) all or

part of the Obligations shall be prepaid, so that under any of such circumstances the amount of interest contracted for, shared or received in connection with the Loan evidenced hereby, would exceed the Maximum Interest Rate, then in any such event (1) the provisions of this paragraph shall govern and control, (2) neither Borrower nor any other Person now or hereafter liable for the payment of the Obligations shall be obligated to pay the amount of such interest to the extent that it is in excess of the Maximum Interest Rate, (3) any such excess which may have been collected shall be either applied as a credit against the then unpaid principal amount of the Obligations or refunded to Borrower, at Lender's option, and (4) the effective rate of interest shall be automatically reduced to the Maximum Interest Rate.  It is further agreed, without limiting the generality of the foregoing, that to the extent permitted by the Applicable Usury Law; (x) all calculations of interest which are made for the purpose of determining whether such rate would exceed the Maximum Interest Rate shall be made by amortizing, prorating, allocating and spreading during the period of the full stated term of the Loans evidenced hereby, all interest at any time contracted for, charged or received from Borrower or otherwise in connection with such Loan; and (y) in the event that the effective rate of interest on the Loans should at any time exceed the Maximum Interest Rate, such excess interest that would otherwise have been collected had there been no ceiling imposed by the Applicable Usury Law shall be paid to Lender from time to time, if and when the effective interest rate on the Loans otherwise falls below the Maximum Interest Rate, to the extent that interest paid to the date of calculation does not exceed the Maximum Interest Rate, until the entire amount of interest which would otherwise have been collected had there been no ceiling imposed by the Applicable Usury Law has been paid in full.  Borrower further agrees that should the Maximum Interest Rate be increased at any time hereafter because of a change in the Applicable Usury Law, then to the extent not prohibited by the Applicable Usury Law, such increases shall apply to all indebtedness evidenced hereby regardless of when incurred; but, again to the extent not prohibited by the Applicable Usury Law, should the Maximum Interest Rate be decreased because of a change in the Applicable Usury Law, such decreases shall not apply to the indebtedness evidenced hereby regardless of when incurred.

3.   SECURITY FOR THE LOAN.

3.1.   Collateral.  The Loan, the Performance of the Obligations, and all other indebtedness and obligations under the Note, the Loan Agreement and the other Loan Documents shall be secured by the Collateral, which shall include, without limitation, the Real Property, the Personal Property and any other collateral or security described in the Loan Agreement or any other Loan Document.  The Collateral shall also secure any other promissory note executed by Borrower in favor of Lender if such promissory note indicates that it is secured by all or any portion of the Collateral or if the description of the obligations secured by the Deed of Trust as set forth therein are broad enough to cover such promissory note.

3.2.   Grant of Security Interest in Personal Property of Borrower; UCC Financing Statements; Additional Documents.  Borrower hereby grants and conveys to Lender, as security for the Loan and for all of the Obligations, a security interest in, to and under all of the Personal Property, tangible and intangible, now owned or hereafter acquired.  Borrower hereby authorizes Lender to file UCC financing statements in the jurisdictions and to the extent Lender deems necessary to perfect its security interests in the Property.  Borrower agrees to execute and deliver such additional documents and do such further acts or things as Lender may reasonably request from time to time in order to effect the purposes of this grant of a security interest and the initial and continued perfection of Lender's liens and security interests in the Collateral.

3.3.   Preservation of Collateral.  Lender may, in its discretion, at any time, discharge any lien or encumbrance on the Collateral or bond the same, pay any insurance, tax or similar charge, obtain any record or take any other action to preserve the Collateral and charge the cost thereof to the Loan account as an Obligation of Borrower.

3.4.   Liability of Guarantors.  The payment and Performance of the Obligations under the Loan Documents shall be jointly, severally, primarily and unconditionally guaranteed by the required guarantors set forth below (each a "**Guarantor**", and collectively, the "**Guarantors**"), subject to the terms of the guaranties executed by each such Guarantor as set forth below (as such guaranties are, have been or will be modified, each a "**Guaranty**", and collectively, the "**Guaranties**"):

10193.1.873922.7                                      7

(a)    the Unconditional Loan Guaranty and Continuing and Subordination Agreement dated as of even date with this Loan Agreement executed by Crestone Property Group, LLC, a Texas limited liability company.

(b)    the Unconditional Loan Guaranty dated as of even date with this Loan Agreement executed by Natin Paul, an unmarried man.

4.  CONDITIONS PRECEDENT TO LOAN CLOSING AND INITIAL FUNDING. The obligation of Lender to make the Loan is subject to the following express conditions precedent, which must be fully satisfied prior to the Loan Closing:

4.1.    Loan Documents. Borrower shall have executed or obtained execution of and delivered to Lender each of the Loan Documents, the final form and substance of which shall be acceptable to Lender, together with such other documents, instruments and agreements in connection with the Loan as Lender may require.

4.2.    Entity Formation Documents and Good Standing Certificates. Lender shall have received true and correct certified copies of Borrower's, each Guarantor's and each other Obligor's (except for an individual) Entity Formation Documents, as amended, restated or supplemented as of the Effective Date and certificates of good standing with respect to Borrower and each Guarantor (other than individual Guarantors) dated within thirty (30) days of the Effective Date issued by the applicable state or states, which certificates shall indicate that each such party is existing or authorized to do business and is in good standing in the applicable states.

4.3.    Resolutions. Lender shall have received: (i) resolutions of Borrower authorizing its obtaining the Loan, approving the Loan Documents, and the execution and delivery of the Loan Agreement and the other Loan Documents to which Borrower is a party, and authorizing specific Persons to execute such Loan Documents; (ii) resolutions of each Guarantor (other than an individual) authorizing it to guarantee the Loan, approving the Guaranty and all other applicable Loan Documents, and the execution and delivery of such documents; and (iii) resolutions of each other Obligors (other than an individual) authorizing it to execute any applicable Loan Documents, and approving the form, execution and delivery of such documents.

4.4.    Title Insurance Commitment.  Borrower shall deliver to Lender a commitment (the "Title Commitment") to issue an ALTA extended coverage lender's policy of title insurance or equivalent form acceptable to Lender (the "Title Policy") underwritten by the Title Company in an amount not less than the amount of the Loan and insuring the lien of the Deed of Trust to be a first priority lien on the Real Property, subject only to such exceptions, encumbrances and conditions to title as Lender shall approve in its discretion and including such endorsements and co-insurance as Lender shall require.

4.5.    Taxes. Borrower shall provide evidence that all taxes and assessments levied against or affecting the Collateral have been paid current; or in the event Borrower has commenced a legal or administrative challenge to any such tax or assessment, evidence that such liability has been bonded over, or that funds for the payment thereof (in the amount of the original assessment) have been escrowed with an independent third party with provisions for the payment thereof satisfactory to Lender.

4.6.    Zoning. Borrower shall provide evidence satisfactory to Lender that the Real Property is properly zoned for its present and contemplated use and that any and all zoning stipulations have been complied with.

4.7.    [Intentionally Omitted]

4.8.    Governmental Approvals. Borrower shall deliver to Lender, and Lender shall be satisfied with all certificate(s) of occupancy for the Real Property, any environmental licenses or approvals for operation within or on the Real Property, if any; any construction or building permits with respect to the Real Property; and any other applicable governmental permits, approvals, consents, licenses and certificates for the use and operation of the Property or which may affect the value of the Collateral.

4.9.     Insurance. Borrower shall provide evidence that there is in effect such hazard, business interruption, public liability, and other insurance as is required by Lender, and written by insurers, and in forms and amounts, satisfactory to Lender.

4.10.    Hazardous Waste; Structural and Mechanical.  Borrower shall provide, at Borrower's sole cost and expense, a Phase I Environmental Site Assessment of the Property (the "Site Assessment").  The results of such Site Assessment must be satisfactory to Lender. All costs incurred in performing the Site Assessment shall be borne by Borrower. Such Site Assessment, if originally addressed to any party other than Lender, shall have been assigned to Lender or the consultant who prepared such Site Assessment shall have otherwise confirmed Lender's right to rely upon the conclusions set forth in such Site Assessment, in form and substance satisfactory to Lender.

4.11.    Utilities. Borrower shall provide evidence satisfactory to Lender that all utilities, including without limitation, water, sewer, gas and electricity, are available to the Real Property in amounts necessary for its present and contemplated use.

4.12.    Appraisal.  Borrower shall deliver to Lender a current MAI appraisal of the Property prepared by an appraiser licensed to practice in the State of Arizona and acceptable to Lender.  Such appraisal, if originally addressed to any party other than Lender, shall have been assigned to Lender or the appraiser who prepared such appraisal shall have otherwise confirmed Lender's right to rely upon the conclusions set forth in such appraisal, in form and substance satisfactory to Lender.

4.13.    Review and Approval of Property-Related Documentation.  Borrower shall have provided to Lender, and Lender shall have reviewed and approved all documentation deemed material by Lender to the operation and present and contemplated use of the Property.

4.14.    Access, Parking and Common Areas.  Lender shall be satisfied that all easements and other agreements providing for public access to, adequate parking for, and the maintenance of any and all common areas related to the Property are in effect, fully enforceable, and fully assignable to Lender as part of its collateral for the Loan.

4.15.    Other Information; Credit References; Search Results.  Borrower shall have provided to Lender any other information or item reasonably deemed necessary by Lender, and the results of all credit references and reports, and bankruptcy, lien, litigation, and UCC searches conducted by Lender shall have proven satisfactory to Lender.

4.16.    Fees, Costs and Expenses.  Borrower shall have paid all fees, costs and expenses required to be paid at the time of the initial advance as set forth in this Agreement.

4.17.    Compliance with Financial Covenants.  Borrower shall have provided evidence to Lender, in form and substance satisfactory to Lender, demonstrating that, as of the Loan Closing, Borrower is in compliance with the Debt Service Coverage Covenant set forth in Section 6.1 of this Agreement.

4.18.    Legal Opinions.  Borrower shall cause to be delivered to Lender such legal opinions with respect to the Loan, the Loan Documents, Borrower and Guarantors as Lender shall require in connection with the closing of this transaction.

4.19.    Principal Place of Business.  The Borrower's principal place of business is 401 Congress Avenue, 33rd Floor, Austin, Texas 78701.

5.    REPRESENTATIONS AND WARRANTIES.  Borrower represents and warrants to Lender as follows:

5.1.     Due Organization and Good Standing.  A true and complete copy of each of the Entity Formation Documents and good standing certificates for Borrower and for each Guarantor (if not an individual) evidencing Borrower's and each such Guarantor's valid existence and good standing under the laws of the state where such entity is formed and where the Property is located, and any and all amendments thereto and restatements and terminations thereof, have been furnished to Lender.  Such Entity Formation Documents constitute the entire

agreement among the holders of equity interests in each such entity, and are binding upon and enforceable against each such holder of an equity interest in accordance with their terms. Except for such Entity Formation Documents, there are no other agreements, oral or written, among any of the holders of an equity interest in Borrower or any Guarantor. No breach exists under such Entity Formation Documents, and no condition exists which, with the giving of notice or the passage of time or both, would constitute a breach under such Entity Formation Documents. Borrower and each Guarantor (if not an individual) is a duly organized and validly existing entity in the state indicated in the introductory paragraph of this Agreement (or in the introductory paragraph of the applicable Guaranty with respect to any Guarantor), is in good standing under the laws of such state, is qualified and authorized to do business and in good standing in all other states in which such qualification and good standing are necessary in order for it to conduct its business and own its property, and has the full legal right and authority to execute and enter into the Loan Documents as contemplated hereunder.

     5.2.   No Violation Caused by the Loan Documents. The execution, delivery, and Performance by Borrower of the Loan Documents will not (a) violate any provisions of any law of the United States of America, the State where the Real Property is located or the State of Borrower's formation, or any municipal department or governmental authority; or (b) result in the breach of, or require any consent under, or result in the creation of any lien, charge, or encumbrance upon any property or assets of Borrower pursuant to any indenture or other agreements or instruments to which Borrower is a party or by which Borrower or its property may be bound or affected, other than as specifically provided herein.

     5.3.   Use of Proceeds. The proceeds of the Loan will be used by Borrower for valid purposes directly relating to Borrower's business, limited to the use of proceeds as set forth in Section 2.2.

     5.4.   Financial Condition. All information set forth in Borrower's loan application and in the financial statements given by Borrower to Lender and all other information given (or to be given) by Borrower to Lender in connection with the Loan, including any statement regarding Borrower's past credit dealings, is true, correct, and complete in all material respects. No material adverse changes have occurred in any such financial condition nor with respect to any other information supplied by Borrower to Lender on or before the Effective Date.

     5.5.   Binding Obligations The Loan Documents are in all respects legal, valid, and binding upon Borrower, according to their terms and grant to Lender direct, valid, and enforceable first liens upon, and security interests in, the Collateral and all other real or personal property, tangible and intangible, described in the Loan Documents.

     5.6.   No Breach. The consummation of the Loan described in this Agreement and the Performance of the Obligations under and by virtue of the Loan Documents will not result in any breach of, or constitute a default under, any mortgage, deed of trust, loan or credit agreement, Entity Formation Document, or any breach of any other agreement or instrument to which Borrower is a party or by which Borrower may be bound or affected.

     5.7.   Litigation. There are no judgments, and no actions, suits, or proceedings pending, or to Borrower's knowledge threatened, against or affecting Borrower or the Collateral, or involving the validity or enforceability of any of the Loan Documents or the priority of the lien thereof, at law or in equity, or before or by any governmental authority, and Borrower is not in default with respect to any writ, injunction, decree, or demand of any court or any governmental authority, other than as previously disclosed in writing to and acknowledged by Lender.

     5.8.   No Violations. Borrower has received no notice of, and to Borrower's knowledge Borrower is not in violation of any applicable statute, regulation, ordinance or any order of any court, tribunal or governmental agency, in any respect materially and adversely affecting the Collateral or its business, assets, operations, prospects or condition, financial or otherwise.

     5.9.   No Other Liens. Except as otherwise specifically provided herein to the contrary, the title to the Collateral and Borrower's interest therein as of the Loan Closing will be free and clear of all liens, encumbrances, and security interests except only those set forth in the Title Commitment and approved by Lender.

10193.1.873922.7          10

5.10.    Loan Documents. The Loan Documents and all other instruments executed and delivered to Lender in connection with this Loan were executed and delivered in accordance with the requirements of law.

5.11.    Title. Borrower is and shall continue to be the lawful owner of the Collateral; no third party, including without limitation any Affiliate of Borrower has any interest in the Collateral (or any part thereof) or in Borrower's interest in the Collateral; and Borrower agrees to protect, preserve, and defend Borrower's and Lender's interest in the Collateral and the title thereto.

5.12.    Utilities. All utilities, including without limitation, water, sewer, gas and electricity, necessary for the present and future operation of the Property are available for the use of the Property and the tenants of the Property, and Borrower has obtained all necessary permits and permissions required from governmental authorities for access to and use of such services in the amounts required for the current operation of the Property, and all fees and deposits due to the providers of such utilities have been paid current.

5.13.    Leases. All Leases, contracts and agreements relating to the Property, or utilized in connection therewith, or constituting any portion of the Collateral, are in full force, and true and correct copies of all such Leases, contracts and agreements have previously been furnished to Lender.

5.14.    Legal Access. The Real Property has legal access to publicly dedicated streets.

5.15.    No Joint Venture. The relationship of Borrower and Lender is that of debtor and creditor, and it is not Borrower's intention by this Agreement or any other instrument being executed in connection with the Loan to establish a partnership or joint venture, and the parties hereto shall not under any circumstances be construed to be partners or joint venturers.

5.16.    Compliance With Anti-Terrorism Regulations. Neither Borrower nor any of its Affiliates is subject to any law, regulation or list of any governmental agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Lender from opening an account for Borrower or any of its Affiliates or making any loan, advance or extension of credit to Borrower or any of its Affiliates or prohibits or limits Lender from otherwise conducting business with Borrower or any of its Affiliates. Neither Borrower nor any persons holding any legal or beneficial interest whatsoever in Borrower shall at any time during the term of the Loan be described in, covered by or specially designated pursuant to or be affiliated with any person described in, covered by or specially designated pursuant to Executive Order 13224, as amended, or any similar list issued by the U.S. Department of the Treasury's Office of Foreign Assets Control (the "OFAC") or any other department or agency of the United States of America. Notwithstanding the foregoing, Borrower hereby confirms that if it becomes aware or receives any notice of any violation of the foregoing covenant and agreement (an "OFAC Violation"), Borrower will immediately (i) give notice to Lender of such OFAC Violation, and (ii) comply with all Laws applicable to such OFAC Violation, including, without limitation, Executive Order 13224; the International Emergency Economic Powers Act, 50 U.S.C. Sections 1701-06; the Iraqi Sanctions Act, Pub. L. 101-513, 104 Stat. 2047-55; the United Nations Participation Act, 22 U.S.C. Section 287c; the Antiterrorism and Effective Death Penalty Act, (enacting 8 U.S.C. Section 219, 18 U.S.C. Section 2332d, and 18 U.S.C. Section 2339b); the International Security and Development Cooperation Act, 22 U.S.C. Section 2349 aa-9; the Terrorism Sanctions Regulations, 31 C.F.R. Part 595; the Terrorism List Governments Sanctions Regulations, 31 C.F.R. Part 596; and the Foreign Terrorist Organizations Sanctions Regulations, 31 C.F.R. Part 597 and the USA PATRIOT ACT of 2001, Publ. L. No. 107-56 (collectively, the "Anti-Terrorism Regulations"), and Borrower hereby authorizes and consents to Lender's taking any and all reasonable steps Lender deems necessary, in its sole discretion, to comply with all Laws applicable to any such OFAC Violation, including the requirements of the Anti-Terrorism Regulations. Notwithstanding anything to the contrary in this Section 5.16, Borrower shall not be deemed to be in violation of the covenants and agreements set forth in the first sentence of this Section 5.16 if Borrower timely complies with all requirements imposed by the foregoing sentence and all requirements of the Anti-Terrorism Regulations and all other applicable Laws relating to such OFAC Violation.

5.17.    Survival of Representations and Warranties. Each of the representations and warranties made by Borrower in this Agreement shall be considered and determined to have been made by Borrower on the Effective Date and shall survive the Loan Closing.

6. <u>COVENANTS</u>.

    6.1.     <u>Affirmative Covenants</u>. Borrower hereby affirmatively covenants to Lender and agrees as follows:

        6.1.1.     <u>Financial Statements; Tax Returns</u>. Borrower and Guarantors shall furnish to Lender or cause to be furnished to Lender the following in form satisfactory to Lender:

        (a)     As soon as available, and in any event within 90 days after the close of its fiscal year, Borrower's internally prepared, certified by an officer, year-end financial statements (in form, presentation and substance acceptable to Lender), including a balance sheet as of the close of such period, an income statement, a statement of cash flows, all in accordance with generally recognized federal income tax basis principles.

        (b)     Within 30 days after written request by Lender, Borrower's internally prepared quarterly financial statements, in form, preparation and substance acceptable to Lender showing the financial performance of the Borrower for such immediately preceding calendar quarter and the results of operations during such calendar quarter, which financial statement shall include, but shall not be limited to, an operating statement, a balance sheet, a detailed income statement, a source and application of funds report, and such other matters as Lender may request, all in reasonable detail and prepared in accordance with generally recognized federal income tax basis accounting principles, consistently applied. Such financial statements may be company prepared and shall be certified by an officer of Borrower.

        (c)     Guarantors shall provide annual financial statements within 30 days of the end of the year.

        (d)     When requested by Lender, such further information as Lender may reasonably request relating to any such financial statements and/or the operation of the Property.

        (e)     Within forty-five (45) days after filing, Borrower shall provide Lender with a copy of Borrower's most recent federal income tax return (together with all K-1s and all supporting schedules), or a copy of the Borrower's extension request for filing the tax return, submitted no later than one hundred twenty (120) days after fiscal year end.

        6.1.2.     <u>Subordination of Debt to Affiliates</u>. Borrower shall obtain and deliver to Lender, from time to time, subordination agreements in form and substance satisfactory to Lender, from Guarantors, and all Affiliates of Borrower subordinating any and all obligations now or hereafter owing to such subordinating party by Borrower (including, without limitation, all management fees and salaries) to Borrower's Obligations to Lender under the Loan Documents; subordinating the lien of any mortgage, deed of trust or other security instrument in any of Borrower's assets to liens created by Lender's Deed of Trust and the other Loan Documents; and evidencing such subordinating party's agreement to not exercise any remedies against Borrower with respect to such loans so long as the Loan is outstanding.

        6.1.3.     <u>Insurance</u>. Borrower shall maintain in effect such hazard, business interruption, public liability, and other insurance as is required by Lender, and written by insurers, and in forms and amounts, satisfactory to Lender in its discretion.

        6.1.4.     <u>Environmental Matters</u>. Borrower shall fully perform all of its obligations under the Environmental Certificate, and if requested by Lender, from time to time throughout the term of the Loan, provide to Lender a written statement signed by an officer of Borrower certifying that all representations and warranties set forth in the Environmental Certificate executed by Borrower on the Effective Date remain, as of the date of such written statement, true, correct and complete in all material respects, together with a detailed explanation of any exceptions to such certification.

6.1.5.  Maintenance of Licenses.  Borrower shall continuously maintain in good order and standing all licenses, permits and any other governmental approvals necessary for the continued operation and use of the Property as it is currently used and shall obtain and continuously maintain in good order and standing all additional licenses, permits and any other governmental approvals necessary for the any development, construction or other use of the Property.

6.1.6.  Entity Existence.  Borrower shall maintain its corporate, limited liability company or partnership entity existence and its qualification to do business and good standing in all states necessary for the conduct of its business and the ownership of its property and maintain adequate authorizations, approvals, assets, licenses, patents, copyrights, trademarks and trade names for the conduct of its business as presently conducted.

6.1.7.  No Violations of Law.  Borrower shall materially comply with all laws, statutes, regulations and ordinances applicable to Borrower and its business.  Borrower shall promptly notify Lender in writing of any violation of any law, statute, regulation or ordinance of any governmental entity, or of any agency thereof, applicable to Borrower which may materially and adversely affect the Collateral or Borrower's business, assets, prospects, operations or condition, financial or otherwise;

6.1.8.  Books and Records.  Borrower shall keep adequate records and books of account with respect to its business activities in which proper entries are made in accordance with GAAP, reflecting all of its financial transactions, and shall permit Lender to review and make copies of all such records and books of account.

6.1.9.  Notice of Litigation.  Borrower shall promptly notify Lender in writing of any litigation, suit or administrative proceeding which may materially and adversely affect the Collateral or Borrower's business, assets, operations, prospects or condition, financial or otherwise, whether or not the claim is covered by insurance;

6.1.10.  Notice of Defaults.  Borrower shall promptly notify Lender in writing within five (5) Business Days of any Event of Default under this Agreement.  Borrower shall notify Lender in writing within five (5) Business Days of Borrower's default under any note, indenture, loan agreement, mortgage, lease (excluding boat slip leases) or other agreement relating to any indebtedness for borrowed money to which Borrower is a party or by which Borrower is bound.

6.1.11.  Inspection of Collateral.  Borrower shall permit Lender, at any reasonable time, to inspect the Collateral and any other property of the Borrower.

6.1.12.  Change in Management.  Borrower shall maintain executive and management personnel with the same qualifications and experience as presently constituted.  Borrower shall notify Lender in writing forty-five (45) days prior to any change in Borrower's executive or management personnel.

6.1.13.  Loan Costs and Fees.  Borrower shall pay all costs and expenses incurred by Lender in connection with making and maintaining the Loans and enforcing its rights under the Loan Documents.

6.1.14.  Field Audit.  Borrower shall, when requested by Lender but not more than once per year, pay all of Lender's costs related to obtaining a field audit of the Collateral.

6.1.15.  Additional Documents.  Borrower shall, at Lender's request, promptly execute or cause to be executed and delivered to Lender any and all documents, instruments or agreements deemed necessary by Lender to facilitate the collection of the Obligations or the Collateral or otherwise to give effect to or carry out the terms or intent of this Agreement or any of the other Loan Documents.

6.1.16.  Debt Service Coverage Ratio.  Borrower shall maintain a Debt Service Coverage Ratio ("DSCR") of not less than 1.25 to 1. DSCR shall be calculated as follows: (1) The sum of (net change in assets + depreciation + amortization + interest expense), divided by (2) the sum of (principal and interest payable by Borrower during the pertinent time period on the Loan and any other current or future loan or credit obligations of Borrower).  DSCR shall be measured annually on a trailing 12 month basis on December 31 of each year based on the Borrower's tax returns or other financial information provided to Lender.  For the purposes of this Agreement,

the term "Net Change In Assets" shall mean, for the applicable period, the excess of all revenues and income derived from operations in the ordinary course of business (excluding extraordinary gains and gains upon the disposition of investments and fixed assets), over all expenses and other proper charges against income (including payment or provision for all applicable income and other taxes, but excluding losses upon the disposition of investments and fixed assets), all as determined in accordance with generally recognized federal income tax basis accounting principles, applied on a consistent basis to the Borrower, for the applicable period preceding the date of determination.

        6.1.17.   <u>Membership; Accounts</u>.  Borrower and Guarantors shall be Members of Lender in good standing. Borrowers shall maintain operating accounts and reserves on deposit with Lender.

        6.1.18.   <u>Other Covenants</u>.  Borrower shall comply with all other covenants set forth in the other Loan Documents.

      6.2.   <u>Negative Covenants</u>  Borrower hereby covenants to Lender and agrees as follows:

        6.2.1.   <u>Change in Borrower's Name or Principal Place of Business</u>.  Borrower will not change its name, state of organization, or move the Collateral, its principal place of business or chief executive office except upon not less than sixty (60) days prior written notice to Lender.

        6.2.2.   <u>No Additional Liens</u>.  Borrower shall not allow any additional liens, encumbrances or other interests to affect the Collateral or any part thereof or Lender's first priority lien therein without the prior written consent of Lender, which may be withheld in Lender's discretion.

        6.2.3.   <u>No Additional Debt</u>.  Borrower shall not, without Lender's prior written consent, which may be withheld in Lender's discretion, incur any additional debt with respect to, or in connection with its ownership and operation of the Property (including without limitation any contingent or guarantor liability), except for short term accounts payable incurred in connection with the operation of the Property.

        6.2.4.   <u>Restrictions to Transfer</u>.  Borrower shall not sell (except for the sale of used furniture, fixtures and equipment which is being replaced with items of similar quality in the ordinary course of business), transfer, lease, encumber or otherwise dispose of the Collateral or any part thereof or interest therein without the prior written consent of Lender, which consent may be withheld by Lender in its discretion.

        6.2.5.   <u>USA Patriot Act</u>.  Without the prior written consent of Lender, neither Borrower nor any of its Affiliates will: (i) be or become subject at any time to any law, regulation or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Lender from opening an account for Borrower or any of its Affiliates or making any loan, advance or extension of credit to Borrower or any of its Affiliates or that prohibits or limits Lender from otherwise conducting business with Borrower or any of its Affiliates, or (ii) fail to provide documentation and other evidence of Borrower's or its Affiliates' identity as may be requested by Lender at any time to enable Lender to verify the Borrower's or any of its Affiliates' identity or to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. § 5318.

7.   <u>DEFAULT AND REMEDIES</u>.

      7.1.   <u>Events of Default</u>.  Any one or more of the following events shall constitute an Event of Default under this Agreement:

        a.   Any failure by Borrower (i) to make all or any part of a principal or interest payment on the Note when it is due, or (ii) to pay any other sum due under the Note, the Deed of Trust, or any of the other Loan Documents, or in any other agreement between Borrower and Lender, whether now or at any time hereafter existing, when the same shall become due and payable as therein expressed;

b.   Upon a default on any Obligation or upon any failure on the part of Borrower to strictly comply with and Perform any term, provision, covenant, or condition contained in this Loan Agreement that is not an obligation to pay money to Lender, or otherwise covered under another subsection of this Section 7.1 and such default or failure continues for a period of thirty (30) days after written notice from Lender to Borrower demanding Performance thereof; provided, however, that if such Performance is of a nature that it cannot be completed solely by the payment of money to a third party, and cannot otherwise reasonably be accomplished within such 30-day period, then so long as Borrower has commenced and is diligently pursuing such Performance, Borrower shall have such additional time as is reasonably necessary (but in no event more than ninety (90) days after such written notice to complete such Performance);

c.   Immediately if any warranty or representation of Borrower or any other Obligor contained in this Loan Agreement or any other Loan Document shall be or shall prove to have been materially false or misleading when made;

d.   Immediately upon (i) the filing by Borrower, any endorser of the Note or any Guarantor (or the filing against Borrower, such endorser or any Guarantor to which Borrower, such endorser or Guarantor acquiesces or which is not dismissed within sixty (60) days after the filing thereof) of any proceeding under federal or state bankruptcy, insolvency or receivership laws now or hereafter existing or any other similar statute now or hereafter in effect; (ii) the entry of an order for relief under such laws with respect to Borrower, any endorser of the Note or any Guarantor; or (iii) the appointment of a receiver, trustee, custodian or conservator of all or any part of the assets of Borrower, any endorser of the Note or any Guarantor;

e.   Immediately upon (i) the insolvency of Borrower, any endorser of the Note or of any Guarantor; (ii) the execution by Borrower, any such endorser or any Guarantor of an assignment for the benefit of creditors; (iii) the convening by Borrower, any such endorser or any Guarantor of a meeting of its creditors, or any class thereof, for purposes of effecting a moratorium upon or extension or composition of its debts; (iv) the failure of Borrower, any such endorser or any Guarantor to pay its debts as they mature; or (v) Borrower, any such endorser or any Guarantor generally not paying its debts as they mature;

f.   Immediately upon the admission in writing by Borrower, any endorser of the Note or any Guarantor that it is unable to pay its debts as they mature or that it is generally not paying its debts as they mature;

g.   Immediately upon the liquidation, termination or dissolution of Borrower, any endorser of the Note or any Guarantor, if a corporation, limited liability company, partnership, trust or joint venture if Lender is not reasonably reassured of timely performance and payment hereunder and under the Note and all other Loan Documents;

h.   Immediately upon any final action, rule, law, or decision of any legislative or administrative body or of any court which would materially impair or materially adversely affect the lien or enforceability of this Agreement or any one or more of the Loan Documents;

i.   Immediately upon the commencement of any action or proceeding to attach, garnish, levy or execute upon, or judicially seize, any of the Collateral, or to establish, assert, perfect, foreclose, or enforce any claim, restriction, encumbrance, deficiency tax assessment, or tax lien, on or with respect to the Collateral, whether or not superior or inferior to the lien of the Loan Documents and whether or not insured against by the Title Company, unless such action or proceeding is involuntary and Borrower, within thirty (30) days from the commencement of such action or filing, causes the same to be dismissed, or unless Borrower shall, within such thirty (30) day period, record and serve a surety bond pursuant to applicable state law or otherwise fully protect Lender from any loss or liability arising therefrom;

j.   Immediately upon the filing of any suit or legal action materially and adversely affecting the Collateral or adversely affecting Borrower's ability to Perform its Obligations under the Loan Documents unless such proceeding is involuntary and such involuntary proceeding is dismissed within sixty (60) days of commencement or filing;

k.  Immediately upon the assignment by Borrower, without Lender's prior written consent, of any of the Loan Documents or any rights of Borrower thereunder;

l.  Immediately upon Borrower's failure to maintain insurance on the Collateral of the types and in the amounts required under either Section 6.1.3 above or the Deed of Trust;

m.  Immediately upon the occurrence of any material damage to or destruction of the Collateral by any casualty not covered by insurance or rendering impossible, in Lender's reasonable judgment, the continued operation of the Property;

n.  Immediately upon Borrower's abandonment of all or any part of the Collateral or the cessation of operation of the Property except for seasonal closings consistent with prior operational practices;

o.  Immediately upon the occurrence of any event stated elsewhere in this Agreement or to constitute an "Event of Default" under this Agreement;

p.  Immediately upon the occurrence of any default under, or breach of any provision of, covenants, conditions and restrictions or easements now or hereafter recorded against the Real Property or any part thereof, which default materially and adversely affects the value, use or operation of the Property;

q.  Immediately upon the occurrence of any Event of Default (as defined therein) under any other Loan Document;

r.  Immediately upon the occurrence of any default under any document or instrument given by Borrower to or for the benefit of Lender in connection with any other indebtedness of Borrower to Lender, which default is not cured within any applicable cure period set forth therein; or

s.  Immediately upon the occurrence of any event of default under any material agreement between Borrower and any third party (including, without limitation, any default which would result in a right by such third party to accelerate the maturity of any material indebtedness of Borrower to such third party) if such event of default involves an amount in excess of $50,000.

7.2.  <u>Remedies</u>.  Upon the occurrence of any Event of Default hereunder, Lender may at its option either simultaneously or in any order whatsoever, take any one or more of the following actions:

a.  Decline and refuse and be relieved of any obligation to advance any funds hereunder or under the Note;

b.  Subject to the proviso set forth at the end of this Section 7.2, declare to be immediately due and payable, with interest, all funds advanced by or owed to Lender under the Note and any of the other Loan Documents;

c.  Take such other action as Lender may deem necessary to protect its interests;

d.  File suit against Borrower for any sums owing and/or for damages;

e.  Foreclose its lien and/or exercise its right to cause the Collateral to be sold under the Deed of Trust and exercise any other rights and remedies given to Lender in all other Loan Documents;

f.  Exercise any and all remedies of a secured party under the UCC with respect to the Collateral;

g.  Enter into possession of the Property in accordance with and for the purposes set forth in the Deed of Trust (all funds disbursed by Lender in exercising such rights shall be deemed to have been disbursed to

Borrower, shall become additional Obligations under the Loan Documents and shall be secured by the Loan Documents);

     h.   Take over and complete any development, construction or renovation work opposed by Lender through existing contractors and subcontractors or through any agent, contractor or subcontractor of Lender's selection, and make advances in payment of the costs, expense, fees, attorneys' fees and other charges incurred in connection with such taking over and completing such work, together with all reasonable allowances for supervision;

     i.   Request and have a receiver appointed with respect to Borrower and/or the Property, and to that end, Borrower hereby consents to the appointment of a receiver in any action initiated by Lender pursuant to this Agreement and to the jurisdiction and venue set forth in Section 9.9 hereof, and Borrower waives notice and posting of bond in connection therewith;

     j.   Withdraw funds from any interest reserve account, capital reserve account or any other reserve or escrow account of Borrower as to which Lender has either a security interest or a right of set-off and apply such funds to the Obligations in such order and manner as Lender shall determine;

     j.   Charge and collect interest on the outstanding principal balance of the Loan at the Default Interest Rate; and

     k.   Take such other actions or remedies as may be available to Lender under the Loan Documents and/or at law or in equity.

The foregoing notwithstanding, upon the occurrence of an Event of Default described in subsections e., f. or g. of Section 7.1, the full unpaid principal balance of the Loan, all accrued interest thereon, and all other amounts owed by Borrower to Lender shall automatically become immediately due and payable, without requirement for any election, declaration or notice by Lender.

     7.3.   Lender's Right to Cure. If Borrower shall fail to comply with or fully Perform any of its Obligations under the Loan Documents, regardless of whether an Event of Default shall then exist, Lender may (but shall not be obligated to), without further demand upon Borrower and without waiving or releasing Borrower from any such Obligation, remedy such defaults. All such sums, together with interest thereon at the Default Interest Rate, shall become additional indebtedness secured by the Collateral. No such payment by Lender shall be deemed to relieve Borrower from any default or Event of Default under any of the Loan Documents.

     7.4.   Power of Attorney. For the purpose set forth under Sections 7.2 and 7.3 above, Borrower hereby irrevocably appoints Lender as Borrower's true and lawful attorney-in-fact with full power of substitution (and such power of attorney shall be deemed to be a power coupled with an interest that cannot be revoked for any reason) to operate the Property and to take such action and require such Performance as it deems necessary. Borrower hereby empowers Lender, as such attorney-in-fact, as follows:

     a.   To take all actions reasonably necessary in connection therewith for the purpose of operating the Property;

     b.   To employ such management companies as shall be convenient for said purpose; and

     c.   To pay, settle, or compromise all existing or future bills and claims which are or may be liens against the Property or may be reasonably necessary or desirable for the operation of the Property.

8.   EXPENSES AND INDEMNITIES.

     8.1.   Loan Expenses. Borrower shall pay all costs of closing the Loan and all expenses of Lender with respect thereto, including, but not limited to, all legal fees and costs incurred by Lender in conjunction with the Loan,

including all fees incurred subsequent to the closing of the Loan in connection with the disbursement, administration, collection (regardless of whether litigation is commenced), or satisfaction of the Loan, advances, recording expenses, survey, taxes, expenses of collection or foreclosure (including attorneys' fees) and similar items. In the event of the commencement of a bankruptcy proceeding by or against Borrower or otherwise involving the Collateral, Lender shall, to the extent not already provided for herein, be entitled to recover, and Borrower shall be obligated to pay, Lender's attorneys' fees and costs incurred in connection with: (i) any determination of the applicability of the bankruptcy laws to the terms of the Loan Documents or Lender's rights thereunder; (ii) any attempt by Lender to enforce or preserve its rights under the bankruptcy laws, or to prevent Borrower or any other person from seeking to deny Lender its rights thereunder; (iii) any effort by Lender to protect, preserve or enforce its rights against the Collateral, or seeking authority to modify the automatic stay of 11 USC Section 362 or otherwise seeking to engage in such protection, preservation or enforcement; or (iv) any proceeding(s) arising under the bankruptcy laws, or arising in or related to a case under the bankruptcy laws. Borrower shall pay all Lender costs, fees and expenses within ten (10) days after its receipt of a written request therefor.

8.2. <u>Inspection Costs</u>. Borrower acknowledges that Lender retains the right to inspect the Property throughout the term of the Loan. Borrower agrees to reimburse Lender for the expense of inspections.

8.3. <u>Indemnification</u>. Borrower shall indemnify, defend and hold Lender harmless for, from and against all claims, costs, expenses, actions, suits, proceedings, losses, damages, and liabilities of any kind whatsoever, including but not limited to attorneys' fees and expenses, arising out any matter relating to the Loan or to the ownership, development, construction, sale, rental or financing of the Property and whether resulting from internal disputes of Borrower, disputes between Borrower and any Affiliate or whether involving other third persons or entities, or out of any other matter whatsoever related to this Agreement, any of the Loan Documents or any property encumbered thereby; excluding, however, claims, costs, expenses, actions, suits, proceedings, losses, damages and liabilities of any kind whatsoever which result from the Lender's gross negligence or willful misconduct. This indemnity provision shall continue in full force and effect and shall survive not only the making of the Loan but shall also survive the repayment of the Loan and the Performance of all of Borrower's other Obligations under this Agreement and the other Loan Documents.

8.4. <u>Brokerage Fees</u>. Borrower has dealt with no mortgage broker or finder with regard to the Loan and Borrower shall indemnify and hold Lender harmless for, from and against any and all claims for fees or compensation claimed to be due in connection with the Loan as a result of the acts of Borrower from any broker or finder.

9. <u>MISCELLANEOUS</u>.

9.1. <u>Notices</u>. All notices required or permitted to be given hereunder shall be in writing, and shall be deemed delivered (a) one (1) Business Day after such are deposited for delivery via Federal Express or other nationally recognized overnight courier service, or (b) three (3) Business Days after such are deposited in the United States mails, certified or registered mail, in either case, with all postage prepaid, and addressed to the party as set forth for such party below its signature block to this Agreement, or to such other address as either party may, from time to time, designate in a written notice to the other party. Written notice may be given to a party by facsimile to the facsimile number set forth for such party below its signature block to this Agreement or such other facsimile number as either party may designate, from time to time, in a written notice to the other party, provided that such facsimile notice shall not be deemed effective unless it is confirmed by depositing no later than the next Business Day a copy of such notice with a nationally recognized overnight courier or in the United States mails for delivery in accordance with the requirements set forth above.

9.2. <u>No Waiver</u>. Any waiver of any of the terms of this Agreement by Lender shall not be construed as a waiver of any other terms of this Agreement, and no waiver shall be effective unless made in writing. The failure of Lender to exercise any right with respect to the declaration of any default shall not be deemed or construed to constitute a wavier of, or to preclude Lender from exercising, any right with respect to such default at a later date or with respect to any subsequent default by Borrower.

9.3. <u>Interpretation</u>. The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party

shall not be employed in the interpretation of this Agreement or the other Loan Documents or any amendments or exhibits hereto or thereto.

9.4.     No Third-Party Beneficiary. This Agreement is made solely between Borrower and Lender. No other person shall have any right of action hereunder. Borrower and Lender expressly agree that no person shall be a third-party beneficiary to this Agreement. Any inspection by Lender of work or documents shall be solely for Lender's benefit, and neither Borrower nor any third party may rely thereon.

9.5.     Binding on Successor and Assigns; No Assignment by Borrower. This Agreement shall inure to the benefit of, and be binding upon, the parties hereto, their respective executors, administrators, heirs, successors, and assigns (including, without limitation, any other lender participating with Lender in the Loan), provided, however, that neither this Agreement nor any rights or Obligations hereunder shall be assignable by Borrower without the prior express written consent of Lender, and any purported assignment made in contravention hereof shall be void. No standard of reasonableness shall attach to Lender's discretion in consenting or not consenting to any assignment.

9.6.     Incorporation. The Recitals, and all exhibits, riders, schedules and attachments hereto and thereto are an integral part of this Agreement and are fully incorporated herein by this reference.

9.7.     Additional Documents; Corrective Documents. Borrower shall execute and deliver any and all documents which may reasonably be requested by Lender in order to effectuate the purpose of this Agreement. If any Loan Document is lost, misplaced, misstated or defective or inaccurately reflects the true and correct terms and conditions of the Loan, upon request of the Lender, Borrower shall promptly comply (and cause any Guarantor or other Affiliate of Borrower to comply) with Lender's request to execute, acknowledge and deliver to Lender any replacement or additional documentation as may be necessary or as may be reasonably requested by Lender to (i) replace or correct such lost, misplaced, misstated, defective or inaccurate documents (subject to Lender indemnifying Borrower against any loss associated with a demand on the original Note if Lender asks that the original Note be replaced), (ii) to carry out more effectively the purposes of the Loan Documents, (iii) to subject to the liens and security interests created hereby and by the other Loan Documents any of Borrower's properties, rights or interests covered or intended to be covered hereby or by any other Loan Document, or (iv) to perfect and maintain such liens and security interests and the priority thereof. Borrower's failure or refusal to comply with such request from Lender shall constitute an Event of Default under this Agreement and the other Loan Documents.

9.8.     Time of Essence. Time is of the essence of each and every provision of this Agreement and the other Loan Documents.

9.9.     CHOICE OF LAW; JURISDICTION AND VENUE; WAIVER OF JURY TRIAL

9.9.1.     CHOICE OF LAW. EXCEPT FOR ACTIONS RELATING TO THE EXERCISE OF REMEDIES AGAINST THE REAL PROPERTY OR OTHER COLLATERAL SITUATED OUTSIDE OF THE STATE OF ARIZONA OR AS OTHERWISE PROVIDED IN A SPECIFIC LOAN DOCUMENT, THE LOAN DOCUMENTS, THIS AGREEMENT AND THE RIGHTS, DUTIES AND OBLIGATIONS OF THE PARTIES THERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF ARIZONA (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND, TO THE EXTENT THEY PREEMPT THE LAWS OF SUCH STATE, THE LAWS OF THE UNITED STATES.

9.9.2.     JURISDICTION AND VENUE. BORROWER: (A) HEREBY IRREVOCABLY SUBMITS ITSELF TO THE PROCESS, JURISDICTION AND VENUE OF THE COURTS OF THE STATE OF ARIZONA, MARICOPA COUNTY, AND TO THE PROCESS, JURISDICTION, AND VENUE OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA, FOR THE PURPOSES OF SUIT, ACTION OR OTHER PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF (EXCEPT AS MAY BE SPECIFICALLY PROVIDED TO THE CONTRARY IN THE DEED OF TRUST), OR, IF LENDER INITIATES SUCH ACTION, ANY COURT IN WHICH LENDER SHALL INITIATE SUCH ACTION AND THE CHOICE OF SUCH VENUE SHALL IN ALL INSTANCES BE AT LENDER'S ELECTION; AND (B) WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, HEREBY WAIVES AND AGREES NOT TO ASSERT BY WAY OF MOTION, DEFENSE OR OTHERWISE IN ANY SUCH SUIT,

ACTION OR PROCEEDING ANY CLAIM THAT BORROWER IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE ABOVE-NAMED COURTS, THAT SUCH SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM OR THAT THE VENUE OF SUCH SUIT, ACTION OR PROCEEDING IS IMPROPER. BORROWER HEREBY WAIVES THE RIGHT TO COLLATERALLY ATTACK ANY JUDGMENT OR ACTION IN ANY OTHER FORUM. TO THE EXTENT THAT A COURT OF COMPETENT JURISDICTION FINDS ARIZONA LAW INAPPLICABLE WITH RESPECT TO ANY PROVISIONS OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, THEN, AS TO THOSE PROVISIONS ONLY, THE LAWS OF THE STATES WHERE THE COLLATERAL IS LOCATED SHALL BE DEEMED TO APPLY.

9.9.3. <u>WAIVER OF JURY TRIAL</u>. LENDER AND BORROWER ACKNOWLEDGE AND AGREE THAT ANY CONTROVERSY WHICH MAY ARISE UNDER ANY OF THE LOAN DOCUMENTS WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES AND THEREFORE, THE PARTIES AGREE THAT ANY LAWSUIT ARISING OUT OF ANY SUCH CONTROVERSY SHALL BE TRIED BY A JUDGE SITTING WITHOUT A JURY, AND BORROWER HEREBY KNOWINGLY AND VOLUNTARILY WAIVES TRIAL BY JURY IN ANY SUCH PROCEEDING.

9.9.4. <u>INDUCEMENT</u>. ALL OF THE PROVISIONS SET FORTH IN THIS SECTION ARE A MATERIAL INDUCEMENT FOR LENDER'S MAKING THE LOAN TO BORROWER.

9.10. <u>Integration</u>. This Agreement, together with the exhibits and other attachments hereto or thereto, together with the other Loan Documents embody the entire and final agreement of the parties in relation to the subject matter hereof, and supersede all terms, conditions and provisions embodied in any commitment letter or agreement between Lender and Borrower and any and all other previous writings between Lender and Borrower. There are no representations, promises, warranties, understandings or agreements, expressed or implied, oral or otherwise, in relation thereto, except those expressly referred to or set forth herein. Borrower acknowledges that the execution and delivery of this Agreement is its free and voluntary act and deed, and that said execution and delivery have not been induced by, nor done in reliance upon, any representations, promises, warranties, understandings, or agreements made by Lender, its agents, officers, employees, or representatives. No promise, representation, warranty or agreement made subsequent to the execution and delivery hereof by either party hereto, and no revocation, partial or otherwise, or change, amendment, addition, alteration or modification of this Agreement shall be valid unless the same be in writing signed by all the parties hereto.

9.11. <u>Captions</u>. The headings or captions of the sections in this Agreement are for convenience and reference only, and in no way define, limit, or describe the scope of intent of this Agreement or the provisions of any section.

9.12. <u>Publicity</u>. At its option, Lender may announce and publicize the source of financing for the Property. Lender shall be included in general Property signage or, at its own expense, may place display signs on the Property indicating its involvement in project financing. Borrower shall maintain any display signs until the Loan is fully repaid.

9.13. <u>Survival</u>. The provisions of this Agreement shall survive the making of the Loan and shall continue in full force and effect until full repayment of the Loan and the complete Performance of all of the Obligations under this Agreement and the other Loan Documents.

9.14. <u>No Joint Venture</u>. Under no circumstances shall Lender and Borrower be deemed partners and/or joint venturers with respect to the Property, the Loan, or any other agreement between the parties.

9.15. <u>Joint and Several Liability</u>. The liability hereunder of all individuals and entities comprising Borrower, if more than one, shall be joint and several.

9.16. <u>Approval Standard</u>. Unless otherwise specifically stipulated in such provision, if a matter is left to the decision, determination, judgment, approval, consent, satisfaction, acceptance, option or discretion of Lender or its

employee, counsel, inspector or agent pursuant to any provision of this Agreement or any other Loan Document, the action with respect to such matter may be exercised by Lender or such other person in its sole and absolute discretion and according to standards established in its sole and absolute discretion.

9.17.    <u>Hierarchy</u>.  In the case of any inconsistency between or within this Agreement and/or the other Loan Documents, the more restrictive provision shall control over the less restrictive provision, and, if incapable of being so resolved, the provisions of this Agreement shall control over those of any of the other Loan Documents, except as otherwise set forth in this Agreement or in the other Loan Documents.

9.18.    <u>Severability</u>.  If any provision of this Agreement shall be prohibited or invalid under applicable law, it shall be ineffective only to such extent, without invalidating the remainder of this Agreement.

9.19.    <u>Injunctive Relief</u>.  Borrower recognizes that, in the event Borrower fails to Perform, observe or discharge any of its Obligations under this Agreement or the other Loan Documents, any remedy at law may prove to be inadequate relief to Lender.  Therefore, Lender, if it so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

9.20.    <u>Counterparts; Facsimile Signatures</u>.  This Agreement and the other Loan Documents may be executed in one or more counterparts, each of which taken together shall constitute one and the same instrument. Lender and its attorneys and agents may also integrate into a single document the signature pages from separate counterparts of this Agreement or any other Loan Document. The facsimile or scanned (and delivered by electronic transmission) signature of a party on any counterpart of this Agreement or any other Loan Document shall be deemed to be an original signature of that party, shall be binding upon the signer for all purposes, and may be relied upon by all other parties hereto or thereto. However, upon written request from Lender to any Person who has submitted a facsimile or scanned signature, such Person will confirm its facsimile or scanned signature by providing Lender with an original of such agreement, document or instrument bearing such Person's original signature.

9.21.    <u>USA Patriot Act Notification</u>.  The following notification is provided to Borrower pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. § 5318:  IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.  To help the United States government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit or other financial services product.  What this means for Borrower:  When Borrower opens an account, if Borrower is an individual, Lender will ask for Borrower's name, taxpayer identification number, residential address, date of birth and other information that will allow Lender to identify Borrower, and, if Borrower is not an individual, Lender will ask for Borrower's name, taxpayer identification number, business address and other information that will allow Lender to identify Borrower.  Lender may also ask to see Borrower's legal or organizational documents or other identifying documents as well as information with respect to its Affiliates.

**[SIGNATURE PAGE FOLLOWS]**

[SIGNATURE PAGE TO LOAN AND SECURITY AGREEMENT]

　　　　IN WITNESS WHEREOF, the parties have duly executed this Agreement to be effective as of the date first appearing above.

"Borrower":

WC PARADISE COVE MARINA, LP, a Texas limited partnership

By:  WC PARADISE COVE GP, LLC, a Texas limited
　　　liability company, its General Partner

　　　By:  WORLD CLASS CAPITAL GROUP, LLC, a
　　　　　Texas limited liability company, its Manager

　　　　By_____
　　　　Printed Name____Natin Paul_____
　　　　Title_____Manager_____


Borrower's Notice Address:
　　　　401 Congress Avenue, 33rd Floor
　　　　Austin, TX 78701
　　　　Attention:  Nate Paul

[SIGNATURE PAGE TO LOAN AND SECURITY AGREEMENT]

IN WITNESS WHEREOF, the parties have duly executed this Agreement to be effective as of the date first appearing above.

"Lender":

NORTHWEST FEDERAL CREDIT UNION


By:_____
Title:  Authorized Signatory


Lender's Notice Address:
          200 Sprint St., Suite 120
          Herndon, VA 20170

10193.1.873922.7                                         23

## Exhibit A

### LEGAL DESCRIPTION OF REAL PROPERTY

COMMENCING FOR REFERENCE at a 1/2" steel pipe found at the northwest corner of Lot 1, Arno Brill Second Subdivision Lake Tracts, recorded in Book 4, Page 193, Travis County Plat Records, also the northeast corner of said 280.509 acres, PROCEEDING S15°59'00"E 25.00 feet along the east line of said 280.509 acres to a mag nail found in rock, at the southeast corner of a 2.337 acre tract conveyed to Joyce Taylor and David Shook by deed recorded in Document No. 2004039877, TCOPR, for the northeast corner and POINT OF BEGINNING hereof;

THENCE S15°59'00"E 266.12 feet along the east line of said 280.509 acres and west line of said Lot 1 and Lot 2, to a 1/2" steel pin found at the mutual west corner of Lots 2 and 3, for angle point hereof;

THENCE S33°41'22"E 343.17 feet with the east line of said of said 280.509 acres and the west line of Lots 3 and 4 to a 1/2" steel pin with cap found, for angle point hereof;

THENCE S52°05'17"E 348.73 feet with the east line of said of said 280.509 acres and the west line of Lots 4, 5 and 6 to a 1/2" steel pin found in the west right-of-way (ROW) line of Rocky Ridge Road for southeast corner hereof;

THENCE with the west and north right-of-way (ROW) line of Rocky Ridge Road and the boundary of said 280.509 acres, the following 5 courses:

1) S10°49'43"W 205.54 feet to 1/2" steel pin found,
2) S25°35'43"W 149.30 feet to 1" steel spindle found,
3) S76°13'43"W 231.80 feet to a 1/2" steel pin with cap found,
4) N75°31'17"W 295.96 feet to a 1/2" steel pin with cap found at the east corner of a 0.088 acre deeded to Ron Doll by quitclaim deed in Volume 7665, Page 628, TCDR,
5) S71°36'18"W 98.24 feet to a 1/2" steel pin with cap found at a fence corner at the southeast corner of a 4833 square foot tract conveyed to Whittington Interests by deed in Document No. 2008039793, TCOPR, for corner hereof;

THENCE N40°35'05"W 123.68 feet along the east line of said Whittington tract, to a 1/2" steel pin with cap found at fence angle for angle point hereof;

THENCE N5°41'43"W 85.61 feet along the east line of said Whittington tract, to a 1/2" steel pin with cap found at fence corner for corner hereof;

THENCE N51°08'19"E 84.96 feet along a west line of said 280.509 acres, to a 1/2" steel pin with cap found at a fence corner at its southeast corner, for inside corner hereof;

THENCE N40°34'07"W 239.28 feet along a fence to a 1/2" steel pin with cap found at the 690-foot elevation contour as found on the ground, for angle hereof;

THENCE along said 690-foot contour as found on the ground and a west line of said 280.509 acres, also the east line of a 1.000 acre tract conveyed to Rocky Ridge Residential LLC by deed recorded in Document No. 2014066058, TCOPR, the following 7 courses:

1) N49°13'50"W 57.26 feet to a 1/2" steel pin with cap found for angle,
2) N49°34'19"W 84.44 feet to a 1/2" steel pin with cap found for angle,
3) N52°26'31"W 53.05 feet to a 1/2" steel pin with cap found for angle,
4) N56°19'05"W 38.03 feet to a 1/2" steel pin with cap found for angle,
5) N71°15'17"W 58.07 feet to a 1/2" steel pin with cap found for angle,
6) N76°43'09"W 55.39 feet to a 1/2" steel pin with cap found for angle,
7) N78°32'22"W 73.09 feet to a 1/2" steel pin found for angle hereof;

10193.1.873922.7                                   24

THENCE with the north line of a 1.464 acre tract conveyed to John Bullock and David L. Morriso by deed recorded in Document No. 2004162480, TCOPR, the following 3 courses:

1) N39°41'20"W 52.76 feet to a mag nail set in asphalt,
2) S89°04'51"W 55.79 feet to a mag nail set in asphalt,
3) S68°30'04"W 64.36 feet to a 1/2" steel pin with cap found at the northwest corner of said 1.464 acres, for angle hereof;

THENCE S39°23'41"W 125.96 feet with the north line of a court settlement of Cause No. 03-93-00153-CV, Third Court of Appeals, Travis County, Texas, to a 1/2" steel pin with orange cap set for corner hereof;

THENCE S52°07'10"E 37.93 feet with the west line of said settlement to a brass disk found in concrete at the northeast corner of a tract conveyed to Fred P. Holub in Volume 6327, Page 243, TCDR (original deed 968/67), for angle hereof;

THENCE S02°45'03"W 100.00 feet along the northwest line of said Holub tract to a 1/2" steel pipe found at the base of a live oak tree, for angle hereof;

THENCE with the north and west line of a 1.369 acre tract conveyed to Christopher A. Woods by deed recorded in Document No. 2008112538, TCOPR, the following 2 courses:

1) N52°10'26"W 77.41 feet to a 1/2" steel pin with orange cap set at the northwest corner of said 1.369 acre tract,
2) S09°42'43"E 143.67 feet to a 1/2" steel pin with orange cap set at the west corner of said 1.369 acre tract, for angle hereof;

THENCE S16°56'59"W 49.95 feet with the west line of a 0.868 acre tract conveyed to Serendipity Properties by deed recorded in Document No. 2004085588, for corner hereof;

THENCE S61°15'19"E 92.53 feet with the southwest line of said 0.868 acre to a 1/2" steel pin with cap set at the northwest corner of a 0.7800 acre tract conveyed to Serendipity Properties by deed recorded in Document No. 2009196097, on an east line of said 280.509 acres, for angle hereof;

THENCE S20°32'36"E 185.40 feet along said east line of 280.509 acres and the northwest lines of two tracts conveyed to Serendipity Properties by deed recorded in Documents 2009196097 and 2011143441, TCOPR, to a 1/2" steel pin with cap set at the southwest corner of said tracts, for inside corner hereof;

THENCE N60°56'26"W 68.33 feet along the northeast line of a 0.3600 acre tract conveyed to Candice O. Jones by deed recorded in Document No. 2008083694, TCOPR, and the northeast line of a 1.928 acre tract conveyed to Serendipity Properties by deed recorded in Document No. 2011095477, TCOPR, to its southwest corner, for angle hereof;

THENCE S08°11'17"E 195.49 feet along the west line of said Serendipity tract and of Lot 21, Arno Brill Third Subdivision Lake Tracts, Book 4, Page 198, Travis County Plat Records, to a 1/2" steel pin with cap set at the northwest corner of said Lot 21, for angle point;

THENCE along the east line of said 280.509 acres and the west line of said subdivision the following 6 courses:

1) S01°05'38"E 184.83 feet to a 1/2" steel pin found with cap,
2) S32°06'13"E 129.56 feet to a 1/2" steel pipe found at corner of Lots 23/23,
3) S43°47'07"E 123.51 feet to a 1/2" steel pipe found at corner of Lots 23/24,
4) S50°16'35"E 130.90 feet to a 1/2" steel pipe found at corner of Lots 24/25,
5) S45°41'35"E 140.90 feet to a 1/2" steel pin found at corner of Lots 25/26,
6) N86°56'03"E 132.72 feet to a 1/2" steel pipe found at the southeast corner of Lot 27, for angle hereof;

THENCE S27°47'22"E 146.57 feet with the west line of a 2.549 acre tract conveyed to Gilberto & Lucia Franco by deed recorded in Document No. 2012210228, TCOPR, to a 1/2" steel pipe found at the corner of Lots 31/32 for corner hereof;

THENCE resuming with the boundary of said Brill Third Subdivision (4/198) and east line of said 280.509 acres the following 6 courses:

1) S52°12'24"W 399.33 feet to a 1/2" steel pipe found at a rock column at the corner of Lots 32/33 for angle,
2) S12°51'04"W 116.26 feet to a steel pin found in a 1/2" steel pipe at an angle of Lot 33,
3) S23°29'28"E 127.06 feet to a 60d nail found at the corner of Lots 33/34,
4) S23°39'12"E 255.48 feet to a 1/2" steel pin with cap set at corner of Lots 34/35,
5) S61°32'37"E 108.82 feet to a 1/2" steel pin with cap set at an angle of Lot 35,
6) N83°02'32"E 50.40 feet to a ½" steel pin found at the northwest corner of a 10.437 acre tract conveyed to Paul Hornsby by deed recorded in Document No. 2003046538, TCOPR, for corner hereof;

THENCE S29°39'06"E 1159.78 feet with the southwest line of said 10.437 acres to a submerged point at its south corner, for southeast corner hereof;

THENCE S27°56'00"W 369.51 feet with the west line of a 1.545 acre tract conveyed to David A. Hall by deed recorded in Document No. 2000184503, and continuing with the approximate center of a submerged ravine, being the west line of a tract conveyed to Charles McCormick in Volume 762, Page 612, TCDR, to a point on the submerged north bank of the Colorado River, for southeast corner hereof;

THENCE with the west line of said 280.509 acres, with calls for the flooded east bank of the Colorado River, said calls taken from LCRA map no. 6-1234 of the Marshall Ford Dam Right-of-Way Survey dated May 14, 1937, the following 11 courses:

1) N56°38'25"W 746.56 feet,
2) N52°07'00"W 1166.00 feet,
3) N62°27'00"W 296.90 feet,
4) N50°43'00"W 355.80 feet,
5) N53°44'00"W 669.00 feet,
6) N40°39'00"W 255.71 feet,
7) N46°52'00"W 825.40 feet,
8) N35°23'00"W 886.70 feet,
9) N12°05'00"W 1017.80 feet,
10) N11°28'00"E 795.10 feet,
11) N27°18'00"E 615.97 feet to a point at the southwest corner of a 2.337 acre, 25-foot wide strip of land conveyed to Joyce Taylor & David Shook by deed recorded in Document No. 2004039877, TCOPR, for the northwest corner hereof;

THENCE S61°05'17"E 3688.99 feet with the south line of said 2.337 acres to a 1/2" steel pin with orange cap found at a point of curve to the left in the south line of said 2.337 acres;

THENCE along said curve to the left, with chord of S83°09'01"E 18.78 feet and radius of 25 feet, to a 1/2" steel pin with orange cap found at the end of said curve;

THENCE N74°47'15"E 374.45 feet with the south line of said 2.337 acres to the POINT OF BEGINNING, containing 269.059 acres of land, more or less.

## Exhibit A-3

**Deed of Trust**

ELECTRONICALLY RECORDED          2015073414
                        TRV    33    PGS

When recorded, return to:

Timothy J. Martens, Esq.
Gammage & Burnham PLC
Two North Central Avenue
15th Floor
Phoenix, Arizona 85004
GF# 471300744446L

## DEED OF TRUST, ASSIGNMENT OF RENTS,
## SECURITY AGREEMENT AND FIXTURE FILING

THIS DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE
FILING (this "Deed of Trust") dated as of April 23, 2015, is executed and delivered by and among WC
PARADISE COVE MARINA, LP, a Texas limited liability company (the "Grantor"), whose mailing address
and whose chief executive office (or residence if such party is an individual without an office) is located at
17141 Rocky Ridge Road, Austin, Texas 78734, REBECCA S. CONRAD, ESQ. (the "Trustee"), whose
mailing address is c/o Chicago Title Insurance Company, 2828 Routh Street, Suite 800, Dallas, Texas, and
NORTHWEST FEDERAL CREDIT UNION (the "Beneficiary"), whose mailing address is 200 Spring
Street, Herndon, Virginia 20170, under the circumstances summarized in the following recitals:

A.      In consideration for a loan in the amount of THREE MILLION TWO HUNDRED
THOUSAND AND NO/100 DOLLARS ($3,200,000.00) (the "Loan") made by Beneficiary to Grantor,
Grantor has executed and delivered to Beneficiary a certain Promissory Note of even date herewith in the
principal amount of the Loan as aforesaid (the "Note"), which Note accrues interest at a market rate as
provided therein, the terms of which are incorporated herein by this reference.

B.      This Deed of Trust secures the payment of the unpaid principal balance of the Note, together
with interest as therein provided and all other obligations of Grantor pursuant to the Note, this Deed of Trust,
the Loan and Security Agreement of even date herewith between Grantor and Beneficiary (the "Agreement")
and all other documents or instruments evidencing or securing the Loan or otherwise executed in connection
with the Loan and any partial or total extensions, renewals, modifications, amendments, restatements,
replacements or substitutions thereof or therefor (collectively referred to herein as the "Loan Documents");

C.      It is intended that this Deed of Trust shall secure unpaid balances of advances made after this
Deed of Trust is recorded in the applicable real property records.

NOW, THEREFORE, in consideration of the Loan made by Beneficiary to Grantor, as evidenced by
the Note, and for other valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, and for the purpose of securing: (i) all payments to be made by Grantor pursuant to the Note,
the Deed of Trust and/or any other Loan Document, (ii) all future or additional advances made at the option
of Beneficiary, as contemplated herein, (iii) all amounts advanced or costs incurred by Beneficiary for the
protection of the Trust Property (as hereinafter defined) or the enforcement of this Deed of Trust, the Note,
the Agreement and/or any other Loan Document, (iv) any other cost or expense which, by the terms of this
Deed of Trust, the Note, the Agreement and/or any other Loan Document, may be the subject of
reimbursement to Beneficiary by Grantor, and (v) the performance and observance of each covenant and

10193.1.874145

**ORIGINAL**

When recorded, return to:

Timothy J. Martens, Esq.
Gammage & Burnham PLC
Two North Central Avenue
15th Floor
Phoenix, Arizona 85004

GR# 4713007444AR

## DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

THIS DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "Deed of Trust") dated as of April 23, 2015, is executed and delivered by and among WC PARADISE COVE MARINA, LP, a Texas limited liability company (the "Grantor"), whose mailing address and whose chief executive office (or residence if such party is an individual without an office) is located at 17141 Rocky Ridge Road, Austin, Texas 78734, REBECCA S. CONRAD, ESQ. (the "Trustee"), whose mailing address is c/o Chicago Title Insurance Company, 2828 Routh Street, Suite 800, Dallas, Texas, and NORTHWEST FEDERAL CREDIT UNION (the "Beneficiary"), whose mailing address is 200 Spring Street, Herndon, Virginia 20170, under the circumstances summarized in the following recitals:

A.      In consideration for a loan in the amount of THREE MILLION TWO HUNDRED THOUSAND AND NO/100 DOLLARS ($3,200,000.00) (the "Loan") made by Beneficiary to Grantor, Grantor has executed and delivered to Beneficiary a certain Promissory Note of even date herewith in the principal amount of the Loan as aforesaid (the "Note"), which Note accrues interest at a market rate as provided therein, the terms of which are incorporated herein by this reference.

B.      This Deed of Trust secures the payment of the unpaid principal balance of the Note, together with interest as therein provided and all other obligations of Grantor pursuant to the Note, this Deed of Trust, the Loan and Security Agreement of even date herewith between Grantor and Beneficiary (the "Agreement") and all other documents or instruments evidencing or securing the Loan or otherwise executed in connection with the Loan and any partial or total extensions, renewals, modifications, amendments, restatements, replacements or substitutions thereof or therefor (collectively referred to herein as the "Loan Documents");

C.      It is intended that this Deed of Trust shall secure unpaid balances of advances made after this Deed of Trust is recorded in the applicable real property records.

NOW, THEREFORE, in consideration of the Loan made by Beneficiary to Grantor, as evidenced by the Note, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and for the purpose of securing: (i) all payments to be made by Grantor pursuant to the Note, the Deed of Trust and/or any other Loan Document, (ii) all future or additional advances made at the option of Beneficiary, as contemplated herein, (iii) all amounts advanced or costs incurred by Beneficiary for the protection of the Trust Property (as hereinafter defined) or the enforcement of this Deed of Trust, the Note, the Agreement and/or any other Loan Document, (iv) any other cost or expense which, by the terms of this Deed of Trust, the Note, the Agreement and/or any other Loan Document, may be the subject of reimbursement to Beneficiary by Grantor, and (v) the performance and observance of each covenant and

10193.1.874145

agreement of Grantor contained in this Deed of Trust, the Note, the Agreement and/or any other Loan Document, Grantor does hereby irrevocably grant, bargain, sell, convey, assign and transfer unto the Trustee, in trust, with power of sale, for the benefit of Beneficiary, its successors and assigns, the following property whether now owned or hereafter acquired (the "Trust Property"):

      (a)      The real property described in *Exhibit "A"* attached hereto (the "Property"), together with all additions, improvements, facilities, fixtures and other property, now or hereafter located in, upon or under, or based upon such Property;

      (b)      All easements, rights of way or uses, licenses, privileges, franchises, servitudes, tenements, hereditaments and appurtenances now or hereafter belonging or in any way appertaining thereto, including, without limitation, all right, title and interest of Grantor in any street, alley, or sidewalk, open or proposed, and in front of, adjoining, adjacent or contiguous thereto, and all rights and estates in reversion or remainder;

      (c)      Subject to the rights of Beneficiary under *Section 19* hereof and the Texas Assignment of Rents Act, all leases, rentals, revenues, payments, repayments, income, charges, moneys, issues and profits thereof;

      (d)      The proceeds from any insurance or condemnation award pertaining thereto, or compensation in lieu thereof, including, but not limited to, any award or compensation for the alteration of the grade of any street or any other injury to, or decrease in the value of, the Trust Property;

      (e)      All of Grantor's right, title, interest, estate, claim and demand, either at law or in equity, in and to all architectural, engineering and similar plans, specifications, drawings, renderings, profiles, studies, shop drawings, reports, plats, permits, surveys and the like, all sewer taps, permits and allocations, and all agreements for utilities, bonds, sureties and the like, relating to the Trust Property or appurtenant facilities erected upon or about the Property;

      (f)      All contracts and other agreements for the sale of any of the Trust Property or any part thereof or interest therein, now or hereafter entered into by Grantor, and all right, title and interest of Grantor thereunder, including, without limitation, all right, title and interest of Grantor in cash or securities deposited thereunder to secure the performance by the contract purchasers of their obligations thereunder, and including, without limitation, the right to receive and collect the proceeds thereof;

      (g)      All of Grantor's rights, powers and privileges (but not the burdens and obligations) under any construction contract or architect's (or engineer's) agreement now or hereafter entered into by Grantor relating to the Trust Property, and all bonds and surety agreements related thereto;

      (h)      All contracts and other agreements, if any, relating to the sale, lease, brokerage, development, management, maintenance and/or operation of the Trust Property (or of any part thereof or interest therein) or otherwise pertaining thereto, including, without limitation, franchise agreements;

      (i)      All rights of Grantor under any commitment for any other loan secured by the Trust Property or any part thereof or interest of Grantor therein;

(j)     All right, title and interest of Grantor in all trade names, trademarks and/or servicemarks hereinafter used in connection with the Trust Property, and all contract rights and contracts, franchise agreements, general intangibles, actions and rights of action, accounts, deposit accounts, instruments, letter of credit rights, supporting obligations, investment property, documents, chattel paper, deposits, prepaid expenses, permits, and licenses, owned by Grantor and used in connection with or related to the Trust Property or in the possession or control of Beneficiary;

(k)     All machinery, apparatus, equipment, fittings, fixtures, inventory, appliances, furniture and articles of personal property of every kind and nature whatsoever, other than consumable goods, now or hereafter located in or upon said Property or any part thereof, owned by Grantor and used or useable in connection with any present or future operation of said Property (herein collectively called "Equipment"), including, but without limiting the generality of the foregoing, all heating, lighting, laundry, incinerating, plumbing, lifting, cleaning, fire-prevention, fire-extinguishing, refrigerating, ventilating, communications, air-conditioning and air-cooling equipment or apparatus, engines, pipes, pumps, tanks, motors, conduits, switchboards, elevators, escalators, shades, awnings, screens, storm doors and windows, stoves, wall beds, refrigerators, attached cabinets, partitions, ducts and compressors, and all of the right, title and interest of Grantor in and to any Equipment which may be subject to any conditional bill of sale, chattel mortgage or security interest superior to the lien or security interest established by this Deed of Trust;

(l)     All proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, the proceeds of insurance; and

(m)     All proceeds, additions, replacements and substitutions of and to any of the foregoing.

TO HAVE AND TO HOLD the Trust Property unto Trustee, and its successors or substitutes in this trust, and to its or their successors and assigns, in trust for the benefit of Beneficiary, upon the terms, provisions and conditions herein set forth.

**Section 1.** Representations and Warranties. Grantor represents and warrants that: (a) Grantor is lawfully seized with good and marketable title in fee simple absolute to the Trust Property, free and clear of all liens and encumbrances whatsoever, except general and special taxes and assessments that are not delinquent, zoning ordinances, and those matters set forth in *Exhibit "B"* attached hereto (hereinafter "Permitted Encumbrances"), and has good and marketable title to all personal property included in the Trust Property, subject only to the Permitted Encumbrances; (b) it has full right, power and authority to bargain, sell, mortgage and convey the Trust Property as herein provided; and (c) except as expressly provided above, it will warrant to Beneficiary, and defend for the benefit of Beneficiary, such title to the Trust Property and the lien and interest of Beneficiary therein and thereon against all claims and demands whatsoever, and will maintain the priority of the lien of, and the security interest granted by, this Deed of Trust upon the Trust Property until Grantor shall be entitled to defeasance as provided herein.

**Section 2.** After-Acquired Property. All property of every kind acquired by Grantor after the date hereof, and located at, on or under the Property, shall, without further mortgage, conveyance or assignment, become subject to the lien of this Deed of Trust as fully as though now owned by Grantor and specifically described herein. Nevertheless, Grantor shall take such actions and execute and deliver such additional instruments as Beneficiary shall reasonably require to further evidence or confirm the subjection of any such property to the lien of this Deed of Trust.

**Section 3. <u>Payment of Indebtedness</u>.** Grantor will pay the indebtedness secured hereby in the manner and at the times provided herein and/or in the Note or any other Loan Document, and, until the indebtedness secured hereby is fully paid, will comply with all of the covenants, terms and provisions contained herein, in the Agreement, and in all of the other Loan Documents.

**Section 4. <u>Loan Advances</u>.** This Deed of Trust secures the unpaid balances of all advances or readvances made under the Note, this Deed of Trust, the Agreement, or any other Loan Document. It is also expressly provided for and agreed that this Deed of Trust secures said future advances and readvances, whether such advances and readvances are obligatory or to be made at the option of Beneficiary or otherwise, to the same extent as if such future advances and readvances were made on the date of the execution of this Deed of Trust, although there may be no advance made at the time of execution of this Deed of Trust or no indebtedness outstanding at the time any advance or readvance is made. All provisions of this Deed of Trust shall apply to any future advances or readvances made pursuant to the provisions of this Section. Nothing contained in this Section shall limit the amount secured by this Deed of Trust.

**Section 5. <u>Continuing Lien</u>.** Grantor expressly agrees that any and all of the Trust Property, howsoever and whensoever acquired, received or arising, shall secure any and all obligations, howsoever and whensoever incurred, without apportionment between obligations of Grantor to Beneficiary under or with respect to any of the Loan Documents. Accordingly, all of the Trust Property is mortgaged, assigned and conveyed, and a security interest in favor of Beneficiary is granted therein, to secure (a) the entire indebtedness which may be owed to Beneficiary from time to time pursuant to the Note or any other Loan Document, and (b) all other obligations of Grantor under or with respect to any of the Loan Documents, and in no manner shall the rights of Beneficiary in all or any portion of the Trust Property be limited by virtue of the fact that any portion of the Trust Property may have been (i) mortgaged, assigned and conveyed to Beneficiary, or a security interest in favor of Beneficiary granted therein, or (ii) placed in the possession or control of Beneficiary ancillary to the making of a particular advance hereunder or the incurrence of any other obligation, and Beneficiary shall have the right, in its sole and absolute discretion, to determine the order in which its rights in or remedies against any Trust Property are to be exercised, which type(s) or portion(s) of Trust Property are to be proceeded against, and the order of application of proceeds of Trust Property as against any particular obligation.

Upon the sale, exchange or other disposition of any of the Trust Property, the lien and security interest created and provided for herein shall, without break in continuity and without further formality or act, continue in and attach to the instruments for the payment of money, accounts receivable, contract rights and all other cash and noncash proceeds of such sale, exchange or disposition. Beneficiary's right to proceeds specifically set forth herein or indicated in any financing statement shall never constitute an express or implied authorization on the part of Beneficiary to Grantor's sale, exchange or other disposition of any or all of the Trust Property except as expressly authorized in the Loan Documents or consented to in writing by Beneficiary.

**Section 6. <u>Hazardous Substances</u>.**

6.1 Grantor hereby warrants and represents that neither Grantor nor any other person or entity has ever generated, used or disposed of any Hazardous Substance (as defined below) from or in connection with the Trust Property or used the Trust Property as a storage facility for any Hazardous Substance.

6.2     Grantor hereby agrees to indemnify Beneficiary and hold Beneficiary harmless from and against any and all losses, liabilities (including, without limitation, strict liability), damages, injuries, expenses (including, without limitation, reasonable attorneys' and paralegals' fees), costs of any settlement or judgment, and claims, of any and every kind whatsoever paid, incurred or suffered by, or asserted against, Beneficiary by any person or entity or governmental agency for, with respect to, or as a direct or indirect result of, the presence, usage, storage, generation or disposal on or under or in connection with the Trust Property, or the escape, seepage, leakage, spillage, discharge, emission, discharging or release from the Trust Property, of any Hazardous Substance (including, without limitation, any losses, liabilities, including strict liability, damages, injuries, expenses, including, without limitation, reasonable attorneys' and paralegals' fees, costs of any settlement or judgment or claims asserted or arising under the Comprehensive Environmental Response, Compensation and Liability Act, under any so called Federal, state or local "superfund" or "superlien" law, or under any statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to or imposing liability, including strict liability, or standards of conduct concerning any Hazardous Substance), regardless of whether such occurrence was within the control of Beneficiary.

6.3     For purposes of this *Section 6*, "Hazardous Substance" shall mean and include those elements or compounds which are from time to time contained in the list of hazardous substances adopted by the United States Environmental Protection Agency ("EPA") and the list of toxic pollutants designated by Congress or the EPA, or defined by any other Federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, as now or at any time hereafter in effect.

6.4     If Grantor receives any notice of (a) the happening of any event involving the spill, release, leak, seepage, discharge or cleanup of any Hazardous Substance on, or in connection with, the Trust Property, or in connection with operations thereon, or (b) any complaint, order, citation or notice with regard to air emissions, water discharges, or any other environmental, health or safety matter affecting or related to the Trust Property (an "Environmental Complaint") from any person or entity (including without limitation the EPA), then Grantor shall immediately notify Beneficiary orally and in writing of said notice.

6.5     Beneficiary shall have the right but not the obligation, and without limitation of Beneficiary's rights under this Deed of Trust, to enter onto the Trust Property or to take such actions as Beneficiary deems necessary or advisable to clean up, remove, resolve or minimize the impact of, or otherwise deal with, any such Hazardous Substance or Environmental Complaint following receipt of any notice from any individual or entity (including, without limitation, the EPA) asserting the existence of any Hazardous Substance or any Environmental Complaint pertaining to the Trust Property or any part thereof which, if true, could result in an order, suit or other action against Grantor and/or which, in the absolute and sole opinion of Beneficiary, could jeopardize Beneficiary's security under this Deed of Trust. All reasonable costs and expenses incurred by Beneficiary in the exercise of any such rights shall be secured by this Deed of Trust and shall be payable by Grantor upon demand.

6.6     Beneficiary shall have the right, in its reasonable discretion, to require Grantor to periodically (but not more frequently than annually unless an Environmental Complaint is then outstanding) perform (at Grantor's expense) an environmental audit and, if deemed necessary by Beneficiary, an environmental risk assessment, each of which must be satisfactory to Beneficiary, of the Trust Property and of hazardous waste management practices and/or hazardous waste disposal sites used in connection with operations conducted at the Trust Property. Said audit and/or risk assessment must be conducted by an

environmental consultant reasonably satisfactory to Beneficiary. Should Grantor's environmental consultant fail to perform said environmental audit and/or risk assessment within thirty (30) days after Beneficiary's written request to Grantor, Beneficiary shall have the right, but not the obligation, to retain an environmental consultant to perform said environmental audit and/or risk assessment. All costs and expenses incurred by Beneficiary in the exercise of such rights shall be secured by this Deed of Trust and shall be payable by Grantor upon demand or charged to the balance of the Loan, at the discretion of Beneficiary.

        6.7     Any breach of any warranty, representation or agreement contained in this *Section 6* shall be an Event of Default under this Deed of Trust and shall entitle Beneficiary to exercise any and all remedies provided in this Deed of Trust or otherwise permitted by law or equity. The provisions of this *Section 6* shall survive satisfaction, release or foreclosure of this Deed of Trust and shall inure to the benefit of any transferee of title to the Trust Property through foreclosure of the Deed of Trust or any Loan Document, through any trustee's sale of the Trust Property or through deed in lieu thereof (but only to the extent such transferee is Beneficiary, its successor, an assignee of the Note, a participant of any of the foregoing, or an affiliate or entity related to any of the foregoing).

       **Section 7.** Uniform Commercial Code Financing Statement. In order to further secure the payment of the secured indebtedness referred to herein, and the performance of the obligations, covenants, agreements, warranties, and undertakings of Grantor herein contained, Grantor hereby grants to Beneficiary a security interest in all of the Trust Property that is personal property or fixtures. This Deed of Trust constitutes a security agreement, and creates a continuing security interest in favor of Beneficiary as to all or any part of the Trust Property which is of a nature that a security interest therein can be created and perfected under the Uniform Commercial Code from time to time in effect in the State of Texas, and all replacements and additions thereto and substitutions and proceeds thereof. Beneficiary shall have all remedies of a secured party under the Uniform Commercial Code with respect to any property subject to the security interest created pursuant to this Section. This Deed of Trust also constitutes a financing statement filed as a fixture filing with respect to any and all property included in the Trust Property which is or may become fixtures. Grantor hereby irrevocably authorizes Beneficiary at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto and any continuation statements containing such information as Beneficiary shall require in order to perfect Beneficiary's security interest in the Trust Property. In addition, Grantor hereby authorizes Beneficiary to file carbon, photographic, electronic and/or other forms of reproduction of a financing statement, and any such filing shall constitute a sufficient financing statement under the Uniform Commercial Code.

       **Section 8.** Maintenance and Use of Trust Property. Grantor, at its expense, shall keep the Trust Property in good order and in a clean and safe condition (ordinary wear and tear excepted), and shall make all necessary or appropriate repairs, replacements, restorations and renewals thereof, including, without limitation, interior, exterior, structural and nonstructural, ordinary and extraordinary, and foreseen and unforeseen. Grantor shall not do, or permit to be done, any act or thing which might impair the value or usefulness of the Trust Property or any part thereof, shall not commit or permit any waste of the Trust Property or any part thereof, and shall not permit any unlawful occupation, business or trade to be conducted on the Trust Property or any part thereof. Grantor shall also, at its expense, promptly comply with all rights of way, privileges, franchises, servitudes, licenses, easements, tenements, hereditaments, restrictions of record and appurtenances that are a part of, or that burden, the Trust Property.

**Section 9.**  Compliance with Legal and Insurance Requirements.  Grantor, at its expense, shall promptly comply with all Legal Requirements and Insurance Requirements, and shall procure, maintain and comply with all permits, licenses and other authorizations required for the construction, installation, operation, maintenance and use of the Trust Property.  As used in this Section, "Legal Requirements" means all laws, statutes, codes, acts, ordinances, resolutions, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, directions and requirements of all governmental entities, departments, commissions, boards, courts, authorities, agencies, officials and officers, foreseen and unforeseen, and ordinary or extraordinary, which now or at any time hereafter may be applicable to the Trust Property or any part thereof, or to any use or condition of the Trust Property or any part thereof, and "Insurance Requirements" means all provisions of any insurance policy covering or applicable to the Trust Property or any part thereof, all requirements of the issuer of any such policy, and all orders, rules, regulations and other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) applicable to or affecting the Trust Property or any part thereof, or to any use or condition thereof.  Grantor may, at its expense and after prior written notice to Beneficiary, contest in good faith, by appropriate legal proceedings, any Legal Requirement, and postpone compliance therewith pending the resolution or settlement of such contest, provided that (a) such postponement does not, in the reasonable opinion of Beneficiary, adversely affect the condition, or value of, or the lien of this Deed of Trust as to, any part of the Trust Property, and (b) Grantor deposits in escrow with Beneficiary, pending such contest, moneys sufficient in amount to cover the cost of compliance with the Legal Requirement so contested.

**Section 10.**  Alterations, Additions and Demolition.  Grantor may, at its expense, make from time to time additions, modifications and/or improvements to the Trust Property, provided that no additions, modifications or improvements involving an expenditure in excess of $10,000.00 shall be made without the prior written consent of Beneficiary, and further provided that the proposed work shall not adversely affect the structural integrity or strength of any improvements constituting a part of the Trust Property or materially interfere with the use and operation thereof.  If so requested, Grantor shall submit to Beneficiary the opinion of a licensed engineer, satisfactory to Beneficiary, certifying that such addition, modification or improvement does not so affect the improvements or so interfere with the use and operation thereof.  All additions, modifications and improvements so made by Grantor shall become or be deemed to constitute a part of the Trust Property.  No building or improvements, or any part thereof, on the Trust Property may be removed or demolished without the prior written consent of Beneficiary.

**Section 11.**  Substitutions and Removals.  If any item of personal property constituting a part of the Trust Property becomes inadequate, obsolete, worn-out, unsuitable, undesirable or unnecessary, or should be replaced, Grantor may remove such item, provided that Grantor shall either:

(a)  Prior to or simultaneously with such removal, substitute other personal property having equal or greater value as such removed personal property (but not necessarily the same function) as part of the Trust Property, and install such other personal property in the operation of the Trust Property, which such substituted property shall be free from all liens and encumbrances (other than Permitted Encumbrances) and shall become part of the Trust Property; or

(b)  In the case of removal of any of the Trust Property without substitution, promptly pay to Beneficiary an amount equal to (i) the proceeds of such sale or the scrap value thereof, if the removed property is sold or scrapped, or (ii) if the removed property is used as a trade-in for property not to be installed as part of the Trust Property, the trade-in credit received by Grantor, or (iii) in the

case of the retention of such removed property by Grantor for other purposes, the fair market value of such property, as determined by a licensed engineer satisfactory to Beneficiary.

Grantor shall promptly report to Beneficiary each such removal, sale or other disposition, and shall pay to Beneficiary such amounts as are required by the provisions of *Section 11(b)* above promptly after the sale, trade-in or other disposition requiring such payment; provided that no such report and payment need be made until the amount to be paid to Beneficiary on account of all such sales, trade-ins or other dispositions not previously reported aggregates at least $5,000.00 in any consecutive twelve-month period. Beneficiary shall apply such moneys to the payment of principal installments on the Note, as provided therein, within Beneficiary's sole discretion.

**Section 12. Payment of Taxes and Other Governmental Charges.** Grantor shall pay promptly when due all taxes, assessments (whether general or special), and other governmental charges of any kind whatsoever, foreseen or unforeseen, and ordinary or extraordinary, that now or may at any time hereafter be imposed, assessed or levied against or with respect to the Trust Property or any part thereof, (including, without limitation, any taxes levied upon or with respect to the revenues, income or profits of Grantor from the Trust Property) or upon Beneficiary's interest therein (without regard to any law heretofore or hereafter enacted imposing payment of the whole or any part thereof upon Beneficiary). Within ten (10) business days before they become delinquent, Grantor shall provide Beneficiary with satisfactory evidence of payment of real estate taxes or assessments relating to the Trust Property.

If at any time applicable law shall require Federal, state and/or local revenue stamps to be affixed to the Note, Grantor shall pay for the same, together with any interest or penalties imposed in connection therewith. In the event of the passage after the date of this Deed of Trust of any Federal, state or local law that deducts from the value of real property for the purposes of taxation any lien thereon, or that changes in any way the laws or the taxation of deeds of trust or debts secured by deeds of trust for Federal, State or local purposes, or the manner of the collection of any such taxes, and that imposes a tax, either directly or indirectly, on this Deed of Trust, the Note, any other indebtedness secured hereby or any instrument securing the indebtedness secured hereby, the holder of this Deed of Trust and of the debt which it secures shall have the right to declare the debt secured by this Deed of Trust and any interest thereon due on a date to be specified in a written notice to be given to Grantor by Beneficiary, which date shall be not less than thirty (30) days after the date of the notice; provided, however, that such election shall be ineffective if Grantor is permitted by law to pay the whole of such tax, in addition to all other payments required hereunder, and if Grantor, prior to such specified date, does pay such tax and agrees to pay any such tax when thereafter levied or assessed against the Trust Property, and such agreement shall constitute a modification of this Deed of Trust.

Grantor may, at its expense and after prior notice to Beneficiary, by appropriate proceedings diligently prosecuted, contest in good faith the validity or amount of any such taxes, assessments and other charges and, during the period of such contest, permit the items so contested to remain unpaid. However, if at any time Beneficiary shall notify Grantor that, in its reasonable opinion, by nonpayment of any such items the lien of the Deed of Trust as to any part of the Trust Property will be adversely affected, or the nonpayment of any such items will result in the creation of a lien upon the Trust Property, Grantor shall promptly pay such taxes, assessments or charges. During the period when the taxes, assessments or other charges so contested remain unpaid, Grantor shall deposit in escrow with Beneficiary moneys equal in amount to the amount of such contested taxes, assessments or charges.

**Section 13.** <u>Required Insurance Coverage</u>.

13.1    Prior to the commencement of the installation and construction of any additions, facilities, fixtures or other improvements included in the Trust Property, including, without limitation, any tenant improvements (excluding such improvements as are not insured by standard builder's risk policies, such as excavations, underground foundations, underground utilities and footings below ground level) (collectively, the "Insurable Improvements"), Grantor shall obtain and continuously maintain, until such improvements are released from the lien of this Deed of Trust or insured pursuant to *Section 13.2* below, builder's all risk insurance on a completed value, nonreporting form with an extended coverage endorsement, including theft, vandalism, malicious mischief, collapse, falsework, temporary buildings and debris removal coverage, and such other coverage(s) as Beneficiary may reasonably require, in amounts approved by Beneficiary, but not less than one hundred percent (100%) of the full insurable replacement cost of the Insurable Improvements without regard for depreciation and with an inflation rider, duly endorsed to show the interest of Beneficiary under a standard noncontributing co-beneficiary or mortgagee clause, and under a loss payee clause.

13.2    Grantor shall keep all Insurable Improvements not included in any insurance obtained pursuant to *Section 13.1* above continuously insured for the benefit of Beneficiary against loss or damage by fire and other hazards included in a standard fire insurance policy with an extended coverage endorsement, including theft, vandalism, malicious mischief, collapse and debris removal coverage, and such other coverage(s) as Beneficiary may reasonably require, duly endorsed to show the interest of Beneficiary under a standard noncontributing beneficiary clause, in an amount equal to the replacement value of the Insurable Improvements, without regard to depreciation and with an inflation rider. If any of the Insurable Improvements are located within a hazardous flood area as designated by any governmental authority, Grantor shall obtain and continuously maintain flood insurance coverage in the maximum amount available, with appropriate endorsements thereto, providing for Beneficiary's interest in the same manner as in the standard fire insurance for the Insurable Improvements.

13.3    Grantor shall obtain and continuously maintain single limit comprehensive general accident and public liability insurance in minimum amounts of $1,000,000.00 per occurrence, and $2,000,000.00 in the aggregate, and naming Beneficiary as an additional insured, and Beneficiary may, in its discretion, require such increases in coverage as it deems necessary or advisable as a result of the operations conducted by Grantor on the Trust Property and/or the insurance coverage carried by other entities conducting similar operations.

13.4    All insurance required to be obtained and maintained pursuant to this Deed of Trust shall be obtained from generally recognized, responsible insurance companies qualified or licensed to transact such business in the State of Texas and otherwise satisfactory to Beneficiary. Each policy of insurance shall not be subject to cancellation or substantial modification without at least thirty (30) days prior written notice to Beneficiary. The loss deductible provision for each such insurance policy shall not exceed $10,000.00.

13.5    Grantor shall deposit with Beneficiary all such policies of insurance or, at the option of Beneficiary, binders, certificates or other evidence satisfactory to Beneficiary that (i) the insurance required hereby has been obtained and is in full force and effect, and (ii) all premiums thereon have been paid in full. Prior to the expiration of any such insurance, Grantor shall furnish Beneficiary with evidence,

satisfactory to Beneficiary, that such insurance has been renewed or replaced and that all premiums thereon have been paid in full, and all insurance policies required hereby are in full force and effect.

13.6     Subject to *Section 18* hereof, Grantor hereby assigns to Beneficiary all of Grantor's right, title and interest in and to all such policies of insurance and in and to all insurance proceeds resulting therefrom to the full extent of the indebtedness secured hereby, authorizes Beneficiary to collect, adjust and compromise all claims under such insurance policies, and further authorizes and directs the insurer to pay any and all such proceeds directly to Beneficiary. Beneficiary may, at its option, collect, adjust and compromise any claims under any such insurance policies. In the event of a foreclosure of this Deed of Trust, the purchaser of the Trust Property shall succeed to all of the rights of Grantor (including any right to unearned premiums) in and to all policies of insurance assigned to Beneficiary pursuant hereto.

13.7     Grantor shall maintain, or cause to be maintained, in connection with the Trust Property any workers' compensation coverage required by the laws of the State of Texas. Grantor shall also maintain liability insurance coverage to insure against any liability or risks on or at the Trust Property not covered by workers' compensation coverage or the other insurance coverage required by this Section.

**Section 14.** Taxes and Insurance Premiums. In order to more fully protect the security of this Deed of Trust, and if Beneficiary shall so elect at any time after the occurrence of an Event of Default or an event which, with notice or lapse of time or both would constitute an Event of Default, Grantor shall pay to Beneficiary, together with and in addition to each payment of principal and interest required by the Note, one-twelfth (1/12th) of the amount (as estimated by Beneficiary) of the annual taxes and annual insurance premiums next becoming due and payable with respect to the Trust Property and the policies of insurance referred to in this Deed of Trust, and Grantor shall also pay to Beneficiary on demand therefor the amount by which the actual taxes and insurance premiums exceed payments actually made pursuant hereto. Any unpaid balance of advances by Beneficiary for taxes and/or insurance premiums shall bear interest at the Default Rate (as hereinafter defined) and, together with such interest, shall be secured by this Deed of Trust. Beneficiary shall not be considered to be a fiduciary with respect to any amounts paid to or received by it pursuant to the terms of this Section, and shall not be liable for the payment of interest on all or any part of such funds.

**Section 15.** Disposition of Trust Property; Liens and Encumbrances. Except as otherwise expressly permitted by *Sections 11 or 19* of this Deed of Trust, Grantor shall not sell, convey, assign, transfer, lease, or dispose of all or any part of the Trust Property, or any interest therein, or enter into any agreement for any of the foregoing, in any case without the prior written consent of Beneficiary. Grantor shall not directly or indirectly create or permit to remain, and will promptly discharge, any mortgage, lien, encumbrance or charge on, pledge of, security interest in, or conditional sale or other title retention agreement with respect to, all or any part of the Trust Property, or any interest therein, or any revenues, income, profit or other sums arising from the Trust Property or any part thereof (including, without limitation, any lien, encumbrance or charge as a result of the operation of law) other than: (a) the lien and security interest of this Deed of Trust; (b) liens for taxes, assessments and other governmental charges which are not at the time required to be paid pursuant to *Section 12* hereof; and (c) the Permitted Encumbrances specified in *Section 1* hereof, if any.

**Section 16.** Construction and Other Liens. Grantor shall not permit any construction, mechanics' or other liens to be filed or to exist against the Trust Property or any part thereof, and Grantor shall, within sixty (60) days after the date of the filing of any such lien, cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction, or otherwise satisfactory to Beneficiary.

**Section 17. No Claims Against Beneficiary.**  Nothing contained in this Deed of Trust shall be construed as a request by Beneficiary, expressed or implied, for the performance of any labor or services or the furnishing of any materials or other property with respect to the Trust Property or any part thereof, or be construed to give Beneficiary any right, power or authority to contract for or permit the performance of any labor or services or the furnishing of any materials or other property with respect to the Trust Property or any part thereof, or be construed to give Grantor any right, power or authority to contract for or permit the performance of any labor or services or the furnishing of any material or other property on behalf of Beneficiary, or in such manner as to provide the basis for any claim either against Beneficiary or that any lien based on the performance of such labor or services, or the furnishing of any such material or other property, is prior to the lien of this Deed of Trust.

**Section 18. Damage, Destruction, Eminent Domain.**

18.1     Grantor shall promptly notify Beneficiary in writing of any damage to or destruction of any part of the Trust Property, and such notice shall include a description of the nature, extent and date of the damage, the estimated cost of repair, and the estimated net proceeds of insurance.  Grantor shall promptly notify Beneficiary in writing of any proposed, threatened or actual taking of or injury to any part of the Trust Property pursuant to the use of the power of eminent domain, which notice shall include a description of the nature, extent and date of the taking or proposed taking and the estimated net proceeds of the condemnation award, or the price for conveyance under threat of condemnation.

18.2     Grantor hereby assigns to Beneficiary all of Grantor's right, title and interest in and to any and all such proceeds of insurance and/or eminent domain awards (including any amount paid for a conveyance under threat of condemnation), and all such proceeds shall be paid to Beneficiary for application to Beneficiary's costs of collection, any amounts then due pursuant to the Note, the Agreement or this Deed of Trust, and then to the prepayment, without premium, of principal; provided, however, that, subject to *Section 18.3* below, and so long as (a) no Event of Default, or event which with notice or lapse of time or both would constitute an Event of Default, has occurred, and (b) all leases relating to all or any portion of the Trust Property shall continue in full force and effect, Beneficiary shall permit all or any part of such insurance proceeds to be used for the purpose of repairing, replacing, restoring and rebuilding the Trust Property as nearly as practicable to the value, condition and character thereof immediately prior to such damage or destruction, with such changes or alterations, however, as Grantor may deem necessary for proper use or operation of the Trust Property and as may be approved by Beneficiary, in accordance with *Section 18.5* hereof.

18.3     If (a) a significant portion (as determined by Beneficiary in its sole discretion reasonably exercised) of any buildings, structures, additions, facilities or other improvements included in the Trust Property is damaged or destroyed to such an extent that such improvements cannot be reasonably repaired, replaced or restored within a period of six (6) months to the condition thereof immediately preceding such damage or destruction, or (b) title to, or the temporary use of a significant portion (as determined by Beneficiary in its sole discretion reasonably exercised) of the Trust Property shall have been taken to such an extent that (i) the Trust Property cannot be reasonably repaired, replaced or restored within a period of six (6) months to a condition not substantially different from that existing prior to such taking, or (ii) normal use and operation of the Trust Property is prevented for a period of six (6) months or more, then, in any of such events, Beneficiary may at its sole option, and within thirty (30) days after receiving notice of any such events, declare the entire indebtedness secured hereby to be due and payable, on a date not earlier

than thirty (30) days after the date of such declaration, and thereupon the entire amount of said indebtedness shall be due and payable without premium on such date, and shall thereafter bear interest at the Default Rate (as hereinafter defined).

18.4    All prepayments of principal pursuant to *Section 18.2* above shall be made without premium or penalty in the inverse order of the maturity thereof, and shall not reduce the periodic installments thereafter becoming due.

18.5    Unless any damage or destruction results in the exercise by Beneficiary of its option pursuant to *Section 18.3* above, Grantor shall, regardless of the adequacy or availability of insurance proceeds, if any, promptly commence and complete the restoration, repair, replacement and rebuilding of the Trust Property as nearly as practicable to the value, condition and character thereof immediately prior to such damage or destruction. Unless any taking results in the exercise by Beneficiary of its option pursuant to *Section 18.3* above, Grantor shall, regardless of the adequacy or availability of proceeds of condemnation therefor, if any, promptly commence and complete the restoration, repair, replacement and rebuilding of the Trust Property as nearly as practicable to the value, condition and character thereof immediately prior to such taking. Unless any damage or destruction results in the exercise by Beneficiary of its option pursuant to *Section 18.3* above, and subject to the satisfaction of the conditions set forth in *Section 18.2* above, Beneficiary shall make any insurance proceeds available for any such repair or restoration, and shall disburse such funds as work progresses in accordance with and subject to Beneficiary's then normal and customary construction loan disbursement practices and procedures, provided that Beneficiary may require Grantor either to deposit with Beneficiary, for disbursement prior to the disbursement of any such insurance proceeds, the amount in addition to such available net proceeds of insurance that will be required (in Beneficiary's judgment) to complete such repair or restoration, or to provide Beneficiary with evidence, satisfactory to Beneficiary, that such additional funds are available for such purposes.

Section 19.  Leases: Assignment of Rents and Leases.  In accordance with the Texas Assignment of Rents Act, Grantor hereby absolutely transfers and assigns to Beneficiary all right, title and interest of Grantor in and to (a) all existing and future leases, subleases, licenses and other agreements for the use and occupancy of all or any part of the Trust Property, whether written or oral and whether for a definite term or month to month, together with all guarantees of the lessee's obligations thereunder and together with all extensions, modifications and renewals thereof (hereinafter called the "Leases"), and (b) all income, receipts, revenues, rents, issues and profits now or hereafter arising from or out of the Leases or from or out of the Trust Property or any part thereof, including, without limitation, room rents, minimum rents, additional rents, percentage rents, occupancy and user fees and charges, license fees, parking and maintenance charges and fees, tax and insurance contributions, proceeds of the sale of utilities and services, cancellation premiums, claims for damages arising from any breach of the Leases, proceeds from any sale or other disposition of all or any portion of the Trust Property, and all other benefits arising from the use or enjoyment of, or the lease, sale or other disposition of, all or any portion of the Trust Property, together with the immediate and continuing right to receive all of the foregoing (hereinafter called the "Rents"). The assignment of Rents and Leases contained herein shall be subject only to the conditional license granted by Beneficiary to Grantor to collect such rentals, income and revenues during such times as no Event of Default shall have occurred hereunder. Grantor shall not enter into any Lease, other than boat slip leases less than one year in duration, except with the prior written consent of Beneficiary and pursuant to lease terms in form and substance satisfactory to Beneficiary. Unless otherwise provided by written instrument signed by Beneficiary, any and all Leases (other than Permitted Encumbrances, if any) shall be subordinated to this

Deed of Trust. Concurrently with the execution and delivery hereof, and not in lieu of the provisions hereof, Grantor has also executed and delivered to Beneficiary an assignment of its interests as lessor in all Leases and to all rentals, income and other revenues payable thereunder or derived therefrom, as additional collateral for the indebtedness hereby secured.

Grantor shall perform, fulfill, comply with and observe each and every covenant, agreement and condition to be performed, fulfilled, complied with and observed by Grantor as lessor under the Leases, and will not suffer or permit any default of Grantor as lessor thereunder to occur (except defaults which are duly cured within the time provided in the Leases for the curing thereof, if any).

Grantor shall not, and shall not have the right or power to, as against Beneficiary without its consent, cancel, terminate, abridge or modify any Lease, accept a surrender thereof or accept prepayments of installments of rent or other sums due or to become due thereunder.

**Section 20.** Inspection. Beneficiary, and its agents and employees, shall have the right to enter upon and inspect the Trust Property at any and all reasonable times for the protection of its interest in the Trust Property and for such other purposes as may, in Beneficiary's sole discretion, be necessary or desirable in connection with the exercise of Beneficiary's rights hereunder or under the Agreement.

**Section 21.** Indemnification. Grantor hereby protects, indemnifies and saves harmless Beneficiary, its officers, directors, agents and employees, from and against any and all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including without limitation, reasonable attorneys' fees and expenses whether or not litigation has been commenced and in all trial, bankruptcy and appellate proceedings) imposed upon, incurred by, or asserted against Beneficiary or any of such persons by reason of (a) ownership of any interest in the Trust Property or any part thereof, (b) any accident, injury to or death of persons or loss of or damage to property occurring on or about the Trust Property or any part thereof or the adjoining sidewalks, curbs, vaults and vault space, if any, streets or ways, (c) any use, disuse or condition of the Trust Property or any part thereof, or the adjoining sidewalks, curbs, vaults and vault space, if any, or any streets or ways, (d) any failure on the part of Grantor to perform or comply with any of the terms hereof or of the Agreement, or any inaccuracy in any representation or warranty made by Grantor herein or in the Agreement, (e) any defense of the right, title or interest conveyed by this Deed of Trust, (f) the performance of any labor or services or the furnishing of any materials or other property in respect of the Trust Property or any part thereof, (g) any subsidence or erosion of any part of the surface of the Trust Property, including any shoreline or any bank of any river, stream, creek, canal, lake, ocean or other water source, or (h) the location or existence of asbestos or any toxic or hazardous waste, chemicals, materials or substance on, at, in or under the Trust Property or any part thereof. If any action, suit or proceeding is brought against Beneficiary, or any of its officers, directors, agents or employees, for any such reason, Grantor, upon the request of any such individual or entity, shall at Grantor's expense, cause such action, suit or proceeding to be resisted and defended by counsel satisfactory to Beneficiary or such individual or entity. Any amounts payable to an indemnified person under this Section which are not paid within ten (10) days after written demand therefor shall bear interest at the Default Rate from the date of such demand, and such amounts, together with such interest, shall be indebtedness secured by this Deed of Trust. The obligations of Grantor under this Section shall survive any defeasance of the Deed of Trust.

**Section 22.** Events of Default. Any one or more of the following events shall be an "Event of Default" under this Deed of Trust:

22.1     Failure by Grantor or any co-maker or guarantor to pay any installment of principal, interest or premium under the Note when the same becomes due and payable, or any other indebtedness secured hereby as and when the same becomes due and payable, or the entire indebtedness secured hereby upon the maturity of the Note;

22.2     Failure by Grantor or any co-maker or guarantor to observe or perform any other term, covenant or agreement contained herein, in the Note or in any other Loan Document that is not otherwise specifically set forth in this *Section 22*; provided, however, that if the failure is other than the payment of money, is not intentional or grossly negligent on the part of Grantor, does not involve a breach of *Sections 12, 13 or 15* of this Deed of Trust, and does not constitute an emergency in the sole opinion of Beneficiary, such failure shall not constitute an Event of Default if: (a) Grantor institutes curative action and pursues such action to completion within thirty (30) days after written notice of such failure has been provided to Grantor by Beneficiary; or (b) the failure is of such a nature that it can be corrected but not within thirty (30) days after written notice thereof has been provided to Grantor by Beneficiary, and Grantor has within the aforesaid thirty (30) days instituted curative action and diligently and continuously pursues such action to completion, provided that such failure shall become an Event of Default if not cured within ninety (90) days after such written notice;

22.3     Grantor or any co-maker or guarantor shall: (a) become insolvent or generally not pay, or be unable to pay, or admit in writing its inability to pay, its debts generally as they become due; (b) commence a proceeding under any Federal or state bankruptcy, insolvency, reorganization or other similar code or law, or have such a proceeding commenced against it and either have an order of insolvency or reorganization entered against it or have the proceeding remain pending for sixty (60) days; (c) make an assignment for the benefit of its creditors; (d) have a receiver or trustee or custodian appointed for it or for the whole or any substantial part of its property or for all or any part of the Trust Property; or (d) adopt a plan of liquidation of its assets;

22.4     Failure by Grantor or any co-maker or guarantor to pay any indebtedness or to observe or perform any terms, covenants or provisions contained in any note, mortgage, deed of trust, agreement or other obligation to Beneficiary, and such failure is not cured within any applicable grace period;

22.5     If any material adverse change shall occur in the financial condition of Grantor or any co-maker or guarantor at any time during the term of the Loan from the financial condition disclosed in statements heretofore presented to Beneficiary, or if Grantor or any co-maker or guarantor or any general partner of Grantor (a) shall cease to exist or to be qualified to do or transact business in the State of Texas or be dissolved, (b) shall be a party to a merger or consolidation, (c) shall issue stock of any type or series (if a corporation), (d) shall sell all or substantially all of its assets, or (e) if an individual, should die, become incapacitated or adjudged incompetent;

22.6     If Grantor or any co-maker or guarantor is a corporation, any shares of stock of Grantor or any such co-maker or guarantor are issued, sold, transferred, conveyed, assigned, mortgaged, pledged, or otherwise disposed of, whether voluntarily or by operation of law, and whether with or without consideration, or any agreement for any of the foregoing is entered into; or, if Grantor or any co-maker or guarantor is a partnership, any general or limited partnership interest or other equity interest in such partnership is sold, transferred, assigned, conveyed, mortgaged, pledged or otherwise disposed of, whether voluntarily or by operation of law, and whether with or without consideration, or an agreement for any of the foregoing is entered into, or, if Grantor or any co-maker or guarantor is a limited liability company, any

membership or other equity interest in such limited liability company is sold, transferred, assigned, conveyed, mortgaged, pledged or otherwise disposed of, whether voluntarily or by operation of law, and whether with or without consideration, or an agreement for any of the foregoing is entered into;

22.7    Any shares of stock of any corporation that is a general partner of Grantor or of any co-maker or guarantor, or a general partner of a partnership that is a general partner of Grantor or of any co-maker or guarantor, or the managing member of a limited liability company that is a general partner of Grantor or of any co-maker or guarantor, are issued, sold, transferred, assigned, conveyed, mortgaged, pledged or otherwise disposed of, whether voluntarily or by operation of law, and whether with or without consideration, or any agreement for any of the foregoing is entered into, executed or delivered, or any general partnership interest in any general partnership that is itself a general partner of Grantor or of any co-maker or guarantor is sold, transferred, assigned, conveyed, mortgaged, pledged or otherwise disposed of, whether voluntarily or by operation of law, and whether with or without consideration, or any agreement for any of the foregoing is entered into;

22.8    If any statement or representation contained in the loan application or any financial statements or other materials furnished to Beneficiary prior or subsequent to the making of the Loan are discovered to have been false or incorrect or incomplete in any material respect;

22.9    An action for foreclosure or marshalling of liens is commenced against all or any part of the Trust Property; or

22.10    A default occurs under any other mortgage, deed of trust or security agreement encumbering all or any part of the Trust Property and the same is not cured within any applicable grace period, or Beneficiary receives any notice which limits or may limit the amount of indebtedness that may be secured by this Deed of Trust.

Notwithstanding anything to the contrary in this Deed of Trust or any of the other Loan Documents, to the extent any guarantor of the Loan is a natural person (the "Guarantor"), the death or legal incompetency of any such Guarantor shall be an Event of Default hereunder unless such Guarantor is replaced in accordance with this paragraph. Grantor shall be permitted to substitute a replacement guarantor and no "Event of Default" shall be deemed to have occurred as a result thereof under the Note, this Deed of Trust or any of the other Loan Documents, provided, that each of the following terms and conditions are satisfied (i) within one hundred twenty (120) days after the occurrence of such death or incompetency adjudication, Grantor delivers Beneficiary written notice of its intent to substitute the guarantor; (ii) the replacement guarantor is a Satisfactory Replacement Guarantor (as defined below); (iii) within fifteen (15) days after delivery of the written notice described in the preceding subclause (i), such Satisfactory Replacement Guarantor executes documents (the "Replacement Guaranty") assuming the obligations of Guarantor under the Loan Documents; and (iv) prior to or concurrently with such assumption, as applicable, Beneficiary receives such information and documentation as may be reasonably required by Beneficiary in connection with such assumption and the foregoing in order to satisfy Beneficiary. As used herein, the term "Satisfactory Replacement Guarantor" shall mean a replacement guarantor that (a) is an individual or an affiliated entity of Grantor having identity, composition, financial condition and creditworthiness, experience, character and business reputation reasonably acceptable to Beneficiary, or (b) is a legal trust into which assets of the deceased Guarantor are transferred for the benefit of the heirs of such Guarantor, which said trust shall have a financial condition reasonably acceptable to Beneficiary. Grantor shall pay all costs and expenses incurred by Beneficiary relating to the preparation and review of the Replacement Guaranty

The provisions of this paragraph shall also apply in the event of the death of any individual Satisfactory Replacement Guarantor.

**Section 23. Right to Cure by Beneficiary.** If Grantor fails to make any payment or perform any act required to be made or performed under this Deed of Trust or the Agreement, Beneficiary, without demand upon Grantor and without waiving or releasing any obligation or default, may (but shall be under no obligation to) make such payment or perform such act for the account and at the expense of Grantor, and may enter upon the Trust Property or any part thereof for such purpose and take all such action thereon as, in Beneficiary's sole opinion, may be necessary or appropriate therefor, all without prejudice to any other rights or remedies available to Beneficiary. All payments so made by Beneficiary and all costs, fees and expenses incurred in connection therewith or in connection with the performance by Beneficiary of any such act, together with interest thereon at the Default Rate (as hereinafter defined) from the date of payment or incurrence, shall constitute additional indebtedness secured by this Deed of Trust and shall be paid by Grantor to Beneficiary on demand.

**Section 24. Remedies.** If an Event of Default occurs, Beneficiary may exercise any or all, or any combination of, the remedies conferred upon or reserved to it under this Deed of Trust, the Agreement or any other Loan Document, or now or hereafter existing at law or in equity or by statute. Without limitation, Beneficiary may do one or more of the following:

24.1    Declare the entire unpaid principal balance of the indebtedness secured hereby to be immediately due and payable, without notice or demand, the same being expressly waived by Grantor, and upon such declaration the entire indebtedness secured hereby shall become immediately due and payable and shall thereafter bear interest at a rate equal to the greater of: (i) five percent (5%) per annum in excess of the rate that would otherwise be applicable pursuant to the terms of the Note, or (ii) eighteen percent (18%) per annum (the "Default Rate").

24.2    Proceed at law or equity to collect all indebtedness secured by this Deed of Trust then due hereunder, whether at maturity or by acceleration.

24.3    Foreclose the lien of this Deed of Trust as against all or any part of the Trust Property in the manner provided by law for the foreclosure of a real property mortgage.

24.4    Give such notice of default and of election to cause the Trust Property to be sold as may be required by law or as may be necessary to cause Trustee to exercise the power of sale granted herein. Trustee shall then record and give such notice of trustee's sale at least 21 days before the date of sale, as required by Section 51.002 of the Texas Property Code, or as then in effect and, after the expiration of such time as may be required by law, may sell the Trust Property between the hours of 10 o'clock a.m. and 4 o'clock p.m. on the first Tuesday in any month after having given notice of such sale at the courthouse of the county in which the Trust Property is located, as a whole or in separate parcels as directed by Beneficiary, or by Grantor to the extent required by law, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale, all in accordance with applicable law. Trustee, from time to time, may postpone or continue the sale of all or any portion of the Trust Property by public declaration at the time and place last appointed for the sale. No other notice of the postponed sale shall be required. Upon any sale, Trustee shall deliver its deed conveying the property sold, without any covenant or warranty, express or implied, to the purchaser or purchasers at the sale. The recitals in such deed of any matters or facts shall be conclusive as to the accuracy thereof. Any person, including Grantor, Trustee and Beneficiary, may

purchase at the sale. In the event of a sale, by foreclosure or otherwise, of less than all of the Trust Property, this Deed of Trust shall continue as a lien on the remaining portion of the Trust Property.

24.5    Exercise any or all of the remedies of a secured party under the Uniform Commercial Code with respect to the personal property that is included within the Trust Property. If Beneficiary should proceed to dispose of any of such personal property in accordance with the provisions of the Uniform Commercial Code, five (5) days' notice by Beneficiary to Grantor shall be deemed to be commercially reasonable notice under each provision of the Uniform Commercial Code requiring notice. Grantor, however, agrees that all property of every nature and description, whether real or personal, covered by this Deed of Trust, together with all personal property used on or in connection with the Property or any business conducted thereon by Grantor and covered by separate security agreements, is encumbered as one unit, that this Deed of Trust and such security interests, at Beneficiary's option, may be foreclosed or sold in the same proceeding, and that all property encumbered (both realty and personalty), at Beneficiary's option, may be sold as such in one unit as a going business, subject to the provisions of applicable law.

24.6    Without regard to the adequacy of any security for the obligations secured hereby or the solvency of Grantor or any other person or entity, send notifications to any and all lessees and tenants under the Leases that all Rents shall be paid to Beneficiary. Thereafter, and after complying with the Texas Assignment of Rents Act, Beneficiary shall be entitled to collect the Rents until Grantor cures all Events of Default and may apply the Rents collected at its sole discretion to the maintenance of the Trust Property and/or the payment of the obligations secured hereby.

24.7    Grantor agrees to the full extent it lawfully may, that, upon the occurrence and during the continuance of an Event of Default, Beneficiary shall have the right and power to enter into and upon and take possession of all or any part of the Trust Property in the possession of Grantor, its successors or assigns, or its or their agents or servants, and may exclude Grantor, its successors or assigns, and all persons claiming under Grantor, and its or their agents or servants wholly or partly therefrom. All costs, expenses and liabilities of every character incurred by Trustee in administering, managing, operating, and controlling the Trust Property shall constitute a demand obligation (which obligation Grantor hereby expressly promises to pay) owing by Grantor to Beneficiary and shall bear interest from date of expenditure until paid at a rate equal to the Default Rate, all of which shall constitute a portion of the Trust Property and shall be secured by this Deed of Trust and all other Loan Documents.

24.8    Upon the occurrence and during the continuance of an Event of Default, and, in addition to all other rights herein conferred on the Beneficiary, the Beneficiary (or any person designated by the Beneficiary) shall have the right and power, but shall not be obligated, to enter upon and take possession of any of Grantor's interest in the Trust Property, and to exclude the Grantor, and the Grantor's agents or servants, wholly therefrom, and to hold, use, administer, manage and operate the same to the extent that the Grantor shall be at the time entitled and in its place and stead. The Beneficiary (or any person designated by the Beneficiary) may operate the same without any liability to the Grantor in connection with such operations, except to use ordinary care in the operation of such properties, and Beneficiary (or any person designated by the Beneficiary) shall have the right to collect, receive and receipt for all Hydrocarbons produced and sold from said properties, to make reasonable and necessary repairs, purchase machinery and equipment, and conduct such work-over operations that a reasonably prudent operator would make, purchase or conduct to maintain the Trust Property. When and if the expenses of such operation and development (including costs of unsuccessful work-over operations or additional wells) have been paid and the

indebtedness paid, said properties shall, if there has been no sale or foreclosure, be returned to the Grantor. All costs, expenses and liabilities of every character incurred by Beneficiary in administering, managing, operating, and controlling the Trust Property shall constitute a demand obligation (which obligation Grantor hereby expressly promises to pay) owing by Grantor to Beneficiary and shall bear interest from date of expenditure until paid at a rate equal to the Default Rate, all of which shall constitute a portion of the Secured Indebtedness and shall be secured by this Deed of Trust and all other Loan Documents.

   **Section 25.** Appraisement; Deficiency. To the full extent Grantor may do so, Grantor agrees that Grantor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for any appraisement, valuation, stay, extension or redemption, and Grantor, for Grantor and Grantor's successors and assigns, and for any and all persons ever claiming any interest in the Trust Property, to the extent permitted by law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, notice of intention to mature or declare due the whole of the Secured Indebtedness, notice of election to mature or declare due the whole of the Secured Indebtedness and all rights to a marshaling of the assets of Grantor, including the Trust Property, or to a sale in inverse order of alienation in the event of foreclosure of the liens and security interests hereby created. Grantor shall not have or assert any right under any statute or rule of law pertaining to the marshaling of assets, sale in inverse order of alienation, or other matters whatever to defeat, reduce or affect the right of the Beneficiary under the terms of this Deed of Trust to a sale of the Trust Property for the collection of the Secured Indebtedness without any prior or different resort for collection, or the right of the Beneficiary under the terms of this Deed of Trust to the payment of such indebtedness out of the proceeds of sale of the Trust Property in preference to every other claimant whatever. If any law referred to in this Section and now in force, of which Grantor or Grantor's successors and assigns and such other persons claiming any interest in the Trust Property might take advantage despite this Section, shall hereafter be repealed or cease to be in force, such law shall not thereafter be deemed to preclude the application of this Section.

   (a)   Notwithstanding the provisions of Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by Texas law, Grantor agrees that Beneficiary shall be entitled to seek a deficiency judgment from Grantor and any other party obligated on the Secured Indebtedness equal to the difference between the amount owing on the Secured Indebtedness and the amount for which the Trust Property was sold pursuant to a judicial or non-judicial foreclosure sale;

   (b)   Grantor expressly recognizes that this section will, to the extent permitted by Texas law, constitute a waiver of any potential rights which would otherwise permit Grantor and other persons against whom recovery of deficiencies is sought or guarantors independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Trust Property as of the date of foreclosure and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than fair market value;

   (c)   Grantor further recognizes and agrees that this waiver will create an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Trust Property for purposes of calculating deficiencies owed by Grantor, other grantors on the Trust Property, guarantors, and others against whom recovery of a deficiency is sought;

   (d)   Alternatively, in the event this waiver is determined by a court of competent jurisdiction to be unenforceable, the following shall be the basis for the finder of fact's determination

of the fair market value of the Trust Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time):

(i)     The Trust Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Trust Property will be repaired or improved in any manner before a resale of the Trust Property after foreclosure;

(ii)    The valuation shall be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Trust Property for cash promptly (but no later than twelve months) following the foreclosure sale;

(iii)   All reasonable closing costs customarily borne by the seller in a commercial real estate transaction should be deducted from the gross fair market value of the Trust Property, including, without limitation, commercially reasonable brokerage commissions, title insurance (without endorsement), a survey of the Trust Property, tax prorations, reasonable attorney's fees, and reasonable marketing costs;

(iv)    The gross fair market value of the Trust Property shall be further discounted to account for any estimated holding costs associated with maintaining the Trust Property pending sale, including, without limitation, utilities expenses, reasonable property management fees (for property similar to the Trust Property), taxes and assessments (to the extent not accounted for in (d)(iii) above), and other reasonable maintenance expenses; and

(v)     Any expert opinion testimony given or considered in connection with a determination of the fair market value of the Trust Property given by persons having at least five year's experience in appraising property similar to the Trust Property and who have conducted and prepared a complete written appraisal of the Trust Property taking into consideration the factors set forth above.

**Section 26.  Appointment of Receiver.** If an Event of Default occurs, Beneficiary shall be entitled, to the extent permitted by law, as a matter of right and without regard to the value or condition of the Trust Property or the adequacy thereof as security, and by *ex parte* proceedings without notice to Grantor, to the appointment of a receiver for all or any part of the Trust Property, whether such receivership is incidental to a proposed sale of the Trust Property or otherwise.  The foregoing is agreed to, in part, in recognition of the fact that a delay in the management, development, disposition or other activity involving the Trust Property may substantially adversely affect Beneficiary's security or the value thereof.  Upon appointment of said receiver, Grantor shall immediately deliver possession of all of the Trust Property to such receiver.  Neither the appointment of a receiver for the Trust Property by any court at the request of Beneficiary or by agreement with Grantor, nor the entering into possession of all or any part of the Trust Property by such receiver, shall constitute the Beneficiary a "mortgagee in possession" or otherwise make Beneficiary responsible or liable in any manner with respect to the Trust Property or the occupancy, operation or use thereof.  Grantor agrees that Beneficiary shall have the absolute and unconditional right to the appointment of a receiver in any independent and/or separate action brought by Beneficiary regardless of whether Beneficiary seeks any relief in such action other than the appointment of a receiver.  In that respect, Grantor waives any express or implied requirement under common law that a receiver may be appointed only

ancillary to other judicial or nonjudicial relief. Grantor hereby consents to the appointment of such receiver and covenants not to oppose any such appointment.

Section 27. Possession, Management and Income: Assignment. If an Event of Default occurs, Beneficiary, to the extent permitted under applicable law, and without notice to Grantor, may enter upon and take possession of the Trust Property or any part thereof by force, summary proceedings, ejectment or otherwise, and may remove Grantor and all other persons and any and all property therefrom, and may hold, operate and manage the same and receive all revenues, income and profits accruing with respect thereto or any part thereof. Beneficiary shall have no liability for or by reason of any such entry, taking of possession, removal, holding, operation, or management, or for the failure to do so, except for grossly negligent or intentional misconduct.

Section 28. Remedies Cumulative. Each right, power and remedy of Beneficiary provided for in this Deed of Trust, in the Note, in the Agreement, or now or hereafter existing at law or in equity or by statute or otherwise, shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy, and the exercise or beginning of the exercise or partial exercise by Beneficiary of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by Beneficiary of any or all such other rights, powers or remedies.

Section 29. Provisions Subject to Applicable Law. All rights, powers and remedies provided herein may be exercised only to the extent that the exercise thereof does not violate any applicable law, and are intended to be limited to the extent necessary so that they will not render this Deed of Trust invalid, unenforceable or not entitled to be recorded, registered or filed under any applicable law.

Section 30. No Waiver by Beneficiary. No failure by Beneficiary to insist upon the strict performance of any term hereof or to exercise any right, power or remedy consequent upon a breach thereof shall constitute a waiver of any such term or of any such breach. No waiver of any breach shall affect or alter this Deed of Trust, which shall continue in full force and effect with respect to any other then existing or subsequent breach.

Section 31. Right to Sue for Installments. Beneficiary shall have the right from time to time to sue for any sums required to be paid pursuant to the terms of this Deed of Trust (whether principal, interest, taxes, insurance premiums, or otherwise) as the same become due, without regard to whether or not the principal or any other sums secured hereby shall then be due and payable, and without prejudice to the right of Beneficiary to accelerate the indebtedness secured hereby or to commence an action for foreclosure or any other action for a default or defaults by Grantor existing at the time such earlier action was commenced.

Section 32. Additional Security. Without impairment of the lien and rights created by this Deed of Trust, Beneficiary may accept additional security for the indebtedness secured by this Deed of Trust from Grantor or (without notice to or the consent of Grantor) from any other person or persons. Beneficiary may release or subordinate any part of the security for the indebtedness secured by this Deed of Trust without in any way impairing or affecting the validity or priority of this Deed of Trust as to the Trust Property not specifically released. Beneficiary may resort to the security created by this Deed of Trust or to any such additional security in such manner and order as Beneficiary may elect, in each case without affecting the lien hereof and the rights conferred hereunder.

**Section 33.** <u>Notices</u>. Any notice, demand or request required or permitted by this Deed of Trust shall be in writing and shall be deemed to have been sufficiently given at the earlier of when personally delivered or at 6:00 P.M. (in the time zone of the addressee of the notice) on the second business day after deposit in the United States certified or registered mail, postage prepaid, or deposit with a nationally recognized overnight delivery service, and addressed to the address of the party to whom such notice is directed as such address is set forth at the beginning of this Deed of Trust, or at such other address as any party may from time to time notify the other by notice in writing as aforesaid. A business day is any day other than a Saturday, Sunday or any day on which federal savings banks in Arizona are authorized or required to be closed.

**Section 34.** <u>Reimbursement of Attorneys' Fees and Expenses</u>. If Beneficiary becomes a party to any action wherein Beneficiary must establish or defend the validity or priority of this Deed of Trust, or if Beneficiary should incur expenses in connection with the collection or enforcement of this Deed of Trust, the Note, the Agreement or any other instrument or document ancillary thereto, Grantor shall reimburse Beneficiary on demand for any and all such costs and/or expenses incurred by Beneficiary, including, without limitation, attorneys' fees in all trial, bankruptcy and appellate proceedings, and whether or not litigation has been commenced, together with interest thereon at the Default Rate from the date such costs and expenses are incurred, and all of said amounts, including interest, shall constitute indebtedness secured by this Deed of Trust to the extent permitted by law. In the event of any court proceedings, court costs and attorneys' fees shall be set by the court and not by the jury and shall be included in any judgment obtained by Beneficiary.

**Section 35.** <u>Discharge of Deed of Trust</u>. If Grantor has fully paid the Note and all other sums payable under this Deed of Trust and the Agreement, and if Grantor has complied with all of the terms, conditions and requirements hereof, and of the Agreement, then Beneficiary shall sign and cause to be recorded a release of the lien of this Deed of Trust.

**Section 36.** <u>Recordation</u>. Grantor, at its expense, shall cause this Deed of Trust, all instruments supplemental hereto, and financing statements, including all necessary amendments, supplements and appropriate continuation statements, to be recorded, registered and filed, and to be kept recorded, registered and filed, in such manner and in such places as may be required in order to establish, preserve and protect the lien of this Deed of Trust as a valid lien on all real property and fixtures included in the Trust Property and a valid, perfected first priority security interest in all fixtures included in the Trust Property (including in each such case, without limitation, any such properties acquired after the execution hereof).

**Section 37.** <u>Further Assurances</u>. Grantor shall properly execute and deliver, or cause to be executed and delivered, from time to time, at the request of Beneficiary, all such further deeds, conveyances, deeds of trust, security agreements, financing statements, assignments of leases now existing or hereafter entered into, transfers and such other assurances as Beneficiary shall require for better assuring, mortgaging, pledging, assigning and confirming unto Beneficiary, all and singular, the Trust Property and the title thereto.

**Section 38.** <u>Estoppel Affidavits</u>. Grantor, within ten (10) days after the date of a written request from Beneficiary, shall furnish a written statement, duly acknowledged, setting forth the unpaid principal of, and interest on, the indebtedness secured hereby, and stating whether or not any offsets or defenses exist against the obligations of Grantor to pay such principal and interest.

**Section 39.** <u>Amendments, Changes and Modifications</u>. Except as otherwise provided in this Deed of Trust, this Deed of Trust may not be effectively amended, changed, modified, altered or terminated without the prior written consent of Beneficiary. If the payment of the indebtedness secured by this Deed of Trust, or any part thereof, is extended or varied, or if any part of the security or guaranties therefor is released, then all persons now or at any time hereafter liable therefor, or interested in the Trust Property, shall be held to assent to such extension, variation or release, and their liability and the lien of this Deed of Trust and all provisions hereof shall continue in full force and effect. The right of recourse against all such persons is expressly reserved by Beneficiary, notwithstanding any such extension, variation or release. Any person, firm or corporation taking a junior deed of trust, mortgage, or other lien upon the Trust Property or any part thereof or any interest therein, shall take said lien subject to the rights of Beneficiary to amend, modify, extend and/or release this Deed of Trust, the Agreement or any other document or instrument evidencing, securing or guarantying the indebtedness secured by this Deed of Trust, in each and every case without obtaining the consent of the holder of such junior lien and without the lien of this Deed of Trust losing its priority over the rights of any such junior lien. Any acceptance by Beneficiary of part payment of any installment of principal or interest, or both, or part performance of any covenant, or delay by Beneficiary for any period of time in exercising the option to accelerate any indebtedness evidenced by the Note, or secured by this Deed of Trust, shall not operate as a waiver of the right to exercise such option to accelerate such indebtedness.

**Section 40.** <u>Governing Law</u>. This Deed of Trust shall be deemed to be made under the laws of the State of Texas and for all purposes shall be governed by and construed in accordance with the laws of the State of Texas.

**Section 41.** <u>Binding Effect</u>. This Deed of Trust shall inure to the benefit of and be binding upon Grantor, its successors and assigns, and Beneficiary, its successors and assigns, provided that Grantor may not assign (a) any of Grantor's rights or benefits under this Deed of Trust; or (b) any of the Trust Property, without the prior written consent of Beneficiary.

**Section 42.** <u>Severability</u>. If any term or provision of this Deed of Trust, or the operation thereof, shall be held to be invalid, illegal or unenforceable, the validity of the remaining provisions hereof, and the operation thereof, shall in no way be affected thereby, and each such remaining provision shall be deemed to be effective to the full extent permitted by law.

**Section 43.** <u>Captions</u>. The captions and headings herein shall be solely for convenience of reference and in no way define, limit or describe the scope or intent of any provisions or sections of this Deed of Trust.

**Section 44.** <u>Counterparts</u>. This Deed of Trust may be executed in any number of counterparts, each of which shall be regarded as an original and all of which shall constitute but one and the same instrument; it shall not be necessary, in proving the validity of this Deed of Trust, to produce or account for more than one such counterpart, or a copy hereof, certified by the appropriate recording officer.

**Section 45.** <u>Joint and Several Liability</u>. If Grantor consists of more than one party, each of the undersigned shall be jointly and severally liable for the performance of all of the obligations, covenants and agreements of Grantor contained herein.

**Section 46.** <u>No Setoffs</u>. Grantor acknowledges that the indebtedness secured hereby was incurred in good faith for full value received, and Grantor has no defenses, setoffs or counterclaims thereto.

**Section 47.** Definitions. Whenever in this instrument the context so admits or requires, the terms "Grantor" and "Beneficiary" shall be construed as including their respective heirs, legal representatives, successors and assigns, as the case may be (provided, however, that nothing herein shall be construed to permit the assignment of this Deed of Trust by Grantor); and the pronoun as used herein to refer to either Grantor or Beneficiary in the third person, singular number and masculine gender, shall be construed as meaning the person, number and gender appropriate to the first designation to the respective parties hereto.

**Section 48.** Joinders and Consents. Beneficiary agrees, upon the request of Grantor, to join in any plat for the Property and any utility easements or licenses, and to consent to any homeowner association documents or declarations, development agreements or similar instruments affecting the Trust Property and needed by Grantor in connection with the development of the Trust Property as contemplated by the Loan Documents, at no cost or liability to Beneficiary, for the sole purpose of subjecting the lien of this Deed of Trust to the effects of such instruments, provided that such instruments are in form and substance acceptable to Beneficiary in Beneficiary's sole and absolute discretion reasonably exercised. Beneficiary shall have no obligation to join in or consent to any such documents if doing so would materially diminish the value of the Trust Property or require Beneficiary to directly assume any of Grantor's obligations under such instruments.

**Section 49.** Waiver of Jury Trial. THE UNDERSIGNED WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, ANY ASPECT OF THE TRANSACTION IN CONNECTION WITH WHICH THIS DOCUMENT IS BEING GIVEN OR ANY DOCUMENT EXECUTED OR DELIVERED IN CONNECTION WITH SUCH TRANSACTION. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY THE UNDERSIGNED AND THE UNDERSIGNED ACKNOWLEDGE THAT NO ONE HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THE UNDERSIGNED FURTHER ACKNOWLEDGE HAVING BEEN REPRESENTED IN CONNECTION WITH THE TRANSACTION WITH RESPECT TO WHICH THIS DOCUMENT IS BEING GIVEN AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED BY THE UNDERSIGNEDS' OWN FREE WILL, AND THAT THE UNDERSIGNED HAVE HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH SUCH COUNSEL. THE UNDERSIGNED FURTHER ACKNOWLEDGE THAT THEY HAVE READ AND THAT THEY UNDERSTAND THE MEANING AND RAMIFICATIONS OF THIS WAIVER PROVISION.

**Section 50.** Trustee. The acceptance by Trustee of this trust shall be evidenced when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law. The trust created hereby is irrevocable by Grantor.

*SIGNATURE PAGE FOLLOWS*

**SIGNATURE PAGE TO DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

IN WITNESS WHEREOF, this instrument has been signed and acknowledged as of the date set forth above.

*"GRANTOR"*

WC PARADISE COVE MARINA, LP, a Texas limited partnership

By: WC PARADISE COVE GP, LLC, a Texas limited liability company, its General Partner

By: WORLD CLASS CAPITAL GROUP, LLC, a Texas limited liability company, its Manager

By _____
Printed Name     Natin Paul
Title                    Manager

STATE OF __Texas__ )
                                    ) ss.
COUNTY OF __Travis__ )

The foregoing instrument was acknowledged before me this 22nd day of April, 2015, by Natin Paul, the Manager of World Class Capital Group, LLC, a Texas limited liability company, the Manager of WC Paradise Cove GP, LLC, a Texas limited liability company, the General Partner of WC Paradise Cove Marina, LP, a Texas limited partnership, on behalf of the partnership.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

NOTARY SEAL:                               _____
                                                                    Notary Public

TAMIE LIANE BROAD
Notary Public, State of Texas
My Commission Expires
May 16, 2019

10193.1.874145                               24

(

## EXHIBIT "A"

### (Legal Description)

COMMENCING FOR REFERENCE at a 1/2" steel pipe found at the northwest corner of Lot 1, Arno Brill Second Subdivision Lake Tracts, recorded in Book 4, Page 193, Travis County Plat Records, also the northeast corner of said 280.509 acres, PROCEEDING S15°59'00"E 25.00 feet along the east line of said 280.509 acres to a mag nail found in rock, at the southeast corner of a 2.337 acre tract conveyed to Joyce Taylor and David Shook by deed recorded in Document No. 2004039877, TCOPR, for the northeast corner and POINT OF BEGINNING hereof;

THENCE S15°59'00"E 266.12 feet along the east line of said 280.509 acres and west line of said Lot 1 and Lot 2, to a 1/2" steel pin found at the mutual west corner of Lots 2 and 3, for angle point hereof;

THENCE S33°41'22"E 343.17 feet with the east line of said of said 280.509 acres and the west line of Lots 3 and 4 to a 1/2" steel pin with cap found, for angle point hereof;

THENCE S52°05'17"E 348.73 feet with the east line of said of said 280.509 acres and the west line of Lots 4, 5 and 6 to a 1/2" steel pin found in the west right-of-way (ROW) line of Rocky Ridge Road for southeast corner hereof;

THENCE with the west and north right-of-way (ROW) line of Rocky Ridge Road and the boundary of said 280.509 acres, the following 5 courses:

1) S10°49'43"W 205.54 feet to 1/2" steel pin found,
2) S25°35'43"W 149.30 feet to 1" steel spindle found,
3) S76°13'43"W 231.80 feet to a 1/2" steel pin with cap found,
4) N75°31'17"W 295.96 feet to a 1/2" steel pin with cap found at the east corner of a 0.088 acre deeded to Ron Doll by quitclaim deed in Volume 7665, Page 628, TCDR,
5) S71°36'18"W 98.24 feet to a 1/2" steel pin with cap found at a fence corner at the southeast corner of a 4833 square foot tract conveyed to Whittington Interests by deed in Document No. 2008039793, TCOPR, for corner hereof;

THENCE N40°35'05"W 123.68 feet along the east line of said Whittington tract, to a 1/2" steel pin with cap found at fence angle for angle point hereof;

THENCE N5°41'43"W 85.61 feet along the east line of said Whittington tract, to a 1/2" steel pin with cap found at fence corner for corner hereof;

THENCE N51°08'19"E 84.96 feet along a west line of said 280.509 acres, to a 1/2" steel pin with cap found at a fence corner at its southeast corner, for inside corner hereof;

THENCE N40°34'07"W 239.28 feet along a fence to a 1/2" steel pin with cap found at the 690-foot elevation contour as found on the ground, for angle hereof;

10193.1.874145.6

THENCE along said 690-foot contour as found on the ground and a west line of said 280.509 acres, also the east line of a 1.000 acre tract conveyed to Rocky Ridge Residential LLC by deed recorded in Document No. 2014066058, TCOPR, the following 7 courses:

1) N49°13'50"W 57.26 feet to a 1/2" steel pin with cap found for angle,
2) N49°34'19"W 84.44 feet to a 1/2" steel pin with cap found for angle,
3) N52°26'31"W 53.05 feet to a 1/2" steel pin with cap found for angle,
4) N56°19'05"W 38.03 feet to a 1/2" steel pin with cap found for angle,
5) N71°15'17"W 58.07 feet to a 1/2" steel pin with cap found for angle,
6) N76°43'09"W 55.39 feet to a 1/2" steel pin with cap found for angle,
7) N78°32'22"W 73.09 feet to a 1/2" steel pin found for angle hereof;

THENCE with the north line of a 1.464 acre tract conveyed to John Bullock and David L. Morriso by deed recorded in Document No. 2004162480, TCOPR, the following 3 courses:

1) N39°41'20"W 52.76 feet to a mag nail set in asphalt,
2) S89°04'51"W 55.79 feet to a mag nail set in asphalt,
3) S68°30'04"W 64.36 feet to a 1/2" steel pin with cap found at the northwest corner of said 1.464 acres, for angle hereof;

THENCE S39°23'41"W 125.96 feet with the north line of a court settlement of Cause No. 03-93-00153-CV, Third Court of Appeals, Travis County, Texas, to a 1/2" steel pin with orange cap set for corner hereof;

THENCE S52°07'10"E 37.93 feet with the west line of said settlement to a brass disk found in concrete at the northeast corner of a tract conveyed to Fred P. Holub in Volume 6327, Page 243, TCDR (original deed 968/67), for angle hereof;

THENCE S02°45'03"W 100.00 feet along the northwest line of said Holub tract to a 1/2" steel pipe found at the base of a live oak tree, for angle hereof;

THENCE with the north and west line of a 1.369 acre tract conveyed to Christopher A. Woods by deed recorded in Document No. 2008112538, TCOPR, the following 2 courses:

1) N52°10'26"W 77.41 feet to a 1/2" steel pin with orange cap set at the northwest corner of said 1.369 acre tract,
2) S09°42'43"E 143.67 feet to a 1/2" steel pin with orange cap set at the west corner of said 1.369 acre tract, for angle hereof;

THENCE S16°56'59"W 49.95 feet with the west line of a 0.868 acre tract conveyed to Serendipity Properties by deed recorded in Document No. 2004085588, for corner hereof;

THENCE S61°15'19"E 92.53 feet with the southwest line of said 0.868 acre to a 1/2" steel pin with cap set at the northwest corner of a 0.7800 acre tract conveyed to Serendipity Properties by deed recorded in Document No. 2009196097, on an east line of said 280.509 acres, for angle hereof;

THENCE S20°32'36"E 185.40 feet along said east line of 280.509 acres and the northwest lines of two tracts conveyed to Serendipity Properties by deed recorded in Documents 2009196097 and 2011143441, TCOPR, to a 1/2" steel pin with cap set at the southwest corner of said tracts, for inside corner hereof;

THENCE N60°56'26"W 68.33 feet along the northeast line of a 0.3600 acre tract conveyed to Candice O. Jones by deed recorded in Document No. 2008083694, TCOPR, and the northeast line of a 1.928 acre tract conveyed to Serendipity Properties by deed recorded in Document No. 2011095477, TCOPR, to its southwest corner, for angle hereof;

THENCE S08°11'17"E 195.49 feet along the west line of said Serendipity tract and of Lot 21, Arno Brill Third Subdivision Lake Tracts, Book 4, Page 198, Travis County Plat Records, to a 1/2" steel pin with cap set at the northwest corner of said Lot 21, for angle point;

THENCE along the east line of said 280.509 acres and the west line of said subdivision the following 6 courses:

1) S01°05'38"E 184.83 feet to a 1/2" steel pin found with cap,
2) S32°06'13"E 129.56 feet to a 1/2" steel pipe found at corner of Lots 23/23,
3) S43°47'07"E 123.51 feet to a 1/2" steel pipe found at corner of Lots 23/24,
4) S50°16'35"E 130.90 feet to a 1/2" steel pipe found at corner of Lots 24/25,
5) S45°41'35"E 140.90 feet to a 1/2" steel pin found at corner of Lots 25/26,
6) N86°56'03"E 132.72 feet to a 1/2" steel pipe found at the southeast corner of Lot 27, for angle hereof;

THENCE S27°47'22"E 146.57 feet with the west line of a 2.549 acre tract conveyed to Gilberto & Lucia Franco by deed recorded in Document No. 2012210228, TCOPR, to a 1/2" steel pipe found at the corner of Lots 31/32 for corner hereof;

THENCE resuming with the boundary of said Brill Third Subdivision (4/198) and east line of said 280.509 acres the following 6 courses:

1) S52°12'24"W 399.33 feet to a 1/2" steel pipe found at a rock column at the corner of Lots 32/33 for angle,
2) S12°51'04"W 116.26 feet to a steel pin found in a 1/2" steel pipe at an angle of Lot 33,
3) S23°29'28"E 127.06 feet to a 60d nail found at the corner of Lots 33/34,
4) S23°39'12"E 255.48 feet to a 1/2" steel pin with cap set at corner of Lots 34/35,
5) S61°32'37"E 108.82 feet to a 1/2" steel pin with cap set at an angle of Lot 35,
6) N83°02'32"E 50.40 feet to a ½" steel pin found at the northwest corner of a 10.437 acre tract conveyed to Paul Hornsby by deed recorded in Document No. 2003046538, TCOPR, for corner hereof;

THENCE S29°39'06"E 1159.78 feet with the southwest line of said 10.437 acres to a submerged point at its south corner, for southeast corner hereof;

THENCE S27°56'00"W 369.51 feet with the west line of a 1.545 acre tract conveyed to David A. Hall by deed recorded in Document No. 2000184503, and continuing with the approximate center of a submerged ravine, being the west line of a tract conveyed to Charles McCormick in Volume 762, Page 612, TCDR, to a point on the submerged north bank of the Colorado River, for southeast corner hereof;

3

THENCE with the west line of said 280.509 acres, with calls for the flooded east bank of the Colorado River, said calls taken from LCRA map no. 6-1234 of the Marshall Ford Dam Right-of-Way Survey dated May 14, 1937, the following 11 courses:

1) N56°38'25"W 746.56 feet,
2) N52°07'00"W 1166.00 feet,
3) N62°27'00"W 296.90 feet,
4) N50°43'00"W 355.80 feet,
5) N53°44'00"W 669.00 feet,
6) N40°39'00"W 255.71 feet,
7) N46°52'00"W 825.40 feet,
8) N35°23'00"W 886.70 feet,
9) N12°05'00"W 1017.80 feet,
10) N11°28'00"E 795.10 feet,
11) N27°18'00"E 615.97 feet to a point at the southwest corner of a 2.337 acre, 25-foot wide strip of land conveyed to Joyce Taylor & David Shook by deed recorded in Document No. 2004039877, TCOPR, for the northwest corner hereof;

THENCE S61°05'17"E 3688.99 feet with the south line of said 2.337 acres to a 1/2" steel pin with orange cap found at a point of curve to the left in the south line of said 2.337 acres;

THENCE along said curve to the left, with chord of S83°09'01"E 18.78 feet and radius of 25 feet, to a 1/2" steel pin with orange cap found at the end of said curve;

THENCE N74°47'15"E 374.45 feet with the south line of said 2.337 acres to the POINT OF BEGINNING, containing 269.059 acres of land, more or less.

EXHIBIT "B"

(Permitted Encumbrances)

1. The following restrictive covenants of record itemized below, but the Company insures that any such restrictive covenants have not been violated so as to affect, and that future violation thereof will not affect, the validity or priority of the mortgage hereby insured (insert specific recording data or delete this exception):

Volume 752, Page 595; Volume 757, Page 223; Volume 761, Page 104; Volume 792, Page 247; Volume 1921, Page 286; Volume 1921, Page 280, and Volume 7696, Page 42, of the Deed Records of Travis County, Texas, and under Document No(s). 2008141052; 2008039792 and 2008039797, of the Official Public Records of Travis County, Texas; but omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.

2. Shortages in area.

3. Standby fees, taxes and assessments by any taxing authority for the year  2014, and subsequent years; but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax year.

4. Schedule B, Item 4 is hereby deleted.

5. (Insert here all other specific exceptions as to the superior liens, easements, outstanding mineral and royalty interests, etc.)

   a. Rights of tenants in possession, as tenants only, under unrecorded lease agreements.

   b. Perpetual easement granted to LCRA for the right to overflow, inundate and submerge all lands lying below the 670 foot contour marker above mean sea level and described in instrument recorded in Volume 606, Page 366, of the Deed Records of Travis County, Texas, and as noted on survey prepared by Stuart Watson, RPLS# 4550, dated March 19, 2015, last revised __ (the "Survey").

   c. Perpetual easement granted to LCRA for the right to overflow, inundate and submerge all lands lying below the 670 foot contour marker above mean sea level and described in instrument recorded in Volume 589, Page 100, of the Deed Records of Travis County, Texas, and as noted on the Survey.

d. Perpetual easement granted to LCRA for the right to overflow, inundate and submerge all lands lying below the 715 foot contour marker above mean sea level and described in instrument recorded in Volume 651, Page 358, of the Deed Records of Travis County, Texas, and as noted on the Survey.

e. Perpetual easement granted to LCRA for the right to overflow, inundate and submerge all lands lying below the 715 foot contour marker above mean sea level and described in instrument recorded in Volume 659, Page 106, of the Deed Records of Travis County, Texas, and as noted on the Survey.

f. Easement for boat docks granted by A. W. Brill, Jr. and wife Kathleen Brill by instrument dated May 3, 1944, recorded in Volume 735, Page 475, of the Deed Records of Travis County, Texas, and as noted on the Survey.

g. Right of way easement reserved by A. H. Sylvester and Emma Sylvester, by instrument dated March 18, 1944, recorded in Volume 737, Page 126, of the Deed Records of Travis County, Texas, and as noted on the Survey.

h. Easement for boat docks granted by A. W. Brill, Jr. and wife Kathleen Brill by instrument dated May 2, 1944, recorded in Volume 737, Page 328, of the Deed Records of Travis County, Texas, and as noted on the Survey.

i. Easement for boat docks granted by A. W. Brill, Jr. and wife Kathleen Brill by instrument dated July 12, 1944, recorded in Volume 746, Page 91, of the Deed Records of Travis County, Texas, and as noted on the Survey.

j. Easement for boat docks granted by A. W. Brill, Jr. and wife Kathleen Brill by instrument dated May 31, 1944, recorded in Volume 763, Page 161, of the Deed Records of Travis County, Texas, and as noted on the Survey.

k. Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated December 18, 1945, recorded in Volume 775, Page 545, of the Deed Records of Travis County, Texas, and as noted on the Survey.

l. Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated September 7, 1945, recorded in Volume 769, Page 674, of the Deed Records of Travis County, Texas, and as noted on the Survey.

m. Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated November 21, 1945, recorded in Volume 773, Page 308, of the Deed Records of Travis County, Texas, and as noted on the Survey.

n. Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated March 5, 1945, recorded in Volume 752, Page 595, of the Deed Records of Travis County, Texas, and as noted on the Survey.

o. Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated March 5, 1945, recorded in Volume 757, Page 223, of the Deed Records of Travis County, Texas, as further described and defined by judgment entered in Cause No. 417,440 in the 201st Judicial District Court of Travis County recorded in Volume 1783, Page 393, of the District Court Minutes of Travis County, Texas, and as noted on the Survey.

p.  Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated March 19, 1945, recorded in Volume 761, Page 104, of the Deed Records of Travis County, Texas, and as noted on the Survey.

q.  Easement for ingress and egress reserved to the present and future owners of property located in the Arno Brill Third Subdivision Lake Tracts, a subdivision in Travis County, Texas, according to the plat recorded in Volume 4, Page 198 of the Plat Records of Travis County, Texas, by instrument dated May 31, 1945, recorded in Volume 761, Page 427, of the Deed Records of Travis County, Texas, and as noted on the Survey.

r.  Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated April 6, 1946, recorded in Volume 792, Page 247, of the Deed Records of Travis County, Texas, and as noted on the Survey.

s.  Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated April 5, 1946, recorded in Volume 825, Page 237, of the Deed Records of Travis County, Texas, and as noted on the Survey.

t.  Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated November 7, 1945, recorded in Volume 844, Page 474, of the Deed Records of Travis County, Texas, and as noted on the Survey.

u.  Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated November 4, 1947, recorded in Volume 877, Page 39, of the Deed Records of Travis County, Texas, and as noted on the Survey.

v.  Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated February 4, 1948, recorded in Volume 905, Page 31, of the Deed Records of Travis County, Texas, and as noted on the Survey.

w.  Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated March 3, 1949, recorded in Volume 968, Page 67, as corrected by instrument recorded in Volume 1896, Page 160, both of the Deed Records of Travis County, Texas, and as noted on the Survey.

x.  Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated September 7, 1945, recorded in Volume 984, Page 238, of the Deed Records of Travis County, Texas, and as noted on the Survey.

y.  Easement for recreational use granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated September 8, 1944, recorded in Volume 992, Page 158, of the Deed Records of Travis County, Texas, and as noted on the Survey.

z.  Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated June 28, 1950, recorded in Volume 1094, Page 149, of the Deed Records of Travis County, Texas, and as noted on the Survey.

aa. Easement for ingress and egress granted by A. W. Brill, Jr. and wife Kathleen Brill, by instrument dated April 23, 1951, recorded in Volume 1111, Page 339, of the Deed Records of Travis County, Texas, and as noted on the Survey.

bb. Easement for boat docks granted by A. W. Brill, Jr. and wife Kathleen Brill by instrument dated May 6, 1955, recorded in Volume 1570, Page 441, of the Deed Records of Travis County, Texas, and as noted on the Survey.

cc. Easement for boat docks granted by A. W. Brill, Jr. and wife Kathleen Brill by instrument dated May 6, 1955, recorded in Volume 1570, Page 443, of the Deed Records of Travis County, Texas, and as noted on the Survey.

dd. Easement for boat docks granted by A. W. Brill, Jr. and wife Kathleen Brill by instrument dated July 18, 1944, recorded in Volume 1867, Page 262, of the Deed Records of Travis County, Texas, and as noted on the Survey.

ee. Easement for ingress and egress granted by Arno Brill and wife Kathleen Brill, by instrument dated February 10, 1956, recorded in Volume 1921, Page 286, of the Deed Records of Travis County, Texas, and as noted on the Survey.

ff. Easement for ingress and egress granted by Arno Brill and wife Kathleen Brill, by instrument dated February 10, 1956, recorded in Volume 1921, Page 280, of the Deed Records of Travis County, Texas, and as noted on the Survey.

gg. Easement for ingress and egress granted by Arno Brill, by instrument dated April 9, 1958, recorded in Volume 1961, Page 433, of the Deed Records of Travis County, Texas, and as noted on the Survey.

hh. Electric and telephone lines and systems easement granted to the City of Austin, by instrument dated October 27, 1958, recorded in Volume 2128, Page 283, of the Deed Records of Travis County, Texas, and as noted on the Survey.

ii. Easement for ingress and egress granted to Ronald L. DOR and John Streatfeild, by instrument dated March 31, 1981, recorded in Volume 7364, Page 319, of the Deed Records of Travis County, Texas, and as noted on the Survey.

jj. Easement for ingress and egress granted to C. E. Childress, by instrument dated August 23, 1985, recorded in Volume 9497, Page 452, of the Deed Records of Travis County, Texas, and as noted on the Survey.

kk. Easement for ingress and egress granted by Ronald Lloyd Doll, by instrument dated April 28, 1992, recorded in Volume 11661, Page 790, as refiled in Volume 11872, Page 872, both of the Real Property Records of Travis County, Texas, and as noted on the Survey.

ll. Electric utility easement granted to the City of Austin, by instrument dated October 22, 2002, recorded under Document No. 2002203125, of the Official Public Records of Travis County, Texas, and as shown on the Survey.

mm. Underground electric utility easement granted to the City of Austin, by instrument dated May 14, 2004, recorded under Document No. 2004095790, of the Official Public Records of Travis County, Texas, and as shown on the Survey.

nn. The terms, conditions and stipulations set out in that certain Property Exchange Agreement dated February 29, 2008, recorded under Document No. 2008039792, of the Official Public Records of Travis County, Texas, and as shown on the Survey.

oo. The terms, conditions and stipulations set out in that certain Easement Agreement dated February 29, 2008, recorded under Document No. 2008039797, of the Official Public Records of Travis County, Texas, and as noted on the Survey.

pp.   Drainage easement granted to the City of Austin, by instrument dated December 22, 2008, recorded under Document No. 2009015228, of the Official Public Records of Travis County, Texas, and as shown on the Survey.

qq.   Matters contained in that certain document:

Entitled: Restricted Covenant and Evacuation Plan
Dated: August 20, 2008
Executed by: Ronald Doll
Recording Date: August 20, 2008
Recording No: Document No. 2008141052, Official Public Records of Travis County, Texas

Reference is hereby made to said document for full particulars.

rr.   Matters contained in that certain document:

Entitled: Easement Agreement
Dated: May 8, 2014
Executed by: Rocky Ridge Partners, LLC and WC Paradise Cove Marina, LP
Recording Date: June 18, 2014
Recording No: Document No. 2014089316, Official Public Records of Travis County, Texas, and as noted on the Survey.

Reference is hereby made to said document for full particulars.

ss.   Matters contained in that certain document:

Entitled: Judgment
Recording No: Document No. 2012210226, Official Public Records of Travis County, Texas

Reference is hereby made to said document for full particulars.

tt.   Section 13 of the Conditions of this policy is hereby deleted.

uu.   The consequences of any change in the location of Lake Travis which forms the boundary of subject property.

vv.   Encroachment/Protrusion of asphalt drive over property line shown on the Survey.

**ELECTRONICALLY RECORDED**          **2015073414**

                    TRV      **33**      PGS

When recorded, return to:

Timothy J. Martens, Esq.
Gammage & Burnham PLC
Two North Central Avenue
15th Floor
Phoenix, Arizona 85004
GF# 471300'1444 AR

          **DEE**          ⁷ RENTS,
          **SEC'**          ℰ FILING

          THIS DEED ⌐          ᴬGREEMENT AND FIXTURE
FILING (this "D⌐          ¹elivered by and among WC
PARADISE C          ⌐'), whose mailing address
and whose chie.          ⌐t an office) is located at
17141 Rocky Ri⌐          'the "Trustee"), whose
mailing address is ⌐          ¹, Dallas, Texas, and
NORTHWEST FED⌐          ⌐ess is 200 Spring
Street, Herndon, Virgin⌐          ⌐ing recitals:

          A.    In consider⌐          ⌐LLION TWO HUNDRED
THOUSAND AND NO/100          ⌐nade by Beneficiary to Grantor,
Grantor has executed and deliv⌐          ⌐ory Note of even date herewith in the
principal amount of the Loan as ⌐          ⌐Note accrues interest at a market rate as
provided therein, the terms of whic⌐          oy this reference.

          B.    This Deed of Trust secur⌐          ⌐. of the unpaid principal balance of the Note, together
with interest as therein provided and all ot⌐          ⌐ations of Grantor pursuant to the Note, this Deed of Trust,
the Loan and Security Agreement of even da⌐⌐ ⌐nerewith between Grantor and Beneficiary (the "Agreement")
and all other documents or instruments evidencing or securing the Loan or otherwise executed in connection
with the Loan and any partial or total extensions, renewals, modifications, amendments, restatements,
replacements or substitutions thereof or therefor (collectively referred to herein as the "Loan Documents");

          C.    It is intended that this Deed of Trust shall secure unpaid balances of advances made after this
Deed of Trust is recorded in the applicable real property records.

          NOW, THEREFORE, in consideration of the Loan made by Beneficiary to Grantor, as evidenced by
the Note, and for other valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, and for the purpose of securing: (i) all payments to be made by Grantor pursuant to the Note,
the Deed of Trust and/or any other Loan Document, (ii) all future or additional advances made at the option
of Beneficiary, as contemplated herein, (iii) all amounts advanced or costs incurred by Beneficiary for the
protection of the Trust Property (as hereinafter defined) or the enforcement of this Deed of Trust, the Note,
the Agreement and/or any other Loan Document, (iv) any other cost or expense which, by the terms of this
Deed of Trust, the Note, the Agreement and/or any other Loan Document, may be the subject of
reimbursement to Beneficiary by Grantor, and (v) the performance and observance of each covenant and

10193.1.874145

agreement of Grantor contained in this Deed of Trust, the Note, the Agreement and/or any other Loan Document, Grantor does hereby irrevocably grant, bargain, sell, convey, assign and transfer unto the Trustee, in trust, with power of sale, for the benefit of Beneficiary, its successors and assigns, the following property whether now owned or hereafter acquired (the "Trust Property"):

(a)    The real property described in *Exhibit "A"* attached hereto (the "Property"), together with all additions, improvements, facilities, fixtures and other property, now or hereafter located in, upon or under, or based upon such Property;

(b)    All easements, rights of way or uses, licenses, privileges, franchises, servitudes, tenements, hereditaments and appurtenances now or hereafter belonging or in any way appertaining thereto, including, without limitation, all right, title and interest of Grantor in any street, alley, or sidewalk, open or proposed, and in front of, adjoining, adjacent or contiguous thereto, and all rights and estates in reversion or remainder;

(c)    Subject to the rights of Beneficiary under *Section 19* hereof and the Texas Assignment of Rents Act, all leases, rentals, revenues, payments, repayments, income, charges, moneys, issues and profits thereof;

(d)    The proceeds from any insurance or condemnation award pertaining thereto, or compensation in lieu thereof, including, but not limited to, any award or compensation for the alteration of the grade of any street or any other injury to, or decrease in the value of, the Trust Property;

(e)    All of Grantor's right, title, interest, estate, claim and demand, either at law or in equity, in and to all architectural, engineering and similar plans, specifications, drawings, renderings, profiles, studies, shop drawings, reports, plats, permits, surveys and the like, all sewer taps, permits and allocations, and all agreements for utilities, bonds, sureties and the like, relating to the Trust Property or appurtenant facilities erected upon or about the Property;

(f)    All contracts and other agreements for the sale of any of the Trust Property or any part thereof or interest therein, now or hereafter entered into by Grantor, and all right, title and interest of Grantor thereunder, including, without limitation, all right, title and interest of Grantor in cash or securities deposited thereunder to secure the performance by the contract purchasers of their obligations thereunder, and including, without limitation, the right to receive and collect the proceeds thereof;

(g)    All of Grantor's rights, powers and privileges (but not the burdens and obligations) under any construction contract or architect's (or engineer's) agreement now or hereafter entered into by Grantor relating to the Trust Property, and all bonds and surety agreements related thereto;

(h)    All contracts and other agreements, if any, relating to the sale, lease, brokerage, development, management, maintenance and/or operation of the Trust Property (or of any part thereof or interest therein) or otherwise pertaining thereto, including, without limitation, franchise agreements;

(i)    All rights of Grantor under any commitment for any other loan secured by the Trust Property or any part thereof or interest of Grantor therein;

(j)     All right, title and interest of Grantor in all trade names, trademarks and/or servicemarks hereinafter used in connection with the Trust Property, and all contract rights and contracts, franchise agreements, general intangibles, actions and rights of action, accounts, deposit accounts, instruments, letter of credit rights, supporting obligations, investment property, documents, chattel paper, deposits, prepaid expenses, permits, and licenses, owned by Grantor and used in connection with or related to the Trust Property or in the possession or control of Beneficiary;

(k)     All machinery, apparatus, equipment, fittings, fixtures, inventory, appliances, furniture and articles of personal property of every kind and nature whatsoever, other than consumable goods, now or hereafter located in or upon said Property or any part thereof, owned by Grantor and used or useable in connection with any present or future operation of said Property (herein collectively called "Equipment"), including, but without limiting the generality of the foregoing, all heating, lighting, laundry, incinerating, plumbing, lifting, cleaning, fire-prevention, fire-extinguishing, refrigerating, ventilating, communications, air-conditioning and air-cooling equipment or apparatus, engines, pipes, pumps, tanks, motors, conduits, switchboards, elevators, escalators, shades, awnings, screens, storm doors and windows, stoves, wall beds, refrigerators, attached cabinets, partitions, ducts and compressors, and all of the right, title and interest of Grantor in and to any Equipment which may be subject to any conditional bill of sale, chattel mortgage or security interest superior to the lien or security interest established by this Deed of Trust;

(l)     All proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, the proceeds of insurance; and

(m)    All proceeds, additions, replacements and substitutions of and to any of the foregoing.

TO HAVE AND TO HOLD the Trust Property unto Trustee, and its successors or substitutes in this trust, and to its or their successors and assigns, in trust for the benefit of Beneficiary, upon the terms, provisions and conditions herein set forth.

Section 1. Representations and Warranties. Grantor represents and warrants that: (a) Grantor is lawfully seized with good and marketable title in fee simple absolute to the Trust Property, free and clear of all liens and encumbrances whatsoever, except general and special taxes and assessments that are not delinquent, zoning ordinances, and those matters set forth in *Exhibit "B"* attached hereto (hereinafter "Permitted Encumbrances"), and has good and marketable title to all personal property included in the Trust Property, subject only to the Permitted Encumbrances; (b) it has full right, power and authority to bargain, sell, mortgage and convey the Trust Property as herein provided; and (c) except as expressly provided above, it will warrant to Beneficiary, and defend for the benefit of Beneficiary, such title to the Trust Property and the lien and interest of Beneficiary therein and thereon against all claims and demands whatsoever, and will maintain the priority of the lien of, and the security interest granted by, this Deed of Trust upon the Trust Property until Grantor shall be entitled to defeasance as provided herein.

Section 2. After-Acquired Property. All property of every kind acquired by Grantor after the date hereof, and located at, on or under the Property, shall, without further mortgage, conveyance or assignment, become subject to the lien of this Deed of Trust as fully as though now owned by Grantor and specifically described herein. Nevertheless, Grantor shall take such actions and execute and deliver such additional instruments as Beneficiary shall reasonably require to further evidence or confirm the subjection of any such property to the lien of this Deed of Trust.

10193.1.874145                                       3

**Section 3.  Payment of Indebtedness.**  Grantor will pay the indebtedness secured hereby in the manner and at the times provided herein and/or in the Note or any other Loan Document, and, until the indebtedness secured hereby is fully paid, will comply with all of the covenants, terms and provisions contained herein, in the Agreement, and in all of the other Loan Documents.

**Section 4.  Loan Advances.**  This Deed of Trust secures the unpaid balances of all advances or readvances made under the Note, this Deed of Trust, the Agreement, or any other Loan Document.  It is also expressly provided for and agreed that this Deed of Trust secures said future advances and readvances, whether such advances and readvances are obligatory or to be made at the option of Beneficiary or otherwise, to the same extent as if such future advances and readvances were made on the date of the execution of this Deed of Trust, although there may be no advance made at the time of execution of this Deed of Trust or no indebtedness outstanding at the time any advance or readvance is made.  All provisions of this Deed of Trust shall apply to any future advances or readvances made pursuant to the provisions of this Section.  Nothing contained in this Section shall limit the amount secured by this Deed of Trust.

**Section 5.  Continuing Lien.**  Grantor expressly agrees that any and all of the Trust Property, howsoever and whensoever acquired, received or arising, shall secure any and all obligations, howsoever and whensoever incurred, without apportionment between obligations of Grantor to Beneficiary under or with respect to any of the Loan Documents.  Accordingly, all of the Trust Property is mortgaged, assigned and conveyed, and a security interest in favor of Beneficiary is granted therein, to secure (a) the entire indebtedness which may be owed to Beneficiary from time to time pursuant to the Note or any other Loan Document, and (b) all other obligations of Grantor under or with respect to any of the Loan Documents, and in no manner shall the rights of Beneficiary in all or any portion of the Trust Property be limited by virtue of the fact that any portion of the Trust Property may have been (i) mortgaged, assigned and conveyed to Beneficiary, or a security interest in favor of Beneficiary granted therein, or (ii) placed in the possession or control of Beneficiary ancillary to the making of a particular advance hereunder or the incurrence of any other obligation, and Beneficiary shall have the right, in its sole and absolute discretion, to determine the order in which its rights in or remedies against any Trust Property are to be exercised, which type(s) or portion(s) of Trust Property are to be proceeded against, and the order of application of proceeds of Trust Property as against any particular obligation.

Upon the sale, exchange or other disposition of any of the Trust Property, the lien and security interest created and provided for herein shall, without break in continuity and without further formality or act, continue in and attach to the instruments for the payment of money, accounts receivable, contract rights and all other cash and noncash proceeds of such sale, exchange or disposition.  Beneficiary's right to proceeds specifically set forth herein or indicated in any financing statement shall never constitute an express or implied authorization on the part of Beneficiary to Grantor's sale, exchange or other disposition of any or all of the Trust Property except as expressly authorized in the Loan Documents or consented to in writing by Beneficiary.

**Section 6.  Hazardous Substances.**

6.1     Grantor hereby warrants and represents that neither Grantor nor any other person or entity has ever generated, used or disposed of any Hazardous Substance (as defined below) from or in connection with the Trust Property or used the Trust Property as a storage facility for any Hazardous Substance.

6.2     Grantor hereby agrees to indemnify Beneficiary and hold Beneficiary harmless from and against any and all losses, liabilities (including, without limitation, strict liability), damages, injuries, expenses (including, without limitation, reasonable attorneys' and paralegals' fees), costs of any settlement or judgment, and claims, of any and every kind whatsoever paid, incurred or suffered by, or asserted against, Beneficiary by any person or entity or governmental agency for, with respect to, or as a direct or indirect result of, the presence, usage, storage, generation or disposal on or under or in connection with the Trust Property, or the escape, seepage, leakage, spillage, discharge, emission, discharging or release from the Trust Property, of any Hazardous Substance (including, without limitation, any losses, liabilities, including strict liability, damages, injuries, expenses, including, without limitation, reasonable attorneys' and paralegals' fees, costs of any settlement or judgment or claims asserted or arising under the Comprehensive Environmental Response, Compensation and Liability Act, under any so called Federal, state or local "superfund" or "superlien" law, or under any statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to or imposing liability, including strict liability, or standards of conduct concerning any Hazardous Substance), regardless of whether such occurrence was within the control of Beneficiary.

6.3     For purposes of this *Section 6*, "Hazardous Substance" shall mean and include those elements or compounds which are from time to time contained in the list of hazardous substances adopted by the United States Environmental Protection Agency ("EPA") and the list of toxic pollutants designated by Congress or the EPA, or defined by any other Federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, as now or at any time hereafter in effect.

6.4     If Grantor receives any notice of (a) the happening of any event involving the spill, release, leak, seepage, discharge or cleanup of any Hazardous Substance on, or in connection with, the Trust Property, or in connection with operations thereon, or (b) any complaint, order, citation or notice with regard to air emissions, water discharges, or any other environmental, health or safety matter affecting or related to the Trust Property (an "Environmental Complaint") from any person or entity (including without limitation the EPA), then Grantor shall immediately notify Beneficiary orally and in writing of said notice.

6.5     Beneficiary shall have the right but not the obligation, and without limitation of Beneficiary's rights under this Deed of Trust, to enter onto the Trust Property or to take such actions as Beneficiary deems necessary or advisable to clean up, remove, resolve or minimize the impact of, or otherwise deal with, any such Hazardous Substance or Environmental Complaint following receipt of any notice from any individual or entity (including, without limitation, the EPA) asserting the existence of any Hazardous Substance or any Environmental Complaint pertaining to the Trust Property or any part thereof which, if true, could result in an order, suit or other action against Grantor and/or which, in the absolute and sole opinion of Beneficiary, could jeopardize Beneficiary's security under this Deed of Trust. All reasonable costs and expenses incurred by Beneficiary in the exercise of any such rights shall be secured by this Deed of Trust and shall be payable by Grantor upon demand.

6.6     Beneficiary shall have the right, in its reasonable discretion, to require Grantor to periodically (but not more frequently than annually unless an Environmental Complaint is then outstanding) perform (at Grantor's expense) an environmental audit and, if deemed necessary by Beneficiary, an environmental risk assessment, each of which must be satisfactory to Beneficiary, of the Trust Property and of hazardous waste management practices and/or hazardous waste disposal sites used in connection with operations conducted at the Trust Property. Said audit and/or risk assessment must be conducted by an

environmental consultant reasonably satisfactory to Beneficiary. Should Grantor's environmental consultant fail to perform said environmental audit and/or risk assessment within thirty (30) days after Beneficiary's written request to Grantor, Beneficiary shall have the right, but not the obligation, to retain an environmental consultant to perform said environmental audit and/or risk assessment. All costs and expenses incurred by Beneficiary in the exercise of such rights shall be secured by this Deed of Trust and shall be payable by Grantor upon demand or charged to the balance of the Loan, at the discretion of Beneficiary.

6.7     Any breach of any warranty, representation or agreement contained in this *Section 6* shall be an Event of Default under this Deed of Trust and shall entitle Beneficiary to exercise any and all remedies provided in this Deed of Trust or otherwise permitted by law or equity. The provisions of this *Section 6* shall survive satisfaction, release or foreclosure of this Deed of Trust and shall inure to the benefit of any transferee of title to the Trust Property through foreclosure of the Deed of Trust or any Loan Document, through any trustee's sale of the Trust Property or through deed in lieu thereof (but only to the extent such transferee is Beneficiary, its successor, an assignee of the Note, a participant of any of the foregoing, or an affiliate or entity related to any of the foregoing).

**Section 7.** Uniform Commercial Code Financing Statement. In order to further secure the payment of the secured indebtedness referred to herein, and the performance of the obligations, covenants, agreements, warranties, and undertakings of Grantor herein contained, Grantor hereby grants to Beneficiary a security interest in all of the Trust Property that is personal property or fixtures. This Deed of Trust constitutes a security agreement, and creates a continuing security interest in favor of Beneficiary as to all or any part of the Trust Property which is of a nature that a security interest therein can be created and perfected under the Uniform Commercial Code from time to time in effect in the State of Texas, and all replacements and additions thereto and substitutions and proceeds thereof. Beneficiary shall have all remedies of a secured party under the Uniform Commercial Code with respect to any property subject to the security interest created pursuant to this Section. This Deed of Trust also constitutes a financing statement filed as a fixture filing with respect to any and all property included in the Trust Property which is or may become fixtures. Grantor hereby irrevocably authorizes Beneficiary at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto and any continuation statements containing such information as Beneficiary shall require in order to perfect Beneficiary's security interest in the Trust Property. In addition, Grantor hereby authorizes Beneficiary to file carbon, photographic, electronic and/or other forms of reproduction of a financing statement, and any such filing shall constitute a sufficient financing statement under the Uniform Commercial Code.

**Section 8.** Maintenance and Use of Trust Property. Grantor, at its expense, shall keep the Trust Property in good order and in a clean and safe condition (ordinary wear and tear excepted), and shall make all necessary or appropriate repairs, replacements, restorations and renewals thereof, including, without limitation, interior, exterior, structural and nonstructural, ordinary and extraordinary, and foreseen and unforeseen. Grantor shall not do, or permit to be done, any act or thing which might impair the value or usefulness of the Trust Property or any part thereof, shall not commit or permit any waste of the Trust Property or any part thereof, and shall not permit any unlawful occupation, business or trade to be conducted on the Trust Property or any part thereof. Grantor shall also, at its expense, promptly comply with all rights of way, privileges, franchises, servitudes, licenses, easements, tenements, hereditaments, restrictions of record and appurtenances that are a part of, or that burden, the Trust Property.

**Section 9.** Compliance with Legal and Insurance Requirements. Grantor, at its expense, shall promptly comply with all Legal Requirements and Insurance Requirements, and shall procure, maintain and comply with all permits, licenses and other authorizations required for the construction, installation, operation, maintenance and use of the Trust Property. As used in this Section, "Legal Requirements" means all laws, statutes, codes, acts, ordinances, resolutions, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, directions and requirements of all governmental entities, departments, commissions, boards, courts, authorities, agencies, officials and officers, foreseen and unforeseen, and ordinary or extraordinary, which now or at any time hereafter may be applicable to the Trust Property or any part thereof, or to any use or condition of the Trust Property or any part thereof, and "Insurance Requirements" means all provisions of any insurance policy covering or applicable to the Trust Property or any part thereof, all requirements of the issuer of any such policy, and all orders, rules, regulations and other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) applicable to or affecting the Trust Property or any part thereof, or to any use or condition thereof. Grantor may, at its expense and after prior written notice to Beneficiary, contest in good faith, by appropriate legal proceedings, any Legal Requirement, and postpone compliance therewith pending the resolution or settlement of such contest, provided that (a) such postponement does not, in the reasonable opinion of Beneficiary, adversely affect the condition, or value of, or the lien of this Deed of Trust as to, any part of the Trust Property, and (b) Grantor deposits in escrow with Beneficiary, pending such contest, moneys sufficient in amount to cover the cost of compliance with the Legal Requirement so contested.

**Section 10.** Alterations, Additions and Demolition. Grantor may, at its expense, make from time to time additions, modifications and/or improvements to the Trust Property, provided that no additions, modifications or improvements involving an expenditure in excess of $10,000.00 shall be made without the prior written consent of Beneficiary, and further provided that the proposed work shall not adversely affect the structural integrity or strength of any improvements constituting a part of the Trust Property or materially interfere with the use and operation thereof. If so requested, Grantor shall submit to Beneficiary the opinion of a licensed engineer, satisfactory to Beneficiary, certifying that such addition, modification or improvement does not so affect the improvements or so interfere with the use and operation thereof. All additions, modifications and improvements so made by Grantor shall become or be deemed to constitute a part of the Trust Property. No building or improvements, or any part thereof, on the Trust Property may be removed or demolished without the prior written consent of Beneficiary.

**Section 11.** Substitutions and Removals. If any item of personal property constituting a part of the Trust Property becomes inadequate, obsolete, worn-out, unsuitable, undesirable or unnecessary, or should be replaced, Grantor may remove such item, provided that Grantor shall either:

      **(a)** Prior to or simultaneously with such removal, substitute other personal property having equal or greater value as such removed personal property (but not necessarily the same function) as part of the Trust Property, and install such other personal property in the operation of the Trust Property, which such substituted property shall be free from all liens and encumbrances (other than Permitted Encumbrances) and shall become part of the Trust Property; or

      **(b)** In the case of removal of any of the Trust Property without substitution, promptly pay to Beneficiary an amount equal to (i) the proceeds of such sale or the scrap value thereof, if the removed property is sold or scrapped, or (ii) if the removed property is used as a trade-in for property not to be installed as part of the Trust Property, the trade-in credit received by Grantor, or (iii) in the

case of the retention of such removed property by Grantor for other purposes, the fair market value of such property, as determined by a licensed engineer satisfactory to Beneficiary.

Grantor shall promptly report to Beneficiary each such removal, sale or other disposition, and shall pay to Beneficiary such amounts as are required by the provisions of *Section 11(b)* above promptly after the sale, trade-in or other disposition requiring such payment; provided that no such report and payment need be made until the amount to be paid to Beneficiary on account of all such sales, trade-ins or other dispositions not previously reported aggregates at least $5,000.00 in any consecutive twelve-month period. Beneficiary shall apply such moneys to the payment of principal installments on the Note, as provided therein, within Beneficiary's sole discretion.

Section 12.   Payment of Taxes and Other Governmental Charges.   Grantor shall pay promptly when due all taxes, assessments (whether general or special), and other governmental charges of any kind whatsoever, foreseen or unforeseen, and ordinary or extraordinary, that now or may at any time hereafter be imposed, assessed or levied against or with respect to the Trust Property or any part thereof, (including, without limitation, any taxes levied upon or with respect to the revenues, income or profits of Grantor from the Trust Property) or upon Beneficiary's interest therein (without regard to any law heretofore or hereafter enacted imposing payment of the whole or any part thereof upon Beneficiary). Within ten (10) business days before they become delinquent, Grantor shall provide Beneficiary with satisfactory evidence of payment of real estate taxes or assessments relating to the Trust Property.

If at any time applicable law shall require Federal, state and/or local revenue stamps to be affixed to the Note, Grantor shall pay for the same, together with any interest or penalties imposed in connection therewith. In the event of the passage after the date of this Deed of Trust of any Federal, state or local law that deducts from the value of real property for the purposes of taxation any lien thereon, or that changes in any way the laws or the taxation of deeds of trust or debts secured by deeds of trust for Federal, State or local purposes, or the manner of the collection of any such taxes, and that imposes a tax, either directly or indirectly, on this Deed of Trust, the Note, any other indebtedness secured hereby or any instrument securing the indebtedness secured hereby, the holder of this Deed of Trust and of the debt which it secures shall have the right to declare the debt secured by this Deed of Trust and any interest thereon due on a date to be specified in a written notice to be given to Grantor by Beneficiary, which date shall be not less than thirty (30) days after the date of the notice; provided, however, that such election shall be ineffective if Grantor is permitted by law to pay the whole of such tax, in addition to all other payments required hereunder, and if Grantor, prior to such specified date, does pay such tax and agrees to pay any such tax when thereafter levied or assessed against the Trust Property, and such agreement shall constitute a modification of this Deed of Trust.

Grantor may, at its expense and after prior notice to Beneficiary, by appropriate proceedings diligently prosecuted, contest in good faith the validity or amount of any such taxes, assessments and other charges and, during the period of such contest, permit the items so contested to remain unpaid. However, if at any time Beneficiary shall notify Grantor that, in its reasonable opinion, by nonpayment of any such items the lien of the Deed of Trust as to any part of the Trust Property will be adversely affected, or the nonpayment of any such items will result in the creation of a lien upon the Trust Property, Grantor shall promptly pay such taxes, assessments or charges. During the period when the taxes, assessments or other charges so contested remain unpaid, Grantor shall deposit in escrow with Beneficiary moneys equal in amount to the amount of such contested taxes, assessments or charges.

**Section 13.  Required Insurance Coverage.**

13.1    Prior to the commencement of the installation and construction of any additions, facilities, fixtures or other improvements included in the Trust Property, including, without limitation, any tenant improvements (excluding such improvements as are not insured by standard builder's risk policies, such as excavations, underground foundations, underground utilities and footings below ground level) (collectively, the "Insurable Improvements"), Grantor shall obtain and continuously maintain, until such improvements are released from the lien of this Deed of Trust or insured pursuant to *Section 13.2* below, builder's all risk insurance on a completed value, nonreporting form with an extended coverage endorsement, including theft, vandalism, malicious mischief, collapse, falsework, temporary buildings and debris removal coverage, and such other coverage(s) as Beneficiary may reasonably require, in amounts approved by Beneficiary, but not less than one hundred percent (100%) of the full insurable replacement cost of the Insurable Improvements without regard for depreciation and with an inflation rider, duly endorsed to show the interest of Beneficiary under a standard noncontributing co-beneficiary or mortgagee clause, and under a loss payee clause.

13.2    Grantor shall keep all Insurable Improvements not included in any insurance obtained pursuant to *Section 13.1* above continuously insured for the benefit of Beneficiary against loss or damage by fire and other hazards included in a standard fire insurance policy with an extended coverage endorsement, including theft, vandalism, malicious mischief, collapse and debris removal coverage, and such other coverage(s) as Beneficiary may reasonably require, duly endorsed to show the interest of Beneficiary under a standard noncontributing beneficiary clause, in an amount equal to the replacement value of the Insurable Improvements, without regard to depreciation and with an inflation rider.  If any of the Insurable Improvements are located within a hazardous flood area as designated by any governmental authority, Grantor shall obtain and continuously maintain flood insurance coverage in the maximum amount available, with appropriate endorsements thereto, providing for Beneficiary's interest in the same manner as in the standard fire insurance for the Insurable Improvements.

13.3    Grantor shall obtain and continuously maintain single limit comprehensive general accident and public liability insurance in minimum amounts of $1,000,000.00 per occurrence, and $2,000,000.00 in the aggregate, and naming Beneficiary as an additional insured, and Beneficiary may, in its discretion, require such increases in coverage as it deems necessary or advisable as a result of the operations conducted by Grantor on the Trust Property and/or the insurance coverage carried by other entities conducting similar operations.

13.4    All insurance required to be obtained and maintained pursuant to this Deed of Trust shall be obtained from generally recognized, responsible insurance companies qualified or licensed to transact such business in the State of Texas and otherwise satisfactory to Beneficiary.  Each policy of insurance shall not be subject to cancellation or substantial modification without at least thirty (30) days prior written notice to Beneficiary.  The loss deductible provision for each such insurance policy shall not exceed $10,000.00.

13.5    Grantor shall deposit with Beneficiary all such policies of insurance or, at the option of Beneficiary, binders, certificates or other evidence satisfactory to Beneficiary that (i) the insurance required hereby has been obtained and is in full force and effect, and (ii) all premiums thereon have been paid in full.  Prior to the expiration of any such insurance, Grantor shall furnish Beneficiary with evidence,

satisfactory to Beneficiary, that such insurance has been renewed or replaced and that all premiums thereon have been paid in full, and all insurance policies required hereby are in full force and effect.

13.6    Subject to *Section 18* hereof, Grantor hereby assigns to Beneficiary all of Grantor's right, title and interest in and to all such policies of insurance and in and to all insurance proceeds resulting therefrom to the full extent of the indebtedness secured hereby, authorizes Beneficiary to collect, adjust and compromise all claims under such insurance policies, and further authorizes and directs the insurer to pay any and all such proceeds directly to Beneficiary.  Beneficiary may, at its option, collect, adjust and compromise any claims under any such insurance policies.  In the event of a foreclosure of this Deed of Trust, the purchaser of the Trust Property shall succeed to all of the rights of Grantor (including any right to unearned premiums) in and to all policies of insurance assigned to Beneficiary pursuant hereto.

13.7    Grantor shall maintain, or cause to be maintained, in connection with the Trust Property any workers' compensation coverage required by the laws of the State of Texas.  Grantor shall also maintain liability insurance coverage to insure against any liability or risks on or at the Trust Property not covered by workers' compensation coverage or the other insurance coverage required by this Section.

**Section 14.**  Taxes and Insurance Premiums.  In order to more fully protect the security of this Deed of Trust, and if Beneficiary shall so elect at any time after the occurrence of an Event of Default or an event which, with notice or lapse of time or both would constitute an Event of Default, Grantor shall pay to Beneficiary, together with and in addition to each payment of principal and interest required by the Note, one-twelfth (1/12th) of the amount (as estimated by Beneficiary) of the annual taxes and annual insurance premiums next becoming due and payable with respect to the Trust Property and the policies of insurance referred to in this Deed of Trust, and Grantor shall also pay to Beneficiary on demand therefor the amount by which the actual taxes and insurance premiums exceed payments actually made pursuant hereto.  Any unpaid balance of advances by Beneficiary for taxes and/or insurance premiums shall bear interest at the Default Rate (as hereinafter defined) and, together with such interest, shall be secured by this Deed of Trust.  Beneficiary shall not be considered to be a fiduciary with respect to any amounts paid to or received by it pursuant to the terms of this Section, and shall not be liable for the payment of interest on all or any part of such funds.

**Section 15.**  Disposition of Trust Property; Liens and Encumbrances.  Except as otherwise expressly permitted by *Sections 11 or 19* of this Deed of Trust, Grantor shall not sell, convey, assign, transfer, lease, or dispose of all or any part of the Trust Property, or any interest therein, or enter into any agreement for any of the foregoing, in any case without the prior written consent of Beneficiary.  Grantor shall not directly or indirectly create or permit to remain, and will promptly discharge, any mortgage, lien, encumbrance or charge on, pledge of, security interest in, or conditional sale or other title retention agreement with respect to, all or any part of the Trust Property, or any interest therein, or any revenues, income, profit or other sums arising from the Trust Property or any part thereof (including, without limitation, any lien, encumbrance or charge as a result of the operation of law) other than: (a) the lien and security interest of this Deed of Trust; (b) liens for taxes, assessments and other governmental charges which are not at the time required to be paid pursuant to *Section 12* hereof; and (c) the Permitted Encumbrances specified in *Section 1* hereof, if any.

**Section 16.**  Construction and Other Liens.  Grantor shall not permit any construction, mechanics' or other liens to be filed or to exist against the Trust Property or any part thereof, and Grantor shall, within sixty (60) days after the date of the filing of any such lien, cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction, or otherwise satisfactory to Beneficiary.

10193.1.874145                                        10

**Section 17. No Claims Against Beneficiary.** Nothing contained in this Deed of Trust shall be construed as a request by Beneficiary, expressed or implied, for the performance of any labor or services or the furnishing of any materials or other property with respect to the Trust Property or any part thereof, or be construed to give Beneficiary any right, power or authority to contract for or permit the performance of any labor or services or the furnishing of any materials or other property with respect to the Trust Property or any part thereof, or be construed to give Grantor any right, power or authority to contract for or permit the performance of any labor or services or the furnishing of any material or other property on behalf of Beneficiary, or in such manner as to provide the basis for any claim either against Beneficiary or that any lien based on the performance of such labor or services, or the furnishing of any such material or other property, is prior to the lien of this Deed of Trust.

**Section 18. Damage, Destruction, Eminent Domain.**

18.1    Grantor shall promptly notify Beneficiary in writing of any damage to or destruction of any part of the Trust Property, and such notice shall include a description of the nature, extent and date of the damage, the estimated cost of repair, and the estimated net proceeds of insurance. Grantor shall promptly notify Beneficiary in writing of any proposed, threatened or actual taking of or injury to any part of the Trust Property pursuant to the use of the power of eminent domain, which notice shall include a description of the nature, extent and date of the taking or proposed taking and the estimated net proceeds of the condemnation award, or the price for conveyance under threat of condemnation.

18.2    Grantor hereby assigns to Beneficiary all of Grantor's right, title and interest in and to any and all such proceeds of insurance and/or eminent domain awards (including any amount paid for a conveyance under threat of condemnation), and all such proceeds shall be paid to Beneficiary for application to Beneficiary's costs of collection, any amounts then due pursuant to the Note, the Agreement or this Deed of Trust, and then to the prepayment, without premium, of principal; provided, however, that, subject to *Section 18.3* below, and so long as (a) no Event of Default, or event which with notice or lapse of time or both would constitute an Event of Default, has occurred, and (b) all leases relating to all or any portion of the Trust Property shall continue in full force and effect, Beneficiary shall permit all or any part of such insurance proceeds to be used for the purpose of repairing, replacing, restoring and rebuilding the Trust Property as nearly as practicable to the value, condition and character thereof immediately prior to such damage or destruction, with such changes or alterations, however, as Grantor may deem necessary for proper use or operation of the Trust Property and as may be approved by Beneficiary, in accordance with *Section 18.5* hereof.

18.3    If (a) a significant portion (as determined by Beneficiary in its sole discretion reasonably exercised) of any buildings, structures, additions, facilities or other improvements included in the Trust Property is damaged or destroyed to such an extent that such improvements cannot be reasonably repaired, replaced or restored within a period of six (6) months to the condition thereof immediately preceding such damage or destruction, or (b) title to, or the temporary use of a significant portion (as determined by Beneficiary in its sole discretion reasonably exercised) of the Trust Property shall have been taken to such an extent that (i) the Trust Property cannot be reasonably repaired, replaced or restored within a period of six (6) months to a condition not substantially different from that existing prior to such taking, or (ii) normal use and operation of the Trust Property is prevented for a period of six (6) months or more, then, in any of such events, Beneficiary may at its sole option, and within thirty (30) days after receiving notice of any such events, declare the entire indebtedness secured hereby to be due and payable, on a date not earlier

than thirty (30) days after the date of such declaration, and thereupon the entire amount of said indebtedness shall be due and payable without premium on such date, and shall thereafter bear interest at the Default Rate (as hereinafter defined).

18.4    All prepayments of principal pursuant to *Section 18.2* above shall be made without premium or penalty in the inverse order of the maturity thereof, and shall not reduce the periodic installments thereafter becoming due.

18.5    Unless any damage or destruction results in the exercise by Beneficiary of its option pursuant to *Section 18.3* above, Grantor shall, regardless of the adequacy or availability of insurance proceeds, if any, promptly commence and complete the restoration, repair, replacement and rebuilding of the Trust Property as nearly as practicable to the value, condition and character thereof immediately prior to such damage or destruction. Unless any taking results in the exercise by Beneficiary of its option pursuant to *Section 18.3* above, Grantor shall, regardless of the adequacy or availability of proceeds of condemnation therefor, if any, promptly commence and complete the restoration, repair, replacement and rebuilding of the Trust Property as nearly as practicable to the value, condition and character thereof immediately prior to such taking. Unless any damage or destruction results in the exercise by Beneficiary of its option pursuant to *Section 18.3* above, and subject to the satisfaction of the conditions set forth in *Section 18.2* above, Beneficiary shall make any insurance proceeds available for any such repair or restoration, and shall disburse such funds as work progresses in accordance with and subject to Beneficiary's then normal and customary construction loan disbursement practices and procedures, provided that Beneficiary may require Grantor either to deposit with Beneficiary, for disbursement prior to the disbursement of any such insurance proceeds, the amount in addition to such available net proceeds of insurance that will be required (in Beneficiary's judgment) to complete such repair or restoration, or to provide Beneficiary with evidence, satisfactory to Beneficiary, that such additional funds are available for such purposes.

**Section 19.  Leases; Assignment of Rents and Leases.**  In accordance with the Texas Assignment of Rents Act, Grantor hereby absolutely transfers and assigns to Beneficiary all right, title and interest of Grantor in and to (a) all existing and future leases, subleases, licenses and other agreements for the use and occupancy of all or any part of the Trust Property, whether written or oral and whether for a definite term or month to month, together with all guarantees of the lessee's obligations thereunder and together with all extensions, modifications and renewals thereof (hereinafter called the "Leases"), and (b) all income, receipts, revenues, rents, issues and profits now or hereafter arising from or out of the Leases or from or out of the Trust Property or any part thereof, including, without limitation, room rents, minimum rents, additional rents, percentage rents, occupancy and user fees and charges, license fees, parking and maintenance charges and fees, tax and insurance contributions, proceeds of the sale of utilities and services, cancellation premiums, claims for damages arising from any breach of the Leases, proceeds from any sale or other disposition of all or any portion of the Trust Property, and all other benefits arising from the use or enjoyment of, or the lease, sale or other disposition of, all or any portion of the Trust Property, together with the immediate and continuing right to receive all of the foregoing (hereinafter called the "Rents"). The assignment of Rents and Leases contained herein shall be subject only to the conditional license granted by Beneficiary to Grantor to collect such rentals, income and revenues during such times as no Event of Default shall have occurred hereunder. Grantor shall not enter into any Lease, other than boat slip leases less than one year in duration, except with the prior written consent of Beneficiary and pursuant to lease terms in form and substance satisfactory to Beneficiary. Unless otherwise provided by written instrument signed by Beneficiary, any and all Leases (other than Permitted Encumbrances, if any) shall be subordinated to this

10193.1.874145                               12

Deed of Trust. Concurrently with the execution and delivery hereof, and not in lieu of the provisions hereof, Grantor has also executed and delivered to Beneficiary an assignment of its interests as lessor in all Leases and to all rentals, income and other revenues payable thereunder or derived therefrom, as additional collateral for the indebtedness hereby secured.

Grantor shall perform, fulfill, comply with and observe each and every covenant, agreement and condition to be performed, fulfilled, complied with and observed by Grantor as lessor under the Leases, and will not suffer or permit any default of Grantor as lessor thereunder to occur (except defaults which are duly cured within the time provided in the Leases for the curing thereof, if any).

Grantor shall not, and shall not have the right or power to, as against Beneficiary without its consent, cancel, terminate, abridge or modify any Lease, accept a surrender thereof or accept prepayments of installments of rent or other sums due or to become due thereunder.

Section 20. Inspection. Beneficiary, and its agents and employees, shall have the right to enter upon and inspect the Trust Property at any and all reasonable times for the protection of its interest in the Trust Property and for such other purposes as may, in Beneficiary's sole discretion, be necessary or desirable in connection with the exercise of Beneficiary's rights hereunder or under the Agreement.

Section 21. Indemnification. Grantor hereby protects, indemnifies and saves harmless Beneficiary, its officers, directors, agents and employees, from and against any and all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including without limitation, reasonable attorneys' fees and expenses whether or not litigation has been commenced and in all trial, bankruptcy and appellate proceedings) imposed upon, incurred by, or asserted against Beneficiary or any of such persons by reason of (a) ownership of any interest in the Trust Property or any part thereof, (b) any accident, injury to or death of persons or loss of or damage to property occurring on or about the Trust Property or any part thereof or the adjoining sidewalks, curbs, vaults and vault space, if any, streets or ways, (c) any use, disuse or condition of the Trust Property or any part thereof, or the adjoining sidewalks, curbs, vaults and vault space, if any, or any streets or ways, (d) any failure on the part of Grantor to perform or comply with any of the terms hereof or of the Agreement, or any inaccuracy in any representation or warranty made by Grantor herein or in the Agreement, (e) any defense of the right, title or interest conveyed by this Deed of Trust, (f) the performance of any labor or services or the furnishing of any materials or other property in respect of the Trust Property or any part thereof, (g) any subsidence or erosion of any part of the surface of the Trust Property, including any shoreline or any bank of any river, stream, creek, canal, lake, ocean or other water source, or (h) the location or existence of asbestos or any toxic or hazardous waste, chemicals, materials or substance on, at, in or under the Trust Property or any part thereof. If any action, suit or proceeding is brought against Beneficiary, or any of its officers, directors, agents or employees, for any such reason, Grantor, upon the request of any such individual or entity, shall at Grantor's expense, cause such action, suit or proceeding to be resisted and defended by counsel satisfactory to Beneficiary or such individual or entity. Any amounts payable to an indemnified person under this Section which are not paid within ten (10) days after written demand therefor shall bear interest at the Default Rate from the date of such demand, and such amounts, together with such interest, shall be indebtedness secured by this Deed of Trust. The obligations of Grantor under this Section shall survive any defeasance of the Deed of Trust.

Section 22. Events of Default. Any one or more of the following events shall be an "Event of Default" under this Deed of Trust:

10193.1.874145                                   13

22.1    Failure by Grantor or any co-maker or guarantor to pay any installment of principal, interest or premium under the Note when the same becomes due and payable, or any other indebtedness secured hereby as and when the same becomes due and payable, or the entire indebtedness secured hereby upon the maturity of the Note;

22.2    Failure by Grantor or any co-maker or guarantor to observe or perform any other term, covenant or agreement contained herein, in the Note or in any other Loan Document that is not otherwise specifically set forth in this *Section 22*; provided, however, that if the failure is other than the payment of money, is not intentional or grossly negligent on the part of Grantor, does not involve a breach of *Sections 12, 13 or 15* of this Deed of Trust, and does not constitute an emergency in the sole opinion of Beneficiary, such failure shall not constitute an Event of Default if: (a) Grantor institutes curative action and pursues such action to completion within thirty (30) days after written notice of such failure has been provided to Grantor by Beneficiary; or (b) the failure is of such a nature that it can be corrected but not within thirty (30) days after written notice thereof has been provided to Grantor by Beneficiary, and Grantor has within the aforesaid thirty (30) days instituted curative action and diligently and continuously pursues such action to completion, provided that such failure shall become an Event of Default if not cured within ninety (90) days after such written notice;

22.3    Grantor or any co-maker or guarantor shall:  (a) become insolvent or generally not pay, or be unable to pay, or admit in writing its inability to pay, its debts generally as they become due; (b) commence a proceeding under any Federal or state bankruptcy, insolvency, reorganization or other similar code or law, or have such a proceeding commenced against it and either have an order of insolvency or reorganization entered against it or have the proceeding remain pending for sixty (60) days; (c) make an assignment for the benefit of its creditors; (d) have a receiver or trustee or custodian appointed for it or for the whole or any substantial part of its property or for all or any part of the Trust Property; or (d) adopt a plan of liquidation of its assets;

22.4    Failure by Grantor or any co-maker or guarantor to pay any indebtedness or to observe or perform any terms, covenants or provisions contained in any note, mortgage, deed of trust, agreement or other obligation to Beneficiary, and such failure is not cured within any applicable grace period;

22.5    If any material adverse change shall occur in the financial condition of Grantor or any co-maker or guarantor at any time during the term of the Loan from the financial condition disclosed in statements heretofore presented to Beneficiary, or if Grantor or any co-maker or guarantor or any general partner of Grantor (a) shall cease to exist or to be qualified to do or transact business in the State of Texas or be dissolved, (b) shall be a party to a merger or consolidation, (c) shall issue stock of any type or series (if a corporation), (d) shall sell all or substantially all of its assets, or (e) if an individual, should die, become incapacitated or adjudged incompetent;

22.6    If Grantor or any co-maker or guarantor is a corporation, any shares of stock of Grantor or any such co-maker or guarantor are issued, sold, transferred, conveyed, assigned, mortgaged, pledged, or otherwise disposed of, whether voluntarily or by operation of law, and whether with or without consideration, or any agreement for any of the foregoing is entered into; or, if Grantor or any co-maker or guarantor is a partnership, any general or limited partnership interest or other equity interest in such partnership is sold, transferred, assigned, conveyed, mortgaged, pledged or otherwise disposed of, whether voluntarily or by operation of law, and whether with or without consideration, or an agreement for any of the foregoing is entered into, or, if Grantor or any co-maker or guarantor is a limited liability company, any

membership or other equity interest in such limited liability company is sold, transferred, assigned, conveyed, mortgaged, pledged or otherwise disposed of, whether voluntarily or by operation of law, and whether with or without consideration, or an agreement for any of the foregoing is entered into;

22.7    Any shares of stock of any corporation that is a general partner of Grantor or of any co-maker or guarantor, or a general partner of a partnership that is a general partner of Grantor or of any co-maker or guarantor, or the managing member of a limited liability company that is a general partner of Grantor or of any co-maker or guarantor, are issued, sold, transferred, assigned, conveyed, mortgaged, pledged or otherwise disposed of, whether voluntarily or by operation of law, and whether with or without consideration, or any agreement for any of the foregoing is entered into, executed or delivered, or any general partnership interest in any general partnership that is itself a general partner of Grantor or of any co-maker or guarantor is sold, transferred, assigned, conveyed, mortgaged, pledged or otherwise disposed of, whether voluntarily or by operation of law, and whether with or without consideration, or any agreement for any of the foregoing is entered into;

22.8    If any statement or representation contained in the loan application or any financial statements or other materials furnished to Beneficiary prior or subsequent to the making of the Loan are discovered to have been false or incorrect or incomplete in any material respect;

22.9    An action for foreclosure or marshalling of liens is commenced against all or any part of the Trust Property; or

22.10   A default occurs under any other mortgage, deed of trust or security agreement encumbering all or any part of the Trust Property and the same is not cured within any applicable grace period, or Beneficiary receives any notice which limits or may limit the amount of indebtedness that may be secured by this Deed of Trust.

Notwithstanding anything to the contrary in this Deed of Trust or any of the other Loan Documents, to the extent any guarantor of the Loan is a natural person (the "Guarantor"), the death or legal incompetency of any such Guarantor shall be an Event of Default hereunder unless such Guarantor is replaced in accordance with this paragraph. Grantor shall be permitted to substitute a replacement guarantor and no "Event of Default" shall be deemed to have occurred as a result thereof under the Note, this Deed of Trust or any of the other Loan Documents, provided, that each of the following terms and conditions are satisfied (i) within one hundred twenty (120) days after the occurrence of such death or incompetency adjudication, Grantor delivers Beneficiary written notice of its intent to substitute the guarantor; (ii) the replacement guarantor is a Satisfactory Replacement Guarantor (as defined below); (iii) within fifteen (15) days after delivery of the written notice described in the preceding subclause (i), such Satisfactory Replacement Guarantor executes documents (the "Replacement Guaranty") assuming the obligations of Guarantor under the Loan Documents; and (iv) prior to or concurrently with such assumption, as applicable, Beneficiary receives such information and documentation as may be reasonably required by Beneficiary in connection with such assumption and the foregoing in order to satisfy Beneficiary.  As used herein, the term "Satisfactory Replacement Guarantor" shall mean a replacement guarantor that (a) is an individual or an affiliated entity of Grantor having identity, composition, financial condition and creditworthiness, experience, character and business reputation reasonably acceptable to Beneficiary, or (b) is a legal trust into which assets of the deceased Guarantor are transferred for the benefit of the heirs of such Guarantor, which said trust shall have a financial condition reasonably acceptable to Beneficiary. Grantor shall pay all costs and expenses incurred by Beneficiary relating to the preparation and review of the Replacement Guaranty